Ki Sau Chan v. Valley Health System Inc, et al., No. 26-3345

# INDEX TO EMERGENCY MOTION, DECLARATIONS, AND EXHIBITS

**Key Exhibits for this motion**

Orders: A, B, C — the order under review (Dkt. 86), the state-court preliminary injunction, and the District Court's July 6, 2026 order

Flags acknowledged, then denied: P, Q, R, S

Substantiated complaints to HSS: AK (written apology and refund for nursing abuse); F (operative reports, postoperative complications from Dr. Elliott's surgeries)

Delayed appendectomy and near-death: AG, AH (outside CT and GI referral); K, L, M, AI, AJ (Dr. Cakrani); H, I, N, O, U, V

Contraindicated barium despite Defendants' own MRI ("may reflect perforated appendicitis"): Y, Z (with H)

Non-consensual haloperidol and Foley catheter: D, E, F, G, J, AC, AD, AE, AF

Delayed emergency retinal surgery and near-blindness: AB, T

Third-party acceptance of false Flags (Aetna): W, X

Professional harm: AA


| Document | PDF page |
| --- | --- |
| Emergency Motion for Injunction Pending Appeal | 3 |
| Declaration of Ki Sau Chan | 26 |
| Declaration of Johnny Yau | 52 |
| Certificates of Compliance and Service | 59 |
| Exhibit A — District Court Letter Order, Aug. 28, 2026 (Dkt. 86) — order under review by this Appellate Court | 60 |
| Exhibit B — N.J. Superior Court Preliminary Injunction Order, Feb. 26, 2026 (Dkt. 5, Ex. A; Dkt. 81, Ex. 4) | 63 |
| Exhibit C — District Court Order, July 6, 2026 (Dkt. 56) | 66 |
| Exhibit D — State Board of Medical Examiners file — Dr. Bernstein narrative (Dkt. 100 at 33–38) | 69 |
| Exhibit E — Dr. Owusu-Dapaah letter to State Board of Medical Examiners (Dkt. 81, Ex. 3) | 76 |
| Exhibit F — Anesthesia and operative records, seven prior surgeries (Dkt. 100 at 39–59) | 81 |
| Exhibit G — Valley Operative Report, Dr. Winkler, Aug. 12, 2025 (Dkt. 81, Ex. 18) | 103 |
| Exhibit H — Valley Abdomen/Pelvis MRI Report, Aug. 10, 2025 (Dkt. 4-3, Ex. W) | 107 |
| Exhibit I — Valley Abdomen/Pelvis CT Report, Aug. 11, 2025 | 110 |
| Exhibit J — Valley Hospitalist Progress Note, Dr. Flowers, Aug. 12, 2025 (Dkt. 4-2, Ex. Q) | 113 |
| Exhibit K — Valley Emergency Department Note, Dr. Cakrani, Aug. 9, 2025 | 118 |
| Exhibit L — Valley Hospitalist H&P, Dr. Hanna, Aug. 9, 2025 | 123 |
| Exhibit M — Valley General Surgery H&P, Dr. Kassirer / Dr. Winkler attestation | 126 |
| Exhibit N — Valley Progress Note, APN Zavadenko, Aug. 10, 2025 | 129 |
| Exhibit O — Valley Order Summaries — APN Zavadenko canceled emergency imaging, citing "Discharged" (Dkt. 4-3, Ex. U) | 133 |

| | |
|---|---|
| Exhibit P — Valley Feb. 6, 2026 State-Court Opposition (Veech) with Zicarelli Feb. 5 Certification and Defendants' Exhibit B (Dkt. 5, Exs. B, C; Dkt. 81, Exs. 7, 8, 11) | 139 |
| Exhibit Q — Kavanagh Certification with Zicarelli Feb. 25, 2026 Supplemental Certification (Dkt. 5, Ex. D; Dkt. 81, Ex. 9) | 154 |
| Exhibit R — Valley Privacy Officer Wright letter and email, Nov. 12 and Nov. 25, 2025 (Dkt. 4, Exs. F, H; Dkt. 81, Ex. 6) | 157 |
| Exhibit S — Valley Mar. 23, 2026 State-Court Reply (Kavanagh) (Dkt. 4, Ex. E; Dkt. 81, Ex. 10) | 160 |
| Exhibit T — Latzer letter (counsel for Dr. Ng) to State Board of Medical Examiners (Dkt. 32, Ex. P-4) | 164 |
| Exhibit U — Aetna/eviCore lumbar-spine MRI preauthorization, Aug. 11, 2025 | 169 |
| Exhibit V — Transcript — Valley Patient Relations call ("Nicole"), Aug. 11, 2025 | 173 |
| Exhibit W — Aetna letter, Oct. 27, 2025 (Dkt. 32 at 27) | 177 |
| Exhibit X — Aetna letter, Nov. 13, 2025 — SIU referral (Dkt. 32 at 29–30) | 179 |
| Exhibit Y — Photograph — READI-CAT 2 barium sulfate bottles, Room 7S-0004 (Dkt. 4-2, Ex. P) | 182 |
| Exhibit Z — Transcript — RN Gizem Akkus barium instruction, Aug. 11, 2025 | 184 |
| Exhibit AA — Professional harm — Appellant's Town Council candidacy: Stand Up Harrison campaign poster and website (Declaration ¶ 27) | 186 |
| Exhibit AB — Visit note of Dr. Vincent Ho (NJ Retina), Sept. 22, 2025 — horseshoe retinal tear and same-day laser retinopexy (Dkt. 32, Ex. P-6; Dkt. 68, Ex. B) | 189 |
| Exhibit AC — Transcript — Feb. 18, 2025 recording with pre-operative nurse Justin Madamba (Haldol refusal; request for another anesthesiologist) (Dkt. 81, Ex. 12) | 192 |
| Exhibit AD — Transcript — Feb. 18, 2025 recording with anesthesiologist Dr. Jacob Abraham ("I told you I wouldn't give it to you") (Dkt. 81, Ex. 12) | 197 |
| Exhibit AE — Transcript — Aug. 12, 2025 recording with night nurse Nicole Smith (Foley catheter disclosure) (Dkt. 81, Ex. 16; Dkt. 4, Ex. I) | 201 |
| Exhibit AF — Transcript — Aug. 13, 2025 recording with surgical resident Dr. Shmuel Kassirer (Dkt. 81, Ex. 17) | 207 |
| Exhibit AG — Outside CT report, Aug. 8, 2025 — "punctate appendicolith," suspected acute appendicitis (Dkt. 4-2, Ex. S) | 213 |
| Exhibit AH — Outside gastroenterology referral for surgical evaluation of acute appendicitis, Aug. 8, 2025 (Dkt. 4-2, Ex. T) | 216 |
| Exhibit AI — Transcript — Aug. 9, 2025 (afternoon) recording with ER physician Dr. Juxhesta Cakrani (imaging planned) (recording listed at Dkt. 81, Ex. 19) | 218 |
| Exhibit AJ — Transcript — Aug. 9, 2025 (evening) recording with Dr. Juxhesta Cakrani (imaging reversed) (recording listed at Dkt. 81, Ex. 19) | 224 |
| Exhibit AK — HSS Office of the President emails (Danielle Bruno), June 9 – July 12, 2021 — apology and private-room refund (Dkt. 92 at 16–21, 40) | 232 |

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

KI SAU CHAN,

*Plaintiff-Appellant,*

v.

VALLEY HEALTH SYSTEM, INC., et al.,

*Defendants-Appellees.*

No. 26-3345

On Appeal from the United States District Court for the District of New Jersey

No. 2:26-cv-03358-MCA-AME

Hon. Madeline Cox Arleo, U.S.D.J.

**APPELLANT'S EMERGENCY MOTION**
**FOR INJUNCTION PENDING APPEAL**
**PURSUANT TO FED. R. APP. P. 8(a)(2) AND 27**

**RULING REQUESTED BY OCTOBER 27, 2026**
**(SPECIALIST APPOINTMENTS, CHAN DECL. ¶ 26)**

## PRELIMINARY STATEMENT

This is a civil-rights and intentional-tort case, not a medical-malpractice case. Appellant Ki Sau Chan alleges hospital and practice administrators planted fabricated psychiatric and behavioral entries ("Flags") in her medical records after she made protected patient-safety complaints, and that clinicians then acted on Flags, without her knowledge or consent, invading her bodily autonomy and integrity and delaying emergency care, producing near-fatal and near-blinding injury. The injury is to her person and dignity, not merely an organ or an eye; the medical injuries are consequences of the violation, not the claim. **Only Flags explain this systemic pattern of aberrant care.**

Defendant Hospital for Special Surgery's ("HSS") own records show its retaliation against Appellant. HSS's Office of the President apologized to Appellant in writing for her treatment by its nurses, refunded her private room in full, and promised "to ensure this does not happen again or in the future." **Exhibit AK**; Dkt. 4-1 at 2, 5; Dkt. 92 at 19. On June 4, 2021, immediately after Appellant complained to HSS's nurse manager, Valium appeared on her discharge medications. Appellant believes the Valium began a manufactured psychiatric history that Defendant Valley Hospital's haloperidol later continued. Dkt. 5 ¶ 36; Declaration ¶ 4. On July 13, 2021, the day after Appellant followed up on her complaints, HSS created a Patient Care Agreement ("PCA"), a behavioral contract that is the alleged origin of Flags, transmitted to Valley and Defendant PRISM. Dkt. 4-1 at 3, 7; Dkt. 5 ¶¶ 18, 41. HSS's counsel, Charles Koernig, conceded in HSS's motion to dismiss that the PCA was created after Defendant Dr. Andrew Elliott reported Appellant's complaints to the HSS legal team. Dkt. 79-1 at 3. PCA and Flags lack clinical basis.

**Appellant has no diagnosis of any psychiatric condition, and no psychiatric evaluation, treatment, or a psychiatric referral, in her life. There is no diagnosis of any psychiatric condition that would warrant an antipsychotic drug. To date, Defendants have produced NO document to the contrary since litigation began almost a year ago.**

After reviewing exhibits and hearing argument, a New Jersey court's February 26, 2026 preliminary injunction barred Defendants from relying on or disseminating Flags. The state court never enforced it and, without notice or docketing her filings, administratively dismissed the case on June 23, 2026, ending that protection. Denied due process there, Appellant sought it here; the District Court refused protection without addressing her exhibits (Dkt. 86). Appellant asks only that it be restored while this appeal is decided.

## RELIEF REQUESTED

Pursuant to Fed. R. App. P. 8(a)(2) and 27, Appellant requests that, pending disposition of this appeal, the Court order that Defendants-Appellees, their officers, agents, servants, employees, and attorneys, and all others in active concert or participation with them who receive actual notice of the order (Fed. R. Civ. P. 65(d)(2)): (1) shall not rely upon, use, or disseminate to any other provider, institution, insurer, or health-information network the behavioral, psychiatric, or patient-conduct flags, alerts, or notations concerning Appellant described in the Amended Complaint (Dkt. 5) and in Dkt. 81 ("Flags"), in connection with any treatment, referral, scheduling, or communication concerning Appellant; and (2) shall continue to preserve, without alteration or deletion, Flags, their audit logs and metadata, and all related electronically stored information. In the alternative, Appellant requests a

temporary administrative injunction to the same effect while the Court considers this motion.

## JURISDICTION AND RULE 8(a)(2) COMPLIANCE

*Jurisdiction.* Section 1292(a)(1) grants jurisdiction over interlocutory orders "refusing" injunctions. Dkt. 86 denied a noticed Rule 65(a) motion for a preliminary injunction; it is an order refusing an injunction on its face. Appellant has addressed the Clerk's jurisdictional screening letter in Document 5 and her supplemental response. No Appellee has responded to that letter or to Appellant's motion to expedite (Document 6); the Valley Defendants stated by email on September 22, 2026 that they oppose expedition. Document 6 ¶ 14.

*Rule 8(a)(2)(A)(i).* Moving first in the District Court would be impracticable. That court refused this same bar on reliance and dissemination, on the same record, in its August 28, 2026 Letter Order (Dkt. 86; this Court's Document 1-2). A further application there would ask it to reverse itself on a record it has already rejected, while each new medical encounter repeats the harm.

*Rule 8(a)(2)(B)–(C).* The facts are supported by the accompanying Declarations of Ki Sau Chan and Johnny Yau (28 U.S.C. § 1746). Key parts of the District Court record are attached: **Exhibit A**, the Order under review, the District Court's August 28, 2026 Letter Order (Dkt. 86); **Exhibit B**, the February 26, 2026 state-court Order (**Exhibit A** to the Amended Complaint, Dkt. 4), and **Exhibit C**, the

District Court's July 6, 2026 Order (Dkt. 56). **Exhibit D** (Dkt. 100 at 33–38) is State Board of Medical Examiners file containing Defendant Dr. Kyra Bernstein's narrative, and **Exhibit F** (Dkt. 100 at 39–59) contains the anesthesia and operative records from seven of Appellant's nine prior surgeries; both are discussed in Declaration ¶¶ 7–10. **Exhibits G** through **N** are Valley's records of the August 2025 admission (Declaration ¶ 15). **Exhibits E and O**–T are excerpts of the District Court record: **Exhibit O** (Dkt. 4-3 at 2–6), Valley's order summaries showing Defendant APN Julie Zavadenko canceled emergency abdominal imaging with the stop reason "Discharged" while Appellant remained admitted; **Exhibit P** (Dkt. 5 at 32–37, 40–41, 52–57), Mr. Veech's February 6, 2026 opposition, Ms. Zicarelli's February 5, 2026 certification, and Defendants' own **Exhibit B**, containing haloperidol records and surgical consent form; **Exhibit Q** (Dkt. 5 at 63–64), Ms. Zicarelli's February 25, 2026 reversal; **Exhibit R** (Dkt. 4 at 6, 14), Ms. Wright's November 12, 2025 letter and November 25, 2025 refusal to implement a litigation hold; and **Exhibit S** (Dkt. 4 at 2–4), Ms. Kavanagh's March 23, 2026 reply. **Exhibits U–Z** support Declaration ¶¶ 15, 19; **Exhibit AA**, campaign poster and website, supports ¶ 27; Exhibit AB, Dr. Ho's visit note, supports ¶ 19. Dkt. 92 and Appellant's opposition to Dkt. 96 were filed after the Order under review; they are cited in support of this motion under Rule 8(a)(2)(B)(ii), not as part of the record on which Dkt. 86 is reviewed. All parties are

served on filing. Appellant notified Clerk's Office before filing, as L.A.R. 27.7 requires.

*Record note.* The District Court docket contains docket clerk errors that may hinder review: the Amended Complaint (Dkt. 5) is docketed as "Notice (Other)" rather than as an amended complaint; its exhibits (Dkt. 4) were not linked to it; several of Appellant's oppositions to motions to dismiss were likewise docketed as miscellaneous letters; and several filings were docketed without their text-searchable layer. Appellant will supply court-stamped copies on request. Appellant's motion for CM/ECF access (Dkt. 9), returnable May 18, 2026, has been pending about six months. Appellant has requested correction of these docket errors from the Clerk's Office since April 2026; none has been made. She is filing a petition for writ of mandamus seeking rulings on Dkt. 9 and docket corrections.

## BACKGROUND

*The Flags.* Appellant's 2021 complaints to HSS were substantiated: her post-operative complications from Dr. Elliott's surgeries were confirmed by four corrective surgeries in the same anatomical sites, two by Dr. Justin Tsai outside HSS. **Exhibit F**; Dkt. 5 ¶¶ 24, 37; Dkt. 4-1 at 2, 5. Yet HSS answered those substantiated complaints with a behavioral contract. On her September 8, 2021 audio recording, Defendant Dr. Andrew Elliott stated: "When you sent me that email that you sent to Schumer and all the state people and everything, I forwarded that to our legal

department. The legal department came up with a patient care agreement contract." He confirmed that she would be barred from treatment if she did not sign it. Dkt. 5 ¶¶ 39–40; Dkt. 92 at 26–27. Appellant did not sign it and requested transfer of care. Dkt. 92 at 22–24. The PCA was created on July 13, 2021, the day after Appellant's internal patient-safety follow-up to HSS and before she contacted any government office, so Dr. Elliott's stated reason cannot explain its creation. Dkt. 5 ¶¶ 38–39; Dkt. 4-1 at 3, 7. Four months later, Dr. Elliott wrote a letter endorsing her for the M.D. program at Saba University School of Medicine, confirming the PCA is a sham. Dkt. 4-1 at 10. Valley Health System's Privacy Officer, Constance Wright (November 12, 2025), its Risk Management Director, Janet M. Zicarelli (February 5, 2026), and Valley's counsel Robert G. Veech, III (opposition brief of February 6, 2026) each acknowledged Flags exist while using HIPAA as a shield, falsely claiming Flags are not part of Appellant's designated record set and therefore need not be produced to her (**Exhibits R, P**). On February 25, 2026, the day after Valley's counsel Eileen M. Kavanagh filed her notice of appearance, Ms. Zicarelli reversed her position and certified that no such entries exist. Ms. Kavanagh later wrote: "I asked Janet Zicarelli to draft a supplemental Certification to specifically combat plaintiff's statements." Dkt. 81, Ex. 10. After those Flags were accessed, Valley's care of Appellant changed, as its own records show.

Valley's emergency physician withheld imaging its own surgical team recommended. Defendant Dr. Juxhesta Cakrani wrote "we do not recommend any imaging at this time" and "we will hold off on imaging" (**Exhibit K** at 3). The surgical team's note that same night states: "Consider other imaging options including MRI or US." (**Exhibit M**). Valley's admitting hospitalist, Dr. Hossam Hanna, and its APN, Julie Zavadenko, charted "Appendicitis: Status: Acute" (**Exhibits L, N**), Ms. Zavadenko on the same day she canceled emergency imaging as "Discharged" (**Exhibit O**). Valley's MRI found a "5.2 cm collection/abscess" that "may reflect perforated appendicitis" (**Exhibit H**); no Valley clinician charted "chronic" appendicitis. The CT report records only "oral administration of contrast," never naming the contraindicated barium sulfate given in place of the IV contrast Dr. Flowers ordered under an NPO order (**Exhibits I, J**). FDA labeling contraindicates barium sulfate in patients "with known or suspected perforation of the GI tract," READI-CAT 2 (barium sulfate) Prescribing Information § 4 (rev. Feb. 2017), and the prior day's MRI had reported possible perforation (**Exhibit H**). No defendant has challenged the barium allegations (Dkt. 5 ¶¶ 33–34, 49). Appellant photographed the barium sulfate bottles (**Exhibit Y**); Defendant RN Gizem Akkus is recorded requiring the barium before transport to CT (**Exhibit Z**). Declaration ¶ 15. No Valley record supplies any psychiatric basis for an antipsychotic: Valley's clinicians charted "Psychiatric: normal" and "Psych: calm and cooperative" (**Exhibits L, N**), and

Defendant Dr. Carl Winkler's operative report omits both haloperidol and Foley catheter (**Exhibit G**); so do the February and August 2025 anesthesiologists' notes; and Valley gave Appellant no discharge papers in August 2025, unlike after her nine prior surgeries. The nonconsensual haloperidol, Foley catheter, barium, and lumbar-spine MRI order were actively concealed. Declaration ¶¶ 15–16.

*The haloperidol.* Six months before her August 12, 2025 surgery, at the same hospital, Appellant refused haloperidol (Haldol), a first-generation antipsychotic drug that carries the FDA's most serious black-box warning for extreme risks of death and permanent disabilities; audio recordings confirm it: she told pre-operative nurse Justin Madamba she had refused it, and Dr. Abraham said, "I told you I wouldn't give it to you." Exhibits AC, AD. Dkt. 5 ¶¶ 55, 76; Dkt. 4, **Ex. J** (Yau Affidavit); Declaration ¶ 5. On August 12, 2025, Dr. Kyra Bernstein ordered it at 15:10, while Appellant was unconscious under general anesthesia, with a pre-set "PRN Reason: Nausea." Defendant RN Elizabeth Sattely administered it at 18:40, overriding two electronic medication systems. At 18:42, Defendant Dr. Harry Owusu-Dapaah signed an assessment recording "Nausea/Vomiting: No." Dkt. 81, Exs. 11, 13. A Foley catheter was inserted into her genitals without her consent or knowledge. No clinical indication existed for either. No physician ever discussed haloperidol with her or her life partner, Johnny Yau, who was at the hospital daily. She learned of them only after the fact: night nurse Nicole Smith disclosed that a

doctor had prescribed haloperidol for her and later disclosed the Foley catheter on recording (Dkt. 4, **Ex. I**; Exhibit AE), surgical resident Dr. Shmuel Kassirer acknowledged both on recording (Exhibit AF) without naming the physicians responsible, and Defendants' own February 2026 exhibit confirmed the haloperidol. Declaration ¶ 16; Yau Declaration ¶ 6. The Amended Complaint further alleges, on information and belief, that haloperidol was also given in the emergency department on August 9, 2025: after an IV injection described as dilaudid, Appellant suffered severe chills, uncontrollable shaking, and a sudden drop in body temperature, witnessed by Valley Pharmacist Sophie Simmons, who called for a nurse; no nurse came. She had never had that reaction to dilaudid. Dkt. 5 ¶ 46. Defense counsel produced the haloperidol record only in a filing after Appellant sued, six months after the surgery. Foley catheter record and records of other nonconsensual interventions, including contraindicated barium and an unrelated order for a lumbar-spine MRI and its report, remain actively concealed from Appellant more than fourteen months after the August 12, 2025 surgery, despite HIPAA requests, a litigation-hold demand, and the state-court Order; the complete February 18, 2025 anesthesia medication-administration record has likewise never been produced. Dkt. 5 ¶¶ 62–65, 76; Declaration ¶¶ 6, 15. Valley Patient Relations denied the MRI order on an audio recording with metadata preserved ("I don't even see an order for that"), yet Aetna/EviCore preauthorization records confirm it was placed by APN Julie

Zavadenko, who misrepresented herself to the insurer as a physician by entering her name in capital letters as "DR. JULIE ZAVADENKO" [sic]. Declaration ¶ 15; **Exhibits U, V**. Records from those seven surgeries at five institutions, summarized at Declaration ¶ 10, show no haloperidol and no post-operative nausea and vomiting (PONV); several record "PONV Status: none" or "no PONV." The PONV "history" Dr. Bernstein cites to justify the anti-nausea rationale first appears in Valley's February 18, 2025 pre-operative note by Dr. Jacob Abraham, which records a "History of Post op nausea/vomiting" and a "PONV Risk Score: 5," contrary to every one of Appellant's seven prior records. Declaration ¶¶ 3, 5, 7–12, 15–17.

**The state-court preliminary injunction.** On February 26, 2026, after oral argument, the Superior Court of New Jersey, Bergen County (Hon. John D. O'Dwyer, P.J.Cv.), ordered Valley defendants to disclose all Flags within seven days (**Exhibit B** ¶ 1) and ordered:

> "2. Defendants, their agents, employees, and all persons acting in concert with them are hereby enjoined and restrained, pending further Order of this Court, from: (a) relying upon, acting pursuant to, or considering any undisclosed behavioral, psychiatric, or similar "flag" or "alert" entries when making clinical, administrative, or treatment decisions concerning Plaintiff Ki Sau Chan; and (b) disseminating any such entries to other healthcare providers or third parties;"

**Exhibit B** ¶ 2. Defendants responded with a one-line unsigned letter: "please be advised there are no responsive documents." The state court denied Appellant's motion to enforce without addressing the merits and never ruled on her motion to

correct the docket, link her evidence-submission module, and remove surgery records erroneously docketed in its psychiatric module. Appellant brought this federal action to obtain the due process she was not receiving. On June 23, 2026, the state court administratively dismissed the case without docketing her filings, 56 days before the August 18, 2026 lack-of-prosecution administrative dismissal date stated in its own written notice, and sent her no notice. That dismissal extinguished the injunction. Appellant learned of it on August 19, 2026. Declaration ¶¶ 28–31.

*The District Court's Order*. Its July 6, 2026 Order held: "Plaintiff's request for the immediate disclosure, production, and restriction on the use of these entries involves matters properly categorized as pre-judgment discovery. Accordingly, the request for production is DEFERRED to the discovery process." Dkt. 56 at 2 (**Exhibit C**). It directed the Magistrate Judge to schedule a Rule 16 conference. None has been held, and no scheduling order has issued. Appellant then filed her Renewed Emergency Motion for Preliminary Injunction (Dkt. 81), a noticed Rule 65(a) motion returnable September 21, 2026 and served on all Defendants. No Defendant filed opposition. On August 28, 2026, twenty-four days before the motion day and before Appellant's reply was due, the District Court held federal preservation duties apply independently of the state order, and ruled as to the reliance-and-dissemination bar:

> "Plaintiff has failed to demonstrate reasonable probability of success on a claim that would provide such relief; or how the denial of such relief

> would cause irreparable harm, since such allegations are hypothetical and speculative. See *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (citations and quotations omitted) (stating '[e]stablishing a risk of irreparable harm is not enough' and emphasizing the 'requisite feared injury or harm must be irreparable—not merely serious or substantial'). Subjective fear or anxiety regarding future medical encounters does not constitute objective, imminent, and non-speculative legal injury under the federal rules. See Fed. R. Civ. P. 65(b)(1)(A)."

Dkt. 86. The Order does not discuss the exhibits to Dkt. 81 or the loss of the state injunction, and it refers to Appellant, a woman, as "his" ("documents related to his healthcare"). *Id.* at 2.

## ARGUMENT

The Court weighs (1) likelihood of success, (2) irreparable harm, (3) harm to others, and (4) the public interest; the first two are most critical, and the movant need show only a reasonable chance of winning, weighed on a sliding scale. *Nken v. Holder*, 556 U.S. 418, 433–34 (2009); *In re Revel AC, Inc.*, 802 F.3d 558, 568–71 (3d Cir. 2015).

### I. Appellant has a reasonable chance of success.

*The claims that support this relief.* Count One pleads discrimination under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182, against Valley Health System, Valley Hospital, Valley Medical Group, HSS, and PRISM, based on a perceived disability: Defendants "discriminated against Plaintiff by placing retaliatory behavioral flags in her medical records that created a false psychiatric

designation, compromised Plaintiff's credibility with healthcare providers, and resulted in altered and compromised medical care, nonconsensual medical interventions, delayed emergency treatment, denial of standard diagnostic examinations, and denial of physician-ordered disability accommodations." Dkt. 5 ¶¶ 85–88. The care was aberrant, abnormal, and severely compromised, nearly killing and blinding Appellant. A person "regarded as" having an impairment is protected, 42 U.S.C. § 12102(1)(C), (3), and the only private remedy under Title III is injunctive relief, 42 U.S.C. § 12188(a)(1). Count Two pleads the same discrimination under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against the same federally funded Defendants. Dkt. 5 ¶¶ 90–91. Count Six pleads fraudulent concealment of Flags, haloperidol administration, Foley catheter, barium, and lumbar-spine MRI. Dkt. 5 ¶ 104. The Amended Complaint prays for an injunction "requiring Defendants to disclose and remove all retaliatory behavioral flags from Plaintiff's medical records." Dkt. 5, Prayer ¶ c. The bar on use and dissemination sought here is a narrower, interim form of that pleaded relief. Counts Four, Five, and Eight (battery, lack of informed consent, and sexual battery) plead bodily invasions the flags produced. Dkt. 5 ¶¶ 98–102, 110–12.

First, the Order measured a noticed Rule 65(a) motion against Rule 65(b)(1)(A), the standard for temporary restraining orders issued without notice. That is a legal error reviewed de novo. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir.

2017). Second, it called "hypothetical and speculative" a harm the record shows has already occurred twice, and nearly a third time on October 2, 2026. *ECRI* concerned a feared commercial injury that had not happened. Third, it adjudicated under the preliminary-injunction standard the restriction-on-use request Dkt. 56 had categorized as a discovery matter and deferred to a Rule 16 process that has never begun, and it did so before any opposition or reply. Having found Flags serious enough to warn counsel of spoliation sanctions (Dkt. 56 at 2), the court could not consistently call harm from their use hypothetical. Fourth, it did not address the record. For about six months after Appellant's August 2025 surgery, no Valley Defendant stated that no flags existed. Dkt. 5 ¶ 80. Instead, every Valley representative who addressed the flags acknowledged they exist and used HIPAA as a shield to withhold them, claiming they fall outside Appellant's designated record set. Valley's Privacy Officer, Constance Wright, wrote on November 12, 2025: "As noted previously in response to your additional request for 'flag or alert entries' and 'audit/access logs,' any such tools or logs are not part of your or any other patient's designated record set. As defined by HIPAA, these entries and logs are not 'records' used, whether in whole or in part, to make decisions about individuals." **Exhibit R** (Dkt. 4 at 6). Valley's Risk Management Director, Janet M. Zicarelli, certified on February 5, 2026 that the items requested "was not a part of the designated medical record" and that "any potential flags were not used by any medical/administrative

staff in rendering care and treatment to the patient." **Exhibit P** (Dkt. 5 at 40–41). Valley's counsel, Robert G. Veech, III, told the state court on February 6, 2026 that Valley is "not legally obligated to maintain such notations as part of the designated record set, pursuant to HIPAA," and that "such 'flags' and 'alerts' are not used for purposes of rendering medical judgment/decisions as to the care and treatment of the patient." **Exhibit P** (Dkt. 5 at 34); Dkt. 81, Exs. 6–8. None of them denied the flags exist. Each argued only that HIPAA did not require Valley to produce them. No one invokes HIPAA to withhold entries that do not exist. On February 25, 2026, the day after Valley's second counsel, Eileen M. Kavanagh, filed her notice of appearance, Ms. Zicarelli reversed herself in a supplemental certification: "There are no 'flags' or 'alerts' in plaintiffs electronic medical record." **Exhibit Q** (Dkt. 5 at 63); Dkt. 81, Ex. 9. That certification never explains how entries Valley had defended withholding under HIPAA ceased to exist. Ms. Kavanagh confessed in writing that she personally directed that reversal, which the Amended Complaint alleges is perjury (Dkt. 5 ¶¶ 80–82; **Exhibit S** (Dkt. 4 at 3); Dkt. 81, Ex. 10). She has since tried to nullify all three Valley representatives' acknowledgments of the flags by omitting their written words from every filing she makes, especially Ms. Zicarelli's February 5, 2026 certification. That is active deception and perjurious conduct. The Order addressed none of this, or the state injunction's lapse. Fifth, having reviewed Appellant's

exhibits and heard oral argument, a state court granted this very relief "for good cause shown" (**Exhibit B**). Appellant's chance of success is well above negligible.

The record refutes the premise that Flags are nonexistent or harmless. Dr. Owusu-Dapaah told the State Board of Medical Examiners: "If a patient requires an additional agent for rescue nausea our order set instructs nursing to give haloperidol as needed." He wrote: "Our goal was never to harm Ms. Chan or give her this medication without her consent." **Exhibit E** (Dkt. 81, Ex. 3). By disclaiming any goal to harm her or to medicate her without consent, he concedes that medicating her without consent is harm. That harm is irreparable: the deprivation of her bodily autonomy, the violation of her body as a human being, and the violation of her patient, civil, and human rights cannot be undone or reversed. It is unconscionable. The nonconsensual haloperidol was a chemical battery and assault on her body, and the nonconsensual Foley catheter was a sexual battery. A "rescue" agent presupposes nausea to rescue. The record documents none: no nausea assessment precedes the 18:40 dose, and Dr. Owusu-Dapaah's own entry two minutes later records "Nausea/Vomiting: No." Dkt. 81, Exs. 11, 13. Dr. Bernstein told the Board she did not ask Appellant specifically about haloperidol. Declaration ¶ 7. The record supports a further inference: in February 2025 Appellant and Mr. Yau overheard Dr. Abraham instruct a trainee to add haloperidol, without discussion with Appellant or request for her consent, and his note first records the PONV "history"; Valley's

protocol restricts haloperidol to “PACU/SDS USE ONLY”; Dr. Owusu-Dapaah describes an “order set” that instructs nursing to give it; and defense counsel grouped Dr. Abraham with the August 2025 anesthesiologists in her police subpoena. Dkt. 5 ¶¶ 55, 74, 77; Dkt. 4, **Ex. L**; Declaration ¶¶ 6, 9. A factfinder could infer Dr. Abraham’s involvement in both surgeries: the August 2025 dose came from a standing PACU order in place since at least February 2025, when Appellant overheard him order the drug and refused it. Ms. Zicarelli’s reversal rests on this: “Upon information and belief, there are no undisclosed “flag or alert entries, behavioral notations, psychiatric designation or similar alerts in plaintiff’s electronic medical record maintained by the defendants”.” Dkt. 81, Ex. 9 ¶ 3.

## II. The harm is irreparable and ongoing.

The emergency is not merely medical. Flags cause providers to treat Appellant not as a patient whose consent is required, but as a body to be restrained and invaded without her knowledge. That violates her bodily autonomy, her physical body, and her civil and human rights; a later money judgment cannot restore consent never obtained or dignity disregarded. The interest in avoiding unwanted antipsychotic medication is significant, *cf. Washington v. Harper*, 494 U.S. 210, 221–22 (1990), and the ADA makes injunctive relief the remedy for Title III discrimination. Preservation does not restrain use. The pattern, across Valley, PRISM, and University Hospital, excludes coincidence. **Only Flags explain this systemic,**

**aberrant pattern.** At PRISM, after office staff accessed her records, Defendant Dr. Elena Ng withheld medically indicated scleral depression, standard for a high-risk retinal patient, delaying diagnosis and emergency treatment of retinal tears six days. Dr. Vincent Ho performed that examination and emergency laser surgery at Appellant's first visit, before his office accessed her records; once it did, he became dismissive, handled her face roughly, and withheld the same examination. Declaration ¶¶ 18–19; Exhibit AB. Each new encounter with a provider who accesses Flags repeats the unconsented use and renews a false psychiatric designation Appellant has never been allowed to see, challenge, or correct. Declaration ¶ 32.

The harm reaches Appellant's name and professional reputation. A false and defamatory psychiatric and behavioral designation, in records that providers and insurers nationwide can open, marks a woman with no psychiatric history in her life as a psychiatric and behavioral problem before she says a word, and discredits every word she says, including about her acute appendicitis and retinal tears, both confirmed by surgery. That discrediting produced medically illogical care: an unrelated lumbar-spine MRI ordered during an acute appendicitis admission, and her symptoms of retinal tears dismissed by Dr. Ng as "a normal day-to-day nuisance, an aging issue rather than any serious pathology." Dkt. 32 at 48. That is harm beyond the medical harm, and she has no means to see, contest, or correct it. Declaration ¶

32. That injury is acute now. Appellant is a write-in candidate for Harrison Town Council, Ward 3, endorsed by Stand Up Harrison, in the November 3, 2026 election, and the flags' consequences, including her untreated October 2 chemical eye burn, have diverted her time, energy, and resources from her campaign to her own medical treatment to prevent potential blindness. Declaration ¶ 27; **Exhibit AA**. Harm to reputation and to an ongoing candidacy cannot be undone by a later award of damages.

Valley's emergency note labels Appellant, falsely, as having "limited health care literacy." **Exhibit K** at 4; Declaration ¶ 15. Appellant conducted preventive-medicine research at Brigham & Women's Hospital/Harvard Medical School, has managed medical practices and offices at Brigham, NYU, and Vanderbilt University Medical Center, and knows how hospital medical records and patient flag systems are created and used. Dkt. 100 at 30; Dkt. 32 at 5–6; Dkt. 18 at 20–26; Declaration ¶¶ 3, 5. Medical emergencies are not scheduled. The absence of a new emergency since August 28 reflects that Appellant has avoided new providers, not that the risk has passed. Declaration ¶¶ 20–21.

This harm is not speculative or based on nerves, fear, or anxiety; it is happening now. Appellant is suffering an ongoing injury to her health because she is being forced to delay necessary evaluations by a retinal specialist for high myopia and vitreomacular adhesion. This delay results from the diagnostic denials and

provider hostility Appellant experienced once the fabricated Flags were accessed. Before seeing Flags, nearly all first-visit providers describe her as "very pleasant." These false Flags have locked Appellant out of safe access to the healthcare system, creating an immediate and continuous risk of permanent, uncorrectable vision loss. Declaration ¶¶ 20, 32.

*Subsequent conduct, offered under Rule 8(a)(2)(B)(ii).* On October 2, 2026, Appellant went with Johnny Yau to University Hospital's emergency department for irrigation of her chemically burned eyes after exposure to an expired contact-lens cleaning solution; she also reported flashes and prior retinal surgery. Intake nurse Charles noted red, irritated eyes and said it "looks like conjunctivitis." After her chart was opened, staff, including APN Sherry Sudama and ophthalmology resident Lauren Hayashi, M.D., were dismissive and hostile. Appellant and Mr. Yau heard APN Sudama showing her chart to other staff and laughing. A nurse named Rob stated that eye, foot, and spine complaints, the three areas of Appellant's prior surgeries, are treated as non-emergencies and reserved for nurse practitioners so as not to "waste resources with real doctors." APN Sudama provided no irrigation, only a numbing drop that burned and worsened her eyes, and told Appellant to flush her chemically burned eyes with tap water. Appellant, shocked at Sudama's ignorance of chemical-burn eye care, refused, explaining tap water carries contaminants and bacteria that will infect chemically burned, open-wound eyes, causing blindness.

Appellant irrigated her eyes continuously in the ER with sterile saline she brought from home, later saving her eyesight at home with oil-based drops. Dr. Hayashi briefly examined her and downgraded the chemical burn to “dry eyes.” Appellant was assigned to a nonhygienic four-patient room beside the psychiatric ward and directed to a urine-puddled chair; when she refused it, staff angrily told her she would be sent back to the waiting area, although empty rooms were available; Sudama said regular patients are now placed with homeless patients. Appellant and Mr. Yau have owned homes since 2001; they are not homeless. Appellant’s eyes remain burning, irritated, and itchy. She has appointments with an ENT physician on October 27 and a retinal surgeon on October 29, 2026, each of whom will access her records. Declaration ¶¶ 22–26; Yau Declaration ¶¶ 7–10. Appellant has requested her University Hospital chart and any Flags, including correction of any false entries. Patient Relations is investigating. Declaration ¶ 26. This episode shows a chemical burn left untreated and aggravated at the first new institution Appellant was forced to visit since the Order, and that she cannot know, before any encounter, what a provider will see or act on.

## III. The balance of harms and the public interest favor relief.

The order sought restores only the protection Defendants were already bound by from February 26 to June 23, 2026. It requires no deletion, production, or change to clinical operations. Defendants cannot be prejudiced by a bar on using Flags they

now swear do not exist. The public interest favors informed consent, the integrity of medical records, and patients' access to emergency and regular care free of unsupported psychiatric labels.

## CONCLUSION

Appellant respectfully requests that the Court grant the injunction described above pending disposition of this appeal.

Dated: October 13, 2026

Respectfully submitted,

/s/ Ki Sau Chan
Ki Sau Chan
Plaintiff-Appellant, Pro Se
403 McGuigan Place
Harrison, New Jersey 07029
(201) 852-5390
ki.chan@alumni.stanford.edu

**DECLARATION OF KI SAU CHAN**
**IN SUPPORT OF MOTION FOR INJUNCTION PENDING APPEAL**

I, Ki Sau Chan, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Plaintiff-Appellant in this case. I make this declaration on personal knowledge, except where stated on information and belief, in support of my motion for an injunction pending appeal.

2. I have no diagnosis of any psychiatric condition, and no psychiatric evaluation, treatment, or even a psychiatric referral, in my entire life. There is no diagnosis of any psychiatric condition that would warrant an antipsychotic drug. Moreover, to date, Defendants have produced NO document whatsoever to the contrary since litigation began almost a year ago.

3. I am familiar with hospital electronic health record alert and flag systems and how they are created and used. I have worked in many hospitals, including as medical practice and office manager at NYU Head & Neck Surgery, NYU Cardiology, and the DHR (Derald H. Ruttenberg) Cancer Center (now Ruttenberg Treatment Center of The Tisch Cancer Institute), and as office manager at Brigham & Women's Hospital/Harvard Medical School. I conducted preventive medicine research and co-authored papers in peer-reviewed medical journals, including *JAMA* and *Cancer Causes & Control*, while at Brigham & Women's Hospital/Harvard Medical School and at Vanderbilt University Medical Center. I first enrolled in

medical school at SUNY Downstate College of Medicine in 1998, but withdrew due to family and musculoskeletal issues. In 2022, I enrolled at Saba University School of Medicine on a merit scholarship, with the goal of specializing in orthopedic surgery. Defendant Dr. Andrew Elliott wrote a letter endorsing me for Saba's M.D. program in January 2022, about four months after he presented the PCA to me. Dkt. 4-1 at 10. I later had to withdraw from Saba because of continuing post-operative complications from Dr. Elliott's surgeries, and I paid withdrawal fees.

4. My 2021 complaints to Defendant Hospital for Special Surgery ("HSS") were substantiated. HSS's Office of the President apologized to me in writing for the nursing abuse and refunded my private hospital room in full. My post-operative complications from Dr. Elliott's surgeries required four revision surgeries in the same anatomical area, two of them performed by a surgeon outside HSS. After Dr. Elliott's second surgery at HSS on June 3, 2021, my life partner, Johnny Yau, and I repeatedly asked to speak with a nurse manager about nursing mistreatment. On the morning of June 4, 2021, staff sent Mr. Yau to retrieve our car, and Nurse Manager Tiffany Smith then met with me alone; I reported the nursing abuse to her. Immediately afterward, Valium (diazepam), a psychoactive drug I had never been prescribed, appeared on my discharge medications. Discharge nurse Genevieve Spinner, RN, read it off and giggled. When I asked what it was for, she became nervous and said "muscle spasms." I told her I had received nerve blocks and had no

muscle spasms; she then said it was "just in case the nerve blocks wear off." Dkt. 5 ¶ 36. Physician Assistant Benjamin Odamtten prescribed the Valium, and the prescription bottle lists both his name and Dr. Elliott's, yet Dr. Elliott's discharge note never mentions diazepam or any muscle spasm. The Valium is in my HSS medical records and was sent to my pharmacy; we picked it up, and I still have the full bottle. I never took it. I can provide the bottle to the Court for inspection. I believe HSS added Valium to manufacture an anxiety and psychiatric history in my records, and that Defendant Valley Hospital did the same with haloperidol: proposed in February 2025, when I refused it, and given in August 2025 while I was unconscious and anesthetized in surgery and could not refuse. HSS created the Patient Care Agreement ("PCA"), a behavioral contract, the day after my July 12, 2021 follow-up on those complaints. On September 8, 2021, at my post-operative visit, Dr. Elliott presented the PCA and stated on my audio recording: "When you sent me that email that you sent to Schumer and all the state people and everything, I forwarded that to our legal department. The legal department came up with a patient care agreement contract." He told me I would be barred from treatment if I did not sign it. I did not sign it and requested transfer of care. I believe the PCA is the origin of the Flags, which were transmitted to Valley and Defendant PRISM. Dkt. 5 ¶¶ 18, 39–41.

5. The only physician I have ever heard mention haloperidol (Haldol), a first-generation antipsychotic drug, while I was a patient is anesthesiologist Dr. Jacob Abraham, at Valley Hospital on February 18, 2025, immediately before my scheduled shoulder surgery, when my life partner Johnny Yau and I overheard him instruct his trainee, Dr. Evelyn Bae, to “add Haldol to Zofran.” It was the very first time Mr. Yau and I ever met Dr. Abraham. It was the first time I ever set foot at Valley Hospital. Dr. Abraham did not tell us about the Haldol until I confronted him after we overheard it. I asked Dr. Abraham why he would give me Haldol, an antipsychotic, when I don't have a psych history; he said it was for anti-nausea and that sometimes Zofran is not enough. I told him I had had nine prior surgeries and was always given Zofran for anti-nausea, never haloperidol (Haldol), that I had worked in a psychiatry department, and that I did not want Haldol. He looked both impressed and shocked. After he and his trainee left the room, I overheard him speaking loudly in the hallway to a woman with a soft voice, whom I could not see and who may have been his trainee, explaining that he could not give me Haldol because I knew what it was and had worked in a psychiatry department. I refused the haloperidol in person; that exchange was not recorded. To protect myself after Dr. Abraham stated he would add Haldol to my Zofran, I then started recording my conversations, beginning with preoperative nurse Justin Madamba, in which I told him that Dr. Abraham had proposed adding Haldol to Zofran and that I had told him

not to, and I asked for a different anesthesiologist; Mr. Madamba said he would ask the charge nurse. I also recorded Dr. Abraham when he returned. He said: “So I thought we had, I just got a call, said you didn't want Haldol. We said we wouldn't be giving it.” He also said: “I told you I wouldn't give it to you.” Exhibits AC, AD. I can produce these recordings, and all of the other audio recordings described in this declaration, in their original form with metadata, for the Court’s verification and review on request. Neither Defendant Dr. Kyra Bernstein nor Defendant Dr. Harry Owusu-Dapaah ever mentioned haloperidol to me. I recognized the drug because I hold a Bachelor of Arts degree in Psychology from Stanford University with transfer credits from Massachusetts Institute of Technology (M.I.T.), and worked as a research assistant in the COPAD unit at Beth Israel Medical Center, where I administered Structured Clinical Interviews (SCID) to patients for recruitment into our research studies. I am credited by name as a research assistant in the Acknowledgment section of the publication, Rosenthal, Hellerstein & Miner, “Positive and Negative Syndrome Typology in Schizophrenic Patients With Psychoactive Substance Use Disorders,” *Comprehensive Psychiatry*, Vol. 35, No. 2 (March/April 1994).

6. Immediately after the February 18, 2025 shoulder surgery at Valley, I was hyperalert, hypervigilant, and agitated, and I needed no sleep for seven days in a row. I had undergone nine prior surgeries and had never had that reaction after any of

them. I believe I was given a drug I was not told about. Vocal-cord spasms and Eustachian-tube fullness followed and continue; I am currently being treated for them by two ENT physicians. The complete February 2025 medication-administration record has not been produced to me. After I filed a criminal complaint naming Dr. Bernstein only, defense counsel Eileen M. Kavanagh included Dr. Abraham and Dr. Owusu-Dapaah in a subpoena to the Paramus Police Department. Dkt. 4, **Ex. L**. I believe that subpoena indicates Dr. Abraham was involved in the haloperidol order and administration, and in their concealment, in both my February and August 2025 surgeries.

7. On August 12, 2026, I received by email from the New Jersey State Board of Medical Examiners, in response to my specific request, the August 12, 2026 letter of Samuel A. Youssof, Esq. to the Board in File No. MED-2026-02439, together with its **Exhibit A**, the April 27, 2026 narrative of Defendant Kyra Bernstein, M.D. I have not altered it in any way. A true and correct copy is Exhibit 1 to my Certification in opposition to Dkt. 96 in the District Court (Dkt. 100 at 33–38) and is attached to this motion as **Exhibit D**. In that narrative, Dr. Bernstein states that she did not ask me specifically about haloperidol.

8. Dr. Bernstein's narrative falsely states that I "endorsed a history of post operative nausea and vomiting (PONV)." I never told Dr. Bernstein, or anyone at Valley Hospital, that I had such a history. Across my seven prior surgeries at five

institutions from 2018 through 2023, none of the anesthesia records I obtained records a history of postoperative nausea or vomiting; my Anesthesia Post Evaluation on 9/19/2019, 12/17/2020, 6/3 - 6/4/2021 all explicitly state “PONV Status: none”, and my 8/5/2022 Anesthesia Postprocedure Evaluation states “no PONV.” Valley’s own February 18, 2025 anesthesia record, signed by Dr. Evelyn Bae, records “nausea/vomiting: No.” Dkt. 81, Ex. 13.

9. The “History of Post op nausea/vomiting” entry first appears in Valley’s February 18, 2025 pre-operative note signed by Dr. Jacob Abraham — the anesthesiologist whom Johnny Yau and I overheard instructing a trainee to add haloperidol to Zofran, and whose proposal I immediately refused in person — and was carried forward verbatim into Dr. Bernstein’s August 12, 2025 pre-operative note. Dkt. 81, Ex. 13.

10. Exhibit 2 to my Certification in opposition to Dkt. 96 (Dkt. 100 at 39–59), attached to this motion as **Exhibit F**, contains true and correct copies of anesthesia and operative records from my seven surgeries under anesthesia at NewYork-Presbyterian/Columbia (Allen Hospital, Och Spine), Lenox Hill, Hospital for Special Surgery, NYU, and Mt. Sinai before my first encounter with Valley Hospital in February 2025. None of these seven records shows haloperidol as anesthesia medication or any medication for me, and none records nausea, vomiting, or PONV as a complication. Below is a summary table of those records.

| Surgery Date | Hospital / Surgeon | Anesthesia | Haloperidol | PONV (excerpts) | Type of record |
|---|---|---|---|---|---|
| 6/29/2018 (discharged 6/30/2018) | Mount Sinai (Dr. Roonprapunt) | General | None | Complications: NO nausea listed | Operative report p. 1 |
| 1/7/2019 (discharged 1/8/2019) | NYP/Columbia (Dr. Riew) | General | None | "Complication: None" | Operative report p. 1; Anesthesia PACU Discharge Documentation medication list shows NO haloperidol |
| 9/19/2019 | HSS (Dr. Qureshi; anesthesia Dr. Yang) | General | None | "PONV Status: none" | Operative report p. 1; MyHSS anesthesia event medication list shows NO haloperidol; Anesthesia Post Evaluation |
| 12/17/2020 | HSS (Dr. Elliott; anesthesia Dr. Dimeo) | Spinal/ popliteal | None | "PONV Status: none" | Operative report p. 1; MyHSS anesthesia event medication list shows NO haloperidol; Anesthesia Post Evaluation |
| 6/3/2021 (discharged 6/4/2021) | HSS (Dr. Elliott; pre-anesthesia Dr. Soffin) | Spinal/ popliteal | None | "PONV Status: none" | Operative report p. 1; MyHSS medication list shows NO haloperidol; Anesthesia Post Evaluation |
| 8/5/2022 | NYU Langone (surgeon; anesthesia Dr. Noorbaksh) | MAC/ sedation | None | "no PONV" | Operative report p. 1 (anesthesia event medication list shows NO haloperidol); Anesthesia Postprocedure Evaluation ("no PONV") |

| Surgery Date | Hospital / Surgeon | Anesthesia | Haloperidol | PONV (excerpts) | Type of record |
|---|---|---|---|---|---|
| 9/14/2023 | Lenox Hill (surgeon; anesthesia Dr. Davis) | General | None | None; "extubated without complications." | Operative report p. 1; Anesthesia record shows NO haloperidol and NO PONV documented |

11. The only record in my medical history that states a "History of Post op nausea/vomiting" is Defendant Valley Hospital's, beginning with Dr. Abraham's February 18, 2025 pre-operative note.

12. Valley's February 18, 2025 pre-operative note, signed by Dr. Abraham, records a "PONV Risk Score: 5." The anesthesia record for that surgery lists Zofran and metoclopramide for anti-nausea, never haloperidol, and no nausea was recorded. Valley's August 12, 2025 pre-operative note, signed by Dr. Bernstein, records a "PONV Risk Score: 3." Haloperidol was ordered and administered for that surgery. Dkt. 81, Ex. 13, at PageID 1555, 1564.

13. For more than four months after I sent my first HIPAA request letter in October 2025, Valley Health System's Privacy Officer, Constance Wright (November 12, 2025), its Risk Management Director Janet M. Zicarelli (February 5, 2026), and Valley's counsel Robert G. Veech, III (February 6, 2026) each acknowledged the existence of the Flags in my records while stating that they are not part of my designated record set. None of them ever denied that the flags exist; each relied on HIPAA as the reason not to produce them. Only on February 25, 2026, the

day after Valley's second defense counsel, Eileen M. Kavanagh, Esq., filed her notice of appearance, did Ms. Zicarelli completely reverse herself in a supplemental certification stating that no such entries exist. Ms. Kavanagh later confessed in writing that she directed that reversal: "I asked Janet Zicarelli to draft a supplemental Certification to specifically combat plaintiff's statements." Exhibit S (Dkt. 4 at 3). Copies of her certifications are attached as **Exhibits P and Q**. Mr. Veech also told the state court: "A review of the August 12, 2025 signed consent form regarding plaintiff's diagnostic laparoscopy indicates that she also understood additional procedures (such as a foley catheter) might be required, due to unforeseen conditions that may arise during the procedure." **Exhibit P** (Dkt. 5 at 36). The consent form attached to his own brief as **Defendants' Exhibit B** lists no Foley catheter anywhere. **Exhibit P** (Dkt. 5 at 55–57).

14. At multiple providers, including institutions that are not defendants, staff have been pleasant and welcoming until they access my chart. After that, they have become frightened, dismissive, or hostile, have recharacterized acute conditions as "chronic," and have delayed or denied emergency care. This has happened repeatedly.

15. At Valley, a third-party CT scan found a "punctate appendicolith" and I had an outside gastroenterology referral for acute appendicitis (Exhibits AG, AH), yet my condition was described as chronic. Defendant Julie Zavadenko, APN,

repeatedly canceled emergency imaging, citing "Discharged" while I was still hospitalized in severe pain. **Exhibit O**. She told me to my face, "You look too healthy. You don't have acute appendicitis," and "I'm going to discharge you from the hospital." She also ordered an unrelated lumbar-spine MRI under the name "DR. JULIE ZAVADENKO" [sic]. A Valley Patient Relations staff member named Nicole denied on audio recording that the order existed (**Exhibit V**), but my insurer's Aetna/EviCore preauthorization records confirm it (**Exhibit U**). I was also given barium sulfate, which was contraindicated. My appendectomy was delayed four days. Defendant Dr. Carl Winkler's operative report, attached as **Exhibit G**, records a pre-operative and post-operative diagnosis of "Perforated appendicitis," a laparoscopic appendectomy converted to open laparotomy on August 12, 2025, an abscess drained, and an appendiceal tip "likely . . . necrotic within the drained abscess cavity." It lists Drs. Bernstein and Owusu-Dapaah as the anesthesiologists and Sam Kassirer, M.D. as an assistant. It actively omits the haloperidol and the Foley catheter. Valley's own imaging confirms the diagnosis: the August 10, 2025 MRI (**Exhibit H**) found a "5.2 cm collection/abscess" that "may reflect perforated appendicitis," and the August 11, 2025 CT (**Exhibit I**) found an "abnormal proximal appendix" with a "fistulous connection between the distal ileum and appendix." The CT report states it was performed "following the oral administration of contrast" and that "[i]ntravenous contrast was not administered," confirming that an oral agent, not

the IV contrast Dr. Flowers ordered, was given. The report does not identify the agent; my photograph of the two 450 mL bottles (Dkt. 4, **Ex. P**), attached as **Exhibit Y**, identifies it as READI-CAT 2 (Barium Sulfate) Oral Suspension. I took it in my Valley Hospital room, 7S-0004; the original image file retains its metadata. I also have an audio recording of Defendant Nurse Gizem Akkus telling me, before I could be taken to the CT scan: “But I’m going to bring Barium first. You need to finish it up first, the bottle.” and “After that you can go.” (**Exhibit Z**). No one explained the risks, benefits, or alternatives of the barium to me or obtained my informed consent; Nurse Akkus conditioned my emergency CT scan for my perforated appendix on my drinking the barium sulfate. I drank it only because I needed treatment for my severe pain and perforated appendix. When I told Dr. Winkler, he was shocked; he had believed I was given water as the oral contrast. I have an audio recording of this conversation. No Valley record produced to me identifies the barium sulfate; the CT report calls it only “oral administration of contrast,” and no medication administration record for it has been produced. The contraindicated barium was thus actively concealed, both in Valley’s records and from the operating surgeon. Valley’s admission records also refute the “chronic” characterization and any behavioral basis for what followed. Defendant Dr. Juxhesta Cakrani’s August 9, 2025 emergency note (**Exhibit K**) records that she spoke with Dr. Winkler, that “we do not recommend any imaging at this time,” and that “we will hold off on imaging,”

citing my contrast allergy (see also my recordings with her that day, Exhibits AI, AJ); yet an iodine allergy does not preclude ultrasound or MRI, and Dr. Kassirer's note the same night (**Exhibit M**) says "Consider other imaging options including MRI or US." Dr. Cakrani's note also states, under "social determinants of health," that my care was impacted by "limited health care literacy." I did not know that entry existed until I read this record while preparing this declaration. That entry is false and defamatory. It discredits my extensive medical and scientific background described in ¶¶ 3, 5 above, including my preventive medicine research and co-authored publications at Brigham & Women's Hospital/Harvard Medical School, my enrollment in two medical school M.D. programs, SUNY Downstate College of Medicine and Saba University School of Medicine, my acceptance to and study at the Massachusetts Institute of Technology, and my graduation from Stuyvesant High School, both specialized mathematics and science schools. Every provider who later opens my chart sees it. It is an example of the kind of false, fabricated entry this motion seeks to stop Defendants from relying on or disseminating. The entry is false. I have attended medical school, worked in hospital administration, and co-authored medical research (¶¶ 3, 5). It discredits my medical background to every provider who reads my chart, and it was placed there without my knowledge. Dr. Hossam Hanna's August 9 history and physical (**Exhibit L**) charts "Appendicitis: Status: Acute" and "Psychiatric: normal." Dr. Kassirer's history and physical, with Dr.

Winkler's August 10 attestation (**Exhibit M**), states Dr. Winkler would obtain MRI "to rule out perforated appendicitis." APN Zavadenko's August 10 progress note (**Exhibit N**) charts "Appendicitis: Status: Acute," "Psych: calm and cooperative," and, in an addendum, "No further work up is indicated." No Valley clinician charted "chronic" appendicitis. Dr. Flowers's August 12, 2025 progress note (**Exhibit J**) lists the assessment as "Acute perforated appendicitis," lists ondansetron as ordered on August 10 with no dose ever administered, and lists no haloperidol among my active medications. Valley's own MRI report states that the study "reflects perforated appendicitis" (**Exhibit H**; Dkt. 4, **Ex. W**), and Dr. Winkler's operative report documents the August 12, 2025 appendectomy (**Exhibit G**). My appendix perforated and became gangrenous, and I suffered septic complications, prolonged intravenous antibiotics, a substantial risk of death, a prolonged hospitalization, and readmission.

16. While I was unconscious, I was given haloperidol, a first-generation antipsychotic drug that carries the FDA's most serious black-box warning for extreme risks of death and permanent disabilities, and a Foley catheter was inserted into my genitals. Defendant Elizabeth Sattely, RN, administered the haloperidol at 18:40 while I was unconscious, overriding two of Valley's electronic medication systems to do so. Dkt. 5 ¶ 32; Exhibit P. I learned of these only afterward: night nurse Nicole Smith asked me whether I wanted a Haldol and, when I asked why, said it had

been prescribed by a doctor; she later told Mr. Yau and me, on recording, that a Foley catheter had been inserted (Exhibit AE); surgical resident Dr. Kassirer acknowledged both the haloperidol and the Foley catheter on recording (Exhibit AF) but did not name the physicians responsible; and the haloperidol administration was confirmed by Defendants' own exhibit in February 2026. I had no knowledge of any haloperidol order until Nurse Smith mentioned it. Because of her disclosures, I sent Valley HIPAA requests beginning October 12, 2025 specifically asking for the haloperidol and Foley catheter records. Dkt. 4, **Ex. G**. I did not consent to either, and no clinical indication existed for either. Neither Dr. Winkler's operative report nor the anesthesiologists' notes from my February and August 2025 surgeries mention haloperidol or a Foley catheter. I was given no discharge papers after either of my August 2025 discharges, on August 17 and August 21, 2025. At my discharge, nurse Alexandra was shocked that there were no discharge notes, and she printed information about appendectomy from Google for me instead. After each of my nine prior surgeries, I was given discharge papers listing the drugs administered and my post-operative medications. Valley is the only exception. I believe these omissions were made to conceal that nonconsensual haloperidol and a nonconsensual Foley catheter were forced on me. These nonconsensual, forced medical interventions, and the flags in my records, nearly killed me and nearly blinded me. Earlier, on August 9, 2025, in the emergency department, a nurse injected an IV medication that she said

was dilaudid. Shortly afterward, while Valley pharmacist Sophie Simmons was updating my medication history, I suddenly had severe chills, uncontrollable shaking, dizziness, and a sudden drop in body temperature. Ms. Simmons became very concerned and asked whether I had ever had that reaction to dilaudid before; I said no. She called for a nurse, but no nurse came, and Mr. Yau had to find blankets for me. I have received dilaudid before and never had that reaction. I recorded this encounter on audio. Exhibit AJ. I believe I was given haloperidol, not dilaudid, without my knowledge or consent. Dkt. 5 ¶ 46.

17. Defendants have now re-characterized the haloperidol as “anti-nausea” medication. The anesthesia record documents no nausea. Dr. Bernstein’s narrative to the Board also attributes to me a history of post-operative nausea and vomiting (PONV) (see ¶ 8 above), yet not one of the medical records I have obtained from my seven consecutive surgeries at five different hospitals immediately before my first Valley surgery in February 2025 documents that I ever had PONV, and none lists haloperidol among the drugs given to me.

18. I have high myopia (approximately −10.50 to −10.75 diopters) and vitreomacular adhesion in my untreated right eye. At PRISM, after office staff accessed my records, Defendant Dr. Elena Ng withheld a scleral-depression examination, and diagnosis and emergency treatment of my retinal tears were delayed six days. I am a high-risk retinal patient. Through her counsel, Eric S. Latzer,

Esq., Dr. Ng admitted to the State Board of Medical Examiners on December 1, 2025: "Dr. Ng did not believe it was warranted to put Ms. Chan through a scleral depression exam, as she had a good view of Ms. Chan's retinas once her pupils were dilated." **Exhibit T** (Dkt. 32 at 34). That is not possible. The far peripheral retina, where retinal tears occur, cannot be fully seen through a dilated pupil alone; showing the peripheral retina is the whole purpose of scleral depression. The American Academy of Ophthalmology's Preferred Practice Pattern states: "There are no symptoms that can reliably distinguish between a PVD with or without an associated retinal break; therefore, a peripheral retinal examination is required. The preferred method of evaluating patients for peripheral vitreoretinal pathology is to use an indirect ophthalmoscope combined with scleral depression." Dkt. 32, Ex. P-5.

19. Dr. Vincent Ho performed the examination and emergency laser surgery at my first visit. Exhibit AB (Dkt. 32, Ex. P-6). After his office accessed my records, he became dismissive, handled my face roughly, and withheld the examination. PRISM/Millennium Eye Care later told my insurer, Aetna, that I had never seen Dr. Ng. Aetna's October 27, 2025 letter to me states: "I have spoken with the office of Millennium Eye care c/o Dr. Elena NG and were advised that you were never seen by Dr. Ng," and "Again advised no record of seeing Dr. Elena NG." Aetna accepted PRISM's statement over mine without checking its own claims records, which show that Aetna paid for Dr. Ng's September 15, 2025 examination. **Exhibit W** (Dkt. 32 at

27). Aetna never checked its own records on its own. Only after I complained to the Centers for Medicare and Medicaid Services and to the State Board of Medical Examiners, submitted the audio recording of my visit with Dr. Ng and Johnny Yau's affidavit, and pointed Aetna to its own records showing it had paid Dr. Ng for my September 15, 2025 visit did Aetna reinvestigate. It then wrote to me on November 13, 2025: "We submitted this information to our Special Investigations Unit (SIU)," and "We contacted the provider and confirmed that you were seen by both of these providers." **Exhibit X** (Dkt. 32 at 29–30). I currently have no treating retinal surgeon. Because my spine surgeon, Dr. Sheeraz Qureshi, practices at HSS, a Defendant, I must also find a new spine surgeon. My longtime, trusted, caring female primary care physician, Dr. Uta Guo, has relocated to California. Since then I have been seeing Dr. Billy Li, Mr. Yau's primary care physician, and I am still seeking a female primary care physician.

20. I am currently delaying essential medical consultations with a retinal specialist for my right eye. I am doing so because the previous hostile encounters and the denial of critical diagnostic exams—which occurred immediately after providers accessed my electronic chart—have made it impossible for me to seek treatment safely. I am trapped in a position where seeking necessary care for a high-risk eye condition exposes me to immediate risk of further medical mismanagement and bodily violation due to the unverified, false Flags. In attempts to avoid these

fraudulent Flags, Mr. Yau and I have already paid about $15,000 out of pocket, documented by receipts, for uninsured, out-of-network, out-of-state, and international care: travel to see Dr. David Oji at Stanford Medicine in California and Dr. Diana Bejarano Pineda in Boston; imaging by Dr. Lev Kalika; consultations with Dr. Lew Schon; platelet-rich plasma treatments, including by Dr. Ryan Lingor; and a telemedicine consultation with a foot and ankle surgeon in Singapore. I believe the Flags follow me nationwide, including to insurers such as Aetna. Aetna's initial letter denied my complaint and credited PRISM's false statements that I never saw Dr. Elena Ng and that PRISM had no record of my seeing her. Aetna backtracked and referred PRISM/Dr. Ng to its Special Investigations Unit only after I sent the audio recording of my visit with Dr. Ng and an eyewitness affidavit stating that I did see Dr. Ng, and after I pointed out that Aetna's own Explanation of Benefits showed that Aetna itself had paid Dr. Ng for that date of service. **Exhibits W, X**.

21. I may need urgent care for my right eye or for another medical emergency at any time. Because the Flags remain in shared records that providers access, I face the risk that each new provider will act on them as providers have before. For that reason, I have avoided new providers and have seen only my long-standing physicians, who already know me.

22. On October 2, 2026, I went with Johnny Yau to the University Hospital emergency department in Newark because it was described to us as having a 24-hour

eye service and it is in a city neighboring Harrison. I went for irrigation of a chemical burn to my eyes after exposure to an expired contact-lens cleaning solution. I also reported flashes and a prior retinal surgery.

23. At intake, a nurse who identified himself as Charles examined me. He was courteous. He said my eyes were red and very irritated and that it "looks like conjunctivitis". To my knowledge, my chart had not yet been opened. After the chart was opened, other staff, including APN Sherry Sudama and ophthalmology resident Lauren Hayashi, M.D., were dismissive, condescending, and hostile. A staff member who identified himself only as Rob said he was a nurse; APN Sudama and others spoke down to him. Rob told me that eye, foot, and spine complaints are treated as non-emergencies, reserved for nurse practitioners, and handled in a separate APN-only area so as not to "waste resources with real doctors." Those are the three areas in which I have had surgery. He named them without being told. Mr. Yau and I both saw and heard APN Sudama pointing at my open chart on the computer to other staff and laughing as she stated I injured my eye.

24. No irrigation was provided. Dr. Hayashi performed a brief examination, reported normal findings, and diagnosed "dry eyes." The chemical burn I came in for was not treated. APN Sudama told me to flush my eyes with tap water from the bathroom. I refused. I told her that my eyes had a chemical burn and open wound, that tap water carries contaminants and bacteria that could cause infection and

potential blindness, and that I was irrigating with sterile saline that Mr. Yau and I had brought from home. I irrigated my eyes continuously in the emergency department with that saline. The only thing hospital staff gave me was a numbing eye drop, which APN Sudama administered while Mr. Yau stood beside me; it burned and made my eyes worse. APN Sudama appeared surprised that I knew this and appeared unaware of proper treatment for a chemical burn.

25. I was assigned to a four-patient room next to the psychiatric ward. APN Sudama told Mr. Yau and me together, while he stood right next to me, that regular patients are now placed with homeless patients in the same shared room, and that she herself had complained to her supervisors and was told that is the way it is. Mr. Yau and I have owned our home in New Jersey since 2001 and our second home in Florida since 2006. We are not homeless. A staff member directed me to a urine-puddled, foul-smelling chair. I refused to sit in it and asked for another room. The staff member became angry and said that if I did not want the chair, I would be taken back to the waiting area to wait a long time for another chair to open up. Mr. Yau and I saw several empty rooms, including one directly across the hall, and APN Sudama would not assign me one. I left the four-patient room and stood in the hallway with Mr. Yau until staff gave me a hallway gurney. When housekeeping mopped the hallway with a chemical cleaner and the fumes went into my eyes, I moved from the gurney into the empty curtained room across the hall. APN Sudama admonished me

for using it. I told her I was not going to sit on an uncomfortable gurney in the middle of a dirty, trafficked hallway, and that I would not sit in a nonhygienic shared room with homeless patients with an open wound in my eye and a possible eye infection. She finally relented.

26. My eyes are still burning, irritated, itchy, and red, and I continue to irrigate them regularly with sterile saline. After the emergency department visit, Mr. Yau and I went to buy oil-based eye drops, and at home those drops absorbed the toxic chemical residue from my eyes. Relying on my own medical knowledge, and with luck, I saved my own eyesight. I have not sought further eye care for this injury because of what happened at University Hospital and at the other providers described above after they accessed my chart. I have appointments with an ENT physician on October 27, 2026 and with a retinal surgeon on October 29, 2026, each of whom will access my records. I have requested my University Hospital chart and any flag, alert, behavioral, or psychiatric entry; that request is pending. Shortly after the visit, I emailed University Hospital's Patient Relations department with my patient-safety concerns. Patient Relations then sent me a letter by U.S. mail stating that it is investigating the October 2, 2026 incident. I later also posted a public review. I have also asked University Hospital, in writing, to amend any entries relating to home deficiency or limited health literacy. I can provide the Court with copies of my email and that letter upon request.

27. In September 2026, the Stand Up Harrison organization endorsed my write-in candidacy for Harrison Town Council, Ward 3, as one of its three candidates for Town Council, along with its candidate for mayor. The election is November 3, 2026. The October 2, 2026 eye emergency has caused serious medical and professional harm, including to my candidacy: it forces me to divert my energy, attention, time, and resources away from my professional campaign to medically treating myself to prevent potential blindness, and I cannot campaign in person with painful burning eyes with intermittent partial and, hopefully, only temporary loss of vision. StandUpHarrison.com listed all four candidates. A true and correct copy of the Stand Up Harrison poster announcing the slate is attached as **Exhibit AA**. As of October 12, 2026, Stand Up Harrison continues to list me on StandUpHarrison.com as its endorsed write-in candidate for Harrison Town Council, Third Ward; true and correct copies of those pages, captured that day, are included in **Exhibit AA**.

28. On February 26, 2026, the Superior Court of New Jersey, Bergen County (Hon. John D. O'Dwyer, P.J.Cv.), entered the preliminary-injunction Order attached to my motion as **Exhibit B**. It ordered Valley to disclose the Flags within seven days, enjoined Valley from relying upon or disseminating them, and ordered their preservation. On March 4, 2026, I received a one-line unsigned letter stating "no responsive documents." Valley produced nothing, not even a statement of which

computer systems it searched before claiming there were no responsive documents. That response is not credible.

29. I moved in the state court to enforce the Order. The state court denied that motion without addressing the merits of my claims. I had also moved to link my evidence-submission module to my state-court docket so that my evidence would be before the court, and to correct the obstructive clerks' placement of my surgical records in a psychiatric module, which gave the false impression that I have psychiatric flags and furthered the defamation of my name and character, and the state court did not rule on that motion. I then filed this federal action.

30. The state court administratively dismissed my case on June 23, 2026, without docketing my filings, 56 days before the August 18, 2026 lack-of-prosecution administrative dismissal date stated in the court's own written notice. I received no notice of the early dismissal.

31. I first learned of the June 23, 2026 dismissal, and that it had extinguished the state-court injunction, on August 19, 2026.

32. The false Flags have severely damaged my name and reputation, harmed me medically, and harmed me professionally. They are damaging my professional campaign by discrediting me across all arenas and fields, especially in the medical system. They designate me as a psychiatric and behavioral problem despite no psychiatric diagnosis, evaluation, treatment, or referral in my entire life. Providers

and others who open my chart see that designation, become scared or hostile, and discriminate against me, including by forcing nonconsensual interventions on me while I am unconscious and anesthetized in surgery, without the ability to refuse, including chemical restraint and battery, and sexual battery by inserting a Foley catheter into my private parts without my knowledge or consent. Defendants also actively concealed these interventions from my medical records. To this day, Defendants have not produced records of the Foley catheter, the barium, or the lumbar-spine MRI order, and Valley Patient Relations denied the MRI order on audio recording, despite Aetna/EviCore documentation showing that APN Julie Zavadenko obtained the preauthorization for the lumbar-spine MRI. Before seeing my chart, providers at a first visit tell me what a pleasure it is to meet me and that I am a very pleasant woman. I have the visit notes, and nearly all first-visit notes describe me as “very pleasant” or “pleasant,” or say it was a pleasure to meet Ms. Chan. I believe doctors do not access the Flags until after my first visit. At the second visit, they become distant, apprehensive, and dismissive. Sometimes they do not schedule a second visit at all. Front-desk staff, by contrast, access my records on their computers immediately, and they are immediately hostile; often they refuse to schedule my follow-up visit, or make up excuses not to schedule it. Defendants have never shown me the fabricated Flags, so I cannot challenge them or have them corrected and removed. I believe Defendants are actively concealing the Flags

because they do not want to be held legally or financially accountable for the nonconsensual, aberrant medical care that nearly cost me my life and my eyesight and that continues to disable me, including permanent eye injuries from retinal tears, with floaters and a Weiss ring, and ongoing vocal-cord and hearing problems (Dkt. 68, Ex. A), or for the damage to my reputation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 13, 2026.

/s/ Ki Sau Chan
Ki Sau Chan

## DECLARATION OF JOHNNY YAU
## IN SUPPORT OF MOTION FOR INJUNCTION PENDING APPEAL

I, Johnny Yau, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the life partner of Plaintiff-Appellant Ki Sau Chan. I make this declaration on personal knowledge in support of her motion for an injunction pending appeal. I worked for New York City Transit for about 35 years before I retired in 2025. We have owned our home in Harrison, New Jersey since 2001 and our second home in Florida since 2006. We are not homeless. Ms. Chan and I have been together for 28 years and have lived together for about 25 years. In her entire life, Ms. Chan has never been diagnosed with, evaluated for, or treated for any psychiatric condition, and she has never been referred for psychiatric care.

2. On June 3–4, 2021, after Ms. Chan and I repeatedly asked to speak with a nurse manager about her nursing mistreatment at HSS, staff sent me to retrieve our car. Afterward, we picked up a Valium (diazepam) prescription from her HSS discharge at our pharmacy. Ms. Chan never took it; the bottle remains full.

3. On September 8, 2021, Ms. Chan attended a post-operative appointment with Dr. Andrew Elliott at HSS's facility in Paramus, New Jersey. I drove there to pick her up. When she got into our car immediately afterward, she was visibly shaken, distressed, and close to tears. She showed me the original Patient Care Agreement ("PCA"), a behavioral contract, that Dr. Elliott had given her, and I

reviewed it inside our car. Although it was September 8, 2021, it bore an earlier date of July 13, 2021 that had been crossed out. It stated: “I understand that if I fail to meet these expectations, I will be barred from receiving treatment at the Hospital for Special Surgery.” I later listened to Ms. Chan’s audio recording of the appointment, on which Dr. Elliott states: “When you sent me that email that you sent to Schumer and all the state people and everything, I forwarded that to our legal department. The legal department came up with a patient care agreement contract.” On the same recording, when Ms. Chan asks whether she would be barred from receiving treatment if she did not sign the PCA, Dr. Elliott responds: “That’s correct. That’s correct.” I believe the PCA is the origin of the false flags in Ms. Chan’s medical records. Ms. Chan enrolled at Saba University School of Medicine but had to withdraw because of continuing post-operative complications from Dr. Elliott’s surgeries, and she paid withdrawal fees.

4. On February 18, 2025, I was with Ms. Chan at Valley Hospital before her scheduled shoulder surgery. I overheard the anesthesiologist, Dr. Jacob Abraham, instruct a trainee, Dr. Evelyn Bae, to “add Haldol to Zofran.” Haldol is haloperidol, an antipsychotic drug. We were both shocked. Dr. Abraham did not tell us about the Haldol until Ms. Chan confronted him after we overheard it. Ms. Chan asked Dr. Abraham why he would give her Haldol, an antipsychotic, when she has zero psych history. He said it was for anti-nausea and that sometimes Zofran is not enough. Ms.

Chan told him she had had nine prior surgeries and was always given Zofran for anti-nausea, never haloperidol (Haldol) and did not want Haldol. She refused it to both Dr. Abraham and pre-operative nurse Justin Madamba, and they both acknowledged her refusal. Dr. Abraham said he would not give her Haldol. It was the first time either of us had met Dr. Abraham.

5. I was with Ms. Chan at Valley Hospital every day of her admission in August 2025, except for short breaks. No physician or nurse discussed haloperidol, or a Foley catheter, with Ms. Chan in my presence or with me at any time. No one asked either of us for consent to either, in my presence. No one ever called me to discuss anything about Ms. Chan either.

6. On the night of August 12, 2025, after the surgery, night nurse Nicole Smith woke Ms. Chan and, while handling Ms. Chan's wristband to scan it, asked whether Ms. Chan wanted a Haldol. Ms. Chan asked why, since she has no psychiatric history. Nurse Smith said it had been prescribed by a doctor. I was shocked. Ms. Chan has no psychiatric history, and no one had ever told either of us that an antipsychotic had been ordered for her. I was also scared, because I knew she had nearly died: her surgery had been delayed for four days, her appendix had perforated, and the surgeon had to convert the operation to an open procedure. Ms. Chan then began recording on her cellphone. Nurse Smith later told Ms. Chan and me that a Foley catheter had been inserted into Ms. Chan during the two-hour

surgery, and said, “Well, if the surgery is not that long, then they don't do any catheter.” Ms. Chan recorded the conversation with Nurse Smith on her cellphone as it was made. Exhibit AE.

7. On October 2, 2026, I accompanied Ms. Chan to the University Hospital emergency department in Newark. She went for irrigation of a chemical burn to her eyes. I was present throughout the visit. I was close enough to hear the exchanges described below.

8. A male intake nurse named Charles was courteous and said Ms. Chan’s eyes were red and irritated and that she likely had conjunctivitis. After that, the staff who dealt with us, including APN Sherry Sudama and the ophthalmology resident, were dismissive and hostile. Ms. Chan and I both saw and heard APN Sudama pointing at Ms. Chan’s open chart on the computer to other staff and laughing as she stated Ms. Chan injured her eye. I heard Rob, who identified himself as a nurse, inform Ms. Chan that eye, foot, and spine complaints are treated as non-emergencies and reserved for nurse practitioners so as not to “waste resources with real doctors.”

9. Ms. Chan was assigned to a four-patient room with a urine-puddled, foul-smelling chair. She refused to sit in it and asked for another room. A staff member angrily told Ms. Chan and me that if she did not want the chair, we would be taken back to the waiting area to wait a long time for another chair to open up. APN Sudama told us that regular patients are now placed with homeless patients in the

same shared room, and that she herself had complained to her supervisors and was told that is the way it is. I saw several empty rooms nearby, including one directly across the hall, which Ms. Chan was not assigned. We stood in the hallway until staff gave her a hallway gurney. When housekeeping mopped the hallway with a chemical cleaner, the toxic fumes seeped into Ms. Chan's eyes and her eyes started burning, so she moved from the gurney into the empty curtained room across the hall. APN Sudama admonished her for using it. Ms. Chan told APN Sudama that her eyes were burning from the toxic housekeeping cleaning fumes and that she was not going to sit on an uncomfortable gurney in the middle of a dirty, trafficked hallway. APN Sudama finally relented.

10. No irrigation was provided. I heard APN Sudama tell Ms. Chan to flush her eyes with tap water from the bathroom, and I heard Ms. Chan refuse and explain that she was using sterile saline we had brought from home. I saw Ms. Chan irrigate her own eyes continuously with that saline in the emergency department. The only thing hospital staff gave Ms. Chan was a numbing eye drop. I was standing right beside her when APN Sudama administered it. It burned and made her eyes worse. After the visit, I bought oil-based eye drops for Ms. Chan, and I saw her use them at home to treat her burning eyes, along with continuous flushing with our sterile saline solution.

11. Ms. Chan is a write-in candidate for the Harrison Town Council, Ward 3, in the November 3, 2026 election, endorsed by the Stand Up Harrison organization. Since the October 2, 2026 visit, I have seen her unable to campaign in person because of her painful, burning eyes, and I have seen the time, energy, and resources she has had to divert from her campaign to this potentially blinding injury and to protecting herself from the effects of the false flags in her records. Her eyes are still burning today, and I see her irrigate them regularly with sterile saline.

12. Ms. Chan has continuing, chronic medical needs, including retinal, musculoskeletal, and spine conditions. She will need further care from new providers as well as from her regular physicians, such as Dr. Justin Tsai and Dr. Billy Li. Her longtime, trusted, caring female primary care physician, Dr. Uta Guo, has relocated to California, and Ms. Chan is still seeking a new female primary care physician and other new providers. Since then she has been seeing my primary care physician, Dr. Billy Li. Because her spine surgeon, Dr. Sheeraz Qureshi, practices at HSS, a Defendant, she must also find a new spine surgeon. I believe that the false flags in her records will cause her further medical injury with each new provider and emergency room, as I saw happen at Valley Hospital, at Dr. Elena Ng's office at PRISM, at HSS, and at University Hospital. Her concerns are deadly serious, not frivolous, speculative, or based on mere anxiety or fear. They are substantiated and real: I saw her nearly die at Valley Hospital in August 2025, and Ms. Chan nearly lost

her eyesight due to denial of a diagnostic exam by Dr. Elena Ng and delayed emergency eye surgery. I was present for each of the events I describe in this declaration. To try to avoid the false flags, Ms. Chan and I have already paid about $15,000 out of pocket, documented by receipts, for out-of-network, out-of-state, and uncovered care: travel to see Dr. David Oji in California and Dr. Diana Bejarano Pineda in Boston, on which I accompanied her; imaging by Dr. Lev Kalika; consultations with Dr. Lew Schon; platelet-rich plasma treatments, including by Dr. Ryan Lingor; and a telemedicine consultation with a foot and ankle surgeon in Singapore. We believe the false flags follow her nationwide, including to insurers such as Aetna, because the flags are in the shared electronic medical record system that is linked across the United States. She was nearly blinded by untreated retinal tears. The delays in her emergency surgeries nearly cost her her life and her vision.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 13, 2026.

Johnny Yau

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,200 words, excluding the parts exempted by Fed. R. App. P. 32(f) and the accompanying declarations, and is within the 5,200-word limit. It complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5)–(6) because it was prepared in a proportionally spaced typeface (Times New Roman) in 14-point type.

/s/ Ki Sau Chan
Dated: October 13, 2026

## CERTIFICATE OF SERVICE

I certify that on October 13, 2026, I filed the foregoing motion, two declarations, and Exhibits A through AK through this Court's CM/ECF system, which will send notice of electronic filing to all counsel of record who are registered CM/ECF users.

/s/ Ki Sau Chan

# EXHIBIT A

Letter Order of the District Court, August 28, 2026 (Dkt. 86)

Order under review (this Court's Document 1-2)

**Significance:** The order under review. It measured Appellant's noticed Rule 65(a) motion against Rule 65(b)(1)(A), the standard for temporary restraining orders issued without notice.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**CHAMBERS OF**
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

**MARTIN LUTHER KING COURTHOUSE**
**50 WALNUT ST. ROOM 4066**
**NEWARK, NJ 07101**
**973-297-4903**

August 28, 2026

VIA ECF
All Counsel of Record
Ki Sau Chan, pro se
403 Mcguigan Place
Harrison, NJ 07029
ki.chan@alumni.stanford.edu

**LETTER ORDER**

**Re: Chan v. Valley Health System, Inc. et al.**
**Civil Action No. 26-3358**

Dear Litigants:

Before the Court is pro se Plaintiff Ki Sau Chan's ("Plaintiff") Renewed Motion for a Preliminary Injunction ("Renewed Motion") pursuant to Federal Rule of Civil Procedure 65. See ECF No. 81. For the reasons set forth below, Plaintiff's Renewed Motion is **DENIED**.

On June 26, 2026, Plaintiff filed a motion for a preliminary injunction pursuant to Rule 65(a) seeking an order compelling Defendants to preserve and produce certain "flag" and "alert" entries, behavioral notations, audit trails, and access logs, and to enjoin Defendants from relying upon or disseminating the same. See ECF No. 51. On July 6, 2026, this Court issued an order on Plaintiff's request for preservation, production, and disclosure. See ECF No. 56.

As to the request for preservation, the Court reminded all counsel of their strict, ongoing ethical and professional obligations to ensure the preservation of all potentially relevant documents, electronically stored information, and physical evidence during the pendency of this litigation. See id. at 1–2. The Court further noted that federal law already imposes a self-executing duty to preserve evidence once litigation is reasonably anticipated, and counsel shall take all necessary proactive steps to ensure no alteration, deletion, or overwriting of metadata occurs. See id. at 2. The Court also stated that a formal preservation order would be largely cumulative, as there existed a parallel state court action involving these same underlying events, and the presiding state court judge appeared to have already entered an order compelling the preservation of all documents and records. See ECF No. 51, Ex A.

Plaintiff's Renewed Motion claims that the parallel state court action has been dismissed without prejudice. See ECF No. 81, at 1. Plaintiff argues that, because the state action is no longer

in effect, the "circumstance on which this Court's deferral rested has ceased to exist." See id. at 4. Thus, in Plaintiff's eyes, "no order now bars Defendants from relying upon or disseminating the flag entries." See id.

The dismissal of the state court action does not warrant an additional order here. The federal obligation to preserve evidence is absolute, independent, and attaches automatically by operation of law, meaning the absence of a parallel state court order does not diminish Defendants' ethical obligations and obligations under the Federal Rules of Civil Procedure. All counsel and parties are again reminded of their preservation duties as per the Court's July 6 Order.

Plaintiff also seek a preliminary order barring Defendants from disseminating any "red flag" issues, and other documents related to his healthcare. But Plaintiff has failed to demonstrate reasonable probability of success on a claim that would provide such relief; or how the denial of such relief would cause irreparable harm, since such allegations are hypothetical and speculative. See ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) (citations and quotations omitted) (stating "[e]stablishing a risk of irreparable harm is not enough" and emphasizing the "requisite feared injury or harm must be irreparable—not merely serious or substantial"). Subjective fear or anxiety regarding future medical encounters does not constitute objective, imminent, and non-speculative legal injury under the federal rules. See Fed. R. Civ. P. 65(b)(1)(A) (requiring "immediate and irreparable injury, loss, or damage").

For the foregoing reasons, Plaintiff's Renewed Motion, ECF No. 81, is **DENIED**. The Clerk of the Court is **ORDERED** to serve a copy of this Order upon Plaintiff via certified mail.

***s/ Madeline Cox Arleo***
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT B

Order of the Superior Court of New Jersey, Bergen County

BER-L-000003-26 (Hon. John D. O'Dwyer, P.J.Cv.), February 26, 2026

(Trans ID: LCV2026476693; also Dkt. 5, Ex. A; Dkt. 81, Ex. 4)

**Significance:** Having reviewed Appellant's exhibits and heard oral argument, the state court granted this very relief "for good cause shown": it ordered the Valley defendants to disclose all Flags within seven days, enjoined them from relying upon or disseminating the Flags, and ordered their preservation.

**AMENDED BY THE COURT**

**SUPERIOR COURT OF NEW JERSEY**
**LAW DIVISION – BERGEN COUNTY**

DOCKET NO. BER-L-000003-26

KI SAU CHAN,
Plaintiff,
v.
VALLEY HEALTH SYSTEM, VALLEY HOSPITAL,
VALLEY MEDICAL GROUP, and
JOHN/JANE DOES 1-50,
Defendants.

**ORDER**

THIS MATTER having been brought before the Court by Plaintiff Ki Sau Chan, pro se, by way of
Order to Show Cause for preliminary injunctive relief; the Court having reviewed Plaintiff's Brief,
Certification, and supporting exhibits; the Court having heard oral argument on February 26, 2026; and for good cause shown,
IT IS on this 26 day of February, 2026,
**ORDERED** as follows:

1. Defendants Valley Health System, Valley Hospital, and Valley Medical Group shall, within **seven (7) days** of the date of this Order, disclose to Plaintiff Ki Sau Chan (and her counsel, if any) copies of all "flag" or "alert" entries, behavioral notations, psychiatric designations, or similar alerts in Plaintiff's electronic medical records maintained by Defendants. Such disclosure shall include the full content of each entry, author, date of creation, source (including whether disseminated from another provider), and any associated notes, metadata, or audit trail information;

2. Defendants, their agents, employees, and all persons acting in concert with them are hereby **enjoined and restrained**, pending further Order of this Court, from:
(a) relying upon, acting pursuant to, or considering any undisclosed behavioral, psychiatric, or similar "flag" or "alert" entries when making clinical, administrative, or treatment decisions concerning Plaintiff Ki Sau Chan; and
(b) disseminating any such entries to other healthcare providers or third parties;

3. Defendants shall immediately **preserve**, without alteration, deletion, or modification, all electronic medical records, audit trails, access logs, and internal communications relating to any "flag" or "alert" entries or behavioral notations concerning Plaintiff Ki Sau Chan; and

This Order is entered without prejudice to any party's rights or defenses on the merits of the underlying claims.

____________________________

Hon. John D. O'Dwyer, P.J.Cv.

Dated: 2/26/26

# EXHIBIT C

Order of the District Court, July 6, 2026 (Dkt. 56)

**Significance:** The District Court deferred Appellant's request for production of the Flags "to the discovery process" and directed a Rule 16 conference. None has been held, and no scheduling order has issued.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KI SAU CHAN,**<br>*Plaintiff,*<br>**v.**<br>**VALLEY HEALTH SYSTEM, INC., *et al.*,**<br>*Defendants.* | **Civil Action No. 26-3358**<br>**ORDER** |

**THIS MATTER** having come before the Court upon pro se Plaintiff Ki Sau Chan's ("Plaintiff") Motion for Preliminary Injunction ("Motion") pursuant to Federal Rule of Civil Procedure 65(a) seeking an order compelling Defendants to preserve and produce certain "flag" and "alert" entries, behavioral notations, audit trails, and access logs, and to enjoin Defendants from relying upon or disseminating the same, see ECF No. 51;

and the Court having considered the submission;

and for good cause shown;

**IT IS** on this 6th day of July, 2026,

**ORDERED** that, as to the request for preservation, all counsel are reminded of their strict, ongoing ethical and professional obligations to ensure the preservation of all potentially relevant documents, electronically stored information ("ESI"), and physical evidence during the pendency of this litigation.[1] This obligation encompasses—but is not limited to—the specific flag and alert entries, behavioral notations, audit trails, access logs, and records relating to the haloperidol administration

[1] The Court notes that a formal preservation order from this Court at this juncture would be largely cumulative. In the parallel state court action involving purportedly these same underlying events, the presiding state court judge appears to have already entered an order compelling the preservation of all documents and records. See ECF No. 51, Ex A. Counsel are expected to maintain the highest standards of professional conduct across both jurisdictions to ensure the integrity of the evidentiary record.

and Foley catheter insertion identified in Plaintiff's Motion. While the law already imposes a self-executing duty to preserve evidence once litigation is reasonably anticipated, counsel are reminded that a failure to meet these ethical duties may result in sanctions. Counsel shall take all necessary proactive steps to ensure no alteration, deletion, or overwriting of metadata occurs; and it is further

**ORDERED** that, as to the request for production and disclosure, a motion for a preliminary injunction is an extraordinary remedy designed to maintain the status quo, not a mechanism to bypass the standard framework of the Federal Rules of Civil Procedure. Plaintiff's request for the immediate disclosure, production, and restriction on the use of these entries involves matters properly categorized as pre-judgment discovery. Accordingly, the request for production is **DEFERRED** to the discovery process; and it is further

**ORDERED** that, to ensure these critical discovery issues are addressed with the utmost efficiency and speed, this matter is hereby referred to the assigned Magistrate Judge, who shall promptly schedule a Rule 16 initial scheduling conference so that the parties may use that conference to discuss the scope, protocol, and targeted timeline for the production of the requested ESI, audit trails, and associated metadata; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order upon Plaintiff via certified mail.

**SO ORDERED.**

***s/ Madeline Cox Arleo***
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT D

N.J. State Board of Medical Examiners letter (Aug. 12, 2026) with Dr. Bernstein's narrative
Dkt. 100 at 33–38 (Declaration ¶ 7)

**Significance:** Defendant Dr. Kyra Bernstein's own narrative to the State Board states that she did not ask Appellant specifically about haloperidol, the antipsychotic ordered while Appellant was unconscious under general anesthesia.

# EXHIBIT 1

*to Plaintiff's Opposition to Dkt. 96*

Letter of Samuel A. Youssof, Esq. to the New Jersey State Board of Medical Examiners, dated August 12, 2026 (File No. MED-2026-02439), with Exhibit A thereto: Narrative of Defendant Kyra Bernstein, M.D., dated April 27, 2026

John W. Barker *
Gary W. Patterson, Jr. * •
Jeffrey R. Nichols * •
Mamie Stathatos-Fulgieri *
Dylan Braverman *
Kiki Chrisomallides * •
Scott A. Singer *
Gregg D. Weinstock *•+¤
Adam S. Covitt *+
Megan A. Lawless *•
Ralph Vincent Morales *

Kevin D. Porter *
Susan Vari *
Brian Andrews *
Jennifer Atchinson * • Δ
Robert Boccio *
Dawn Bristol *
Gilbert H. Choi *
Joshua R. Cohen *
Tricia M. Criscito *
Brian DiPentima *•
Charles K. Faillace *
Taryn M. Fitzgerald *
Lysa Friedlieb ¤

Danielle M. Hansen *
Anna Hock *
Thomas Jaffa *
Gemma Kenney *•+
Douglas Langholz*
Timothy P. Lewis ¤
Jennifer M. Lobaito *•
Rosemary E. Martinson*•
Nicole E. Martone *
Neil Mascolo, Jr. *
Adonaid Medina *•
Michael Milchan *
Joseph P. Muscarella *
Miles S. Reiner *
Bhalinder L. Rikhye *
Nicole C. Salerno *•
Matthew Shindell •Δ
Gonzalo Suarez *
Tammy A. Trees *
Karolina Wiaderna *¤
Arthur I. Yankowitz *+

Cielle Avena •
Zachary Benoit *
Kelly Bronner *
Julia R. Bryant *
Stephen Mario Cardarelli *
Patrick Duffy †
Jerica Gill *
Lauren P. Ingvoldstad†
Arijeta Kukic *
Patrick La Rosa *
Robert Lobaito *•
Rachel McGarry * • Δ
Jeremy Moldovan * • Δ
Alexandra Nieto *
Kayla Nieves *•
Gunjan Persaud *
Kevin Qu *
Aiden Ryder *
Lawrence Suarez ¤
Nicole A. Wolfer *+
Brandon Wong *
Cayley Young *

*Of Counsel*
Theresa A. Bohn *
Angela R. Bonica *•+
Roseann V. Driscoll *
Joseph D. Furlong *
John Katz *
Rani B. Kulkarni *
Daniel O'Connell *•¤
Seema Palmerson *
Bonnie LS. Parente *
Alesha N. Powell *•+
Valerie L. Siragusa *
Thomas W. Willis ¤
Samuel Youssof •Δ
Alexandra Zerrillo *•+

* Admitted to Practice in NY
• Admitted to Practice in NJ
+ Admitted to Practice in CT
Δ Admitted to Practice in PA
¤ Admitted to Practice in FL
† Admission Pending

BPN

**Barker Patterson Nichols**

STATHATOS-FULGIERI, BRAVERMAN, CHRISOMALLIDES, SINGER, WEINSTOCK, COVITT, LAWLESS, MORALES

August 12, 2026

**Via email: BMECOMPLAINT@dca.njoag.gov**

New Jersey Office of the Attorney General
Division of Consumer Affairs
State Board of Medical Examiners
P.O. Box 183
Trenton, N.J. 08625-0183

Attn: Antonia Winstead
Executive Director

Re: Ki Sau Chan, Complainant
File: MED-2026-02439
Our File No.: 0231-123

Dear Ms. Winstead:

This firm represents Kyra Bernstein, M.D., who is the subject of a complaint filed by former patient, Ki Sau Chan. Dr. Bernstein received correspondence from the Board dated April 10, 2026, advising of Ms. Chan's complaint and requesting a written narrative and medical records within twenty-one days. Pursuant to the Board's directive, Dr. Bernstein timely mailed the requested narrative and anesthesia chart to the Board by Certified Mail on April 27, 2026 (Tracking Number 9589071052703794103688). See **Exhibit A**, Narrative and **Exhibit B**, Certified Mail Receipt. The mailing was delivered to the Board on April 30, 2026. See **Exhibit C**, USPS Tracking.

As evidenced in Dr. Bernstein's narrative, the care provided at all times comported with the standard of care. Indeed, Ms. Chan communicated her history of post anesthesia nausea and vomiting, yet at no time expressed an aversion to the administration of haloperidol. Moreover, contrary to Ms. Chan's assertion, the standard of care does not require obtaining consent for every medication that may be used during the course of a procedure.

Finally, it was Dr. Bernstein's custom and practice to order haloperidol in the PACU to control nausea, provided the drug was not administered in the operating room. This is what occurred in the case of Ms. Chan. The sole purpose of dispensing haloperidol was to address Ms. Chan's nausea. Dr. Bernstein's responsibility was to manage Ms. Chan's anesthetic safely and provide Ms. Chan with utmost comfort. By all indications the procedure was a success. To be sure, Ms. Chan does not claim any adverse consequence from the administration of the haloperidol.

For the foregoing reasons, we respectfully request that the complaint be dismissed. If I can be of any assistance, please feel free to contact me. Thank you for your consideration.

Very truly yours,

*Samuel A. Youssof*

Samuel A. Youssof

cc: Kyra Bernstein, M.D. (kyra.bernstein@gmail.com)

# EXHIBIT A

Dear Ms. Winstead and the NJ Board of Medical Examiners,

Thank you for the opportunity to respond to Ms. Ki Sau Chan's complaint.

Given that the complaint refers to multiple anesthetic providers, I will first define and qualify my involvement in Ms. Chan's care. I took care of Ms. Chan on 8/12/2026 for an emergency laparoscopy which ultimately converted to an open procedure. I performed the pre-operative evaluation and started the case (pre-operative evaluation performed at 13:27 and case from 14:17-16:18). After the procedure had begun, I placed our standard post-operative order set, being mindful of the patient's listed and reviewed allergies and intolerances. Dr. Harry Owusu Dapaah, my colleague, took over the case for me at 16:18.
Attached, please find the anesthetic record for Ms. Chan's care which corroborates all timings listed as well as all of the medications provided during the intraoperative portion of the anesthetic.

I am unable to comment on Ms. Chan's other complaints regarding medical care provided outside of this specific anesthetic, as I did not have access to any of that information at the time of her care (audio recordings of conversations with prior anesthesiologists, records from Hospital for Special Surgery). I am also unaware of any type of "flag" in the patient's chart - in fact I am not aware of a system for flagging charts at all at The Valley Hospital. My one and only goal was to assess the patient before surgery, provide appropriate anesthetic care during surgery, and prescribe an immediate treatment plan for the patient's recovery in the post anesthesia care unit.

In our pre-operative conversation, I had the opportunity to review Ms. Chan's allergies, which are listed as "decadron, prednisone, triamcinolone, iodine, nickel, finasteride, and seasonal allergies." She also endorsed a history of post operative nausea and vomiting (PONV). The patient made no mention of a desire to avoid haldol during this conversation. In the complaint itself, Ms. Chan references a discussion about haldol that was had during a prior anesthetic with a different provider (Dr. Abraham) - this preference was not mentioned to me. As it is not standard of care to obtain consent for every medication that may be used during the course of an anesthetic I did not ask specifically about haldol.

I recall making an anesthetic plan which included multiple attempts to prevent PONV, including use of intraoperative ondansetron, metoclopramide, and a propofol infusion. As you can see from the attached anesthetic record, there was NO haldol administered during the intraoperative portion of the anesthetic by either myself or Dr. Dapaah.

Our standard order set for the post anesthesia care unit (PACU) includes an order for haldol 0.5mg x2 doses *if not administered in the operating room*. Because Ms. Chan had nausea in the PACU, and haldol was prescribed as an as needed (PRN) order, the nurse appropriately administered this medication according to the order.

I am saddened to hear that Ms. Chan believes that haldol was administered with mal-intent, or that there was concealment of a dose in the operating room. There was no haldol administered in the operating room. My only intent was to get her through her procedure in safety and comfort. I am also not aware of any adverse events of the PRN dose administered in the PACU.

Kyra Bernstein MD
4/27/2026

K Bernstein

# EXHIBIT E

Letter of Harry Owusu-Dapaah, M.D., to the N.J. State Board of Medical Examiners regarding Ki Sau Chan, April 20, 2026

(also Dkt. 81, Ex. 3)

**Significance:** Defendant Dr. Owusu-Dapaah writes: “Our goal was never to harm Ms. Chan or give her this medication without her consent.” By disclaiming any goal to medicate her without consent, he concedes that medicating her without consent is harm.

*State of New Jersey*
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CONSUMER AFFAIRS
STATE BOARD OF MEDICAL EXAMINIERS
PO BOX 183
TRENTON, NJ 08625-0183

Mikie Sherrill
*Governor*

DR. DALE G. CALDWELL
*Lt. Governor*

Jennifer Davenport
*Attorney General*

JEREMY E. HOLLANDER
*Acting Director*

April 29, 2026

Ki Sau Chan
ki.chan@alumni.stanford.edu
403 McGuigan Place
Harrison NJ 07029

Re: Harry Owusu-Dapaah
File: MED-2026-02439

Dear Ki Sau Chan,

As you were previously advised, the Medical Examiners (Board) is in receipt of your complaint regarding the above referenced licensee. The Board has received a response to your complaint from the licensee. Enclosed please find the licensee's narrative response regarding this matter.

You have the opportunity to review the licensee's narrative response and submit a reply for the Board's consideration. Please be advised this opportunity to reply is optional and a reply from you is not required. Should you wish to reply, please submit one (1) final written response within twenty-one (21) days from the date of this letter. Please note any additional documentation and information for the Board's consideration must be submitted at this time.

Following the 21-day period, the matter will be scheduled for Board review, with or without your reply. The Board will consider all available information to determine if any Board laws or regulations have been violated. The Board may determine to request additional information from the involved parties, expand the investigation, refer the matter to another agency, close the matter with no disciplinary action, or pursue disciplinary action. Disciplinary actions may include the assessment of a civil penalty, completion of additional continuing education, a reprimand, license restriction or suspension, and/or revocation or surrender of license. You will be notified in writing of the Board's final determination.

The Board would like to take this opportunity to provide you with the following reminders:

This information is being provided to you as part of the Board's investigation into this complaint. During the active investigation process, the Board does not disclose any information regarding the investigation, and accordingly requests that you also keep confidential any information or documents you may receive during the course of this investigation.

The amount of time it takes for the Board to make a final decision depends on many factors. If the Board determines to request additional information from involved parties, expand the investigation, refer the matter for additional legal analysis or pursue disciplinary action against the licensee, it may extend the time that it takes to resolve the matter.

The Board is not able to keep you apprised of details concerning its investigation while it is ongoing, as the investigation is confidential until the matter is closed. Please be assured that your complaint will be given every consideration.

Sincerely,

Antonia Winstead
*Antonia Winstead*
Executive Director
NJ Board of Medical Examiners

April 20, 2026

NJ Office of the Attorney General
Division of Consumer Affairs
State Board of Medical Examiners
PO BOX 183
Trenton, NJ 08625-0183

Re: Ki Sau Chan

Dear NJ State Medical Board,

My name is Harry Owusu-Dapaah. I am a staff attending physician with Bergen Anesthesia Group (BAG) who provides anesthesia care to patients at The Valley Hospital. I am board certified in both internal medicine and anesthesiology. The patient's complaint to the medical board lists me as a trainee under the supervision of Dr. Kyra Bernstein. That is not an accurate designation. On August 12, 2025 I was a board-eligible anesthesia attending physician employed by BAG at The Valley Hospital who assumed care of the patient in question from Dr. Bernstein at 16:18. I was on-call on this late afternoon and was assigned to relieve Dr. Bernstein for the day.

Before presiding over Mrs. Chan's care I was given an appropriate summary of events from Dr. Bernstein regarding the patient's indication for surgery, past medical/surgical history, home medications, allergies, preoperative and intra-operative vitals, pertinent labs, airway management and medications that had been already administered. Less than an hour after taking care of Mrs. Chan surgery was complete. At this time I successfully emerged her from anesthesia, extubated without difficulty and transported her safely to the post operative care unit (PACU). A summary of the patient's intraoperative events was reported to the receiving PACU nurse. There were no significant events reported. Due to the patient's drowsiness after receiving anesthesia I never had a meaningful conversation or verbal interaction with the patient. I never interacted with the patient prior to surgery either. I also never personally administered or authorized the use of haloperidol to Mrs. Chan. The anesthesia record reflects this as well as the patient medication administration record (MAR) while the patient was in PACU.

At no point was I told that the patient did not want haloperidol administered. I was not privy to any prior conversations the patient had with other anesthesiologists regarding haloperidol or any commonly used anesthesia medications. I did not place any medication orders for this patient during their entire hospital stay and the medical record reflects this. Personally, It is not my practice to give haloperidol intraoepratively. A review of my anesthesia records from prior patient's would demonstrate this. Haloperidol is one of the anti-nausea agents that exists in our

PACU order set for patients recovering from anesthesia. It is our practice to place PACU orders for a patient at some point prior to bringing them to PACU. If a patient requires an additional agent for rescue nausea our order set instructs nursing to give haloperidol as needed. The anesthesia record shows that neither Dr. Bernstein or myself administered haloperidol during the intraoperative phase of our care.

Dr. Bernstein, a colleague who I admire, is an exceptional anesthesiologist who provides world-class care. If the patient in question ever outlined that she did not want to receive haloperidol during her hospital stay I have no doubt in my mind that Dr. Bernstein would ensure this would not happen.

Our goal was never to harm Ms. Chan or give her this medication without her consent. It is a great shock to me that this is her sentiment. Our goal was to deliver outstanding care to Ms. Chan as we would for any other patient.

Please feel free to contact me with questions or concerns.

Harry Owusu-Dapaah

# EXHIBIT F

Anesthesia and operative records from Appellant's seven prior surgeries (2018–2023)

Dkt. 100 at 39–59 (Declaration ¶¶ 8–10)

**Significance:** Seven prior surgeries under anesthesia at other institutions: no haloperidol and no post-operative nausea and vomiting; several expressly record "PONV Status: none." Valley's defense counsel, in his opposition brief, and the two Defendant anesthesiologists claimed that haloperidol (an antipsychotic) was used as an "anti-nausea" agent because Appellant had a history of PONV (Exhibits P, D, E). These seven surgical records document zero history of PONV. Where anti-nausea drugs were given, the records list ondansetron (Zofran) and dexamethasone (Decadron), never haloperidol. There was no medical basis for the antipsychotic haloperidol, which was forced upon Appellant while she was unconscious and sedated in surgery.

# EXHIBIT 2

*to Plaintiff's Opposition to Dkt. 96* ***(Certification of Plaintiff Ki Sau Chan ¶ 8)***

- Seven (7) of Plaintiff's Anesthesia and/or Operative records for her seven (7) consecutive surgeries from years 2018 through 2023 across five different hospitals, immediately before Plaintiff's first encounter with Valley in February 2025.
- **None of the seven medical records across five different hospitals list haloperidol for Plaintiff.**
- **None of the seven documents nausea, vomiting or PONV as a complication.**
- **In summary, Plaintiff has no history of haloperidol. Contrary to Dr. Bernstein's statement that Plaintiff "endorsed a history of post operative nausea and vomiting (PONV)," Plaintiff has no history of PONV. See Ex. 1.**

| Surgery Date | Hospital/ Surgeon | Anesthesia | Haloperidol | PONV (Post-operative nausea and vomiting) | Type of record (Excerpts) | Ex. Pp. |
|---|---|---|---|---|---|---|
| 6/29/2018 (Discharged 6/30/2018) | Mount Sinai (Dr. Roonprapunt) | General | **None** | **Complications: NO nausea listed** | Operative report p.1 | 8 |
| 1/7/2019 (Discharged 1/8/2019) | NYP/Columbia (Dr. Riew) | General | **None** | **"Complication: None"** | Operative report p.1, Anesthesia PACU Discharge Documentation medication list shows NO haloperidol | 9-11 |
| 9/19/2019 | HSS (Dr. Qureshi; anesthesia Dr. Yang) | General | **None** | **"PONV Status: none"** | Operative report p. 1, MyHSS anesthesia event medication list shows NO haloperidol; Anesthesia Post Evaluation | 12-14 |
| 12/17/2020 | HSS (Dr. Elliott; anesthesia Dr. Dimeo) | Spinal/ popliteal | **None** | **"PONV Status: none"** | Operative report p. 1; MyHSS anesthesia event medication list shows NO haloperidol; Anesthesia Post Evaluation | 15-17 |
| 6/3/2021 (Discharged 6/4/2021) | HSS (Dr. Elliott; pre-anesthesia Dr. Soffin) | Spinal/ popliteal | **None** | **"PONV Status: none"** | Operative report p. 1; MyHSS medication list shows NO haloperidol; Anesthesia Post Evaluation | 18-20 |
| 8/5/2022 | NYU Langone (Dr. Tsai; anesthesia Dr. Noorbaksh) | MAC/ sedation | **None** | **"no PONV"** | Operative report p. 1 (anesthesia event medication list shows NO haloperidol; Anesthesia Postprocedure Evaluation ('no PONV') | 21-24 |
| 9/14/2023 | Lenox Hill (Dr. Tsai; anesthesia Dr. Davis) | General | **None** | **None; "extubated without complications."** | Operative report p. 1, Anesthesia record shows NO haloperidol and NO PONV documented. | 25-27 |

Chan, Ki S (MR # [redacted] DOB: [redacted]

No haloperidol given - June 30, 2018 surgery
No nausea, no PONV

# Chan, Ki S

MRN: [redacted]
Description: 49 year old female

**OP Operative Report** Date of Service: 06/29/18 0001
Creation Time: 06/30/18 1230

Chanland Roonprapunt, MD
NEUROLOGICAL SURGERY, GENERAL

DATE OF OPERATION: 06/29/2018

SURGEON: CHANLAND ROONPRAPUNT, MD
ASSISTANT: FRANK FIUMECALDO, P.A.

PREOPERATIVE DIAGNOSIS: Cervical spondylosis with myelopathy, C4-C5 and C5-C6.

POSTOPERATIVE DIAGNOSIS: Cervical spondylosis with myelopathy, C4-C5 and C5-C6.

OPERATIONS PERFORMED: Anterior cervical diskectomy and fusion, C4-C5 and C5-C6, with placement of interbody cage for purposes of spinal fusion and instrumentation with neurophysiologic monitoring and fluoroscopy guidance.

ANESTHESIA: General.

ANESTHESIOLOGIST: Dr. Kassapidis.

SPECIMEN: Disk.

ESTIMATED BLOOD LOSS: 50 cc.

COMPLICATIONS: Incidental right C5-C6 durotomy.

INDICATIONS: The patient is a 49-year-old female who presents with a history of progressively worsening severe right neck pain, radiating to her right upper extremity, associated with right deltoid and biceps weakness. MRI and CT scan has revealed multilevel cervical spondylosis with severe neural foraminal stenosis. The patient was

No haloperidol given - Jan 8, 2019 surgery
No complications

ColumbiaDoctors | *Orthopedics*

K. Daniel Riew M.D.
ColumbiaDoctors Orthopedics
622 West 168 Street, PH11
New York, NY 10032
(212) 932-5100

columbiaortho.org

Patient: KI CHAN
MRN: [redacted]

Date of Visit: Jan 8 2019
DOB: [redacted]

**APPOINTMENTS**
(212) 305-4565
appts-ortho@cumc.columbia.edu
columbiaortho.org

**LOCATIONS**

**Midtown Manhattan**
*51 West 51st Street*
*590 5th Avenue*
*343 West 58th Street*

**Northern Manhattan**
*NYP/Columbia*
*161 Ft. Washington Ave*
*NYP/Allen Hospital*
*5141 Broadway*
*Morningside Heights*
*601 West 113th Street*

**Westchester**
*155 White Plains Road*
*Tarrytown*
*85 Pondfield Road*
*Bronxville*

**New Jersey**
*500 Grand Avenue*
*Englewood*

New York Presbyterian Hospital - Columbia
Operative Report
NAME:CHAN, KI
MRN:4845127
ATT:
DICT:Daniel K. Riew, MD
Admit Date:01/07/2019
Discharge Date:
Procedure Date:01/07/2019
SURGEON: DANIEL K. RIEW, MD
PREOPERATIVE DIAGNOSIS:
STATUS POST ANTERIOR CERVICAL DISKECTOMY AND FUSION AT C4-5 AND C5-6 WITH
STAND-ALONE CAGES BY A DIFFERENT SURGEON AT MT. SINAI WITH PSEUDOARTHROSIS,
RECURRENT RADICULOPATHY, KYPHOSIS, AND PERSISTENT CENTRAL AND FORAMINAL
STENOSIS.
POSTOPERATIVE DIAGNOSIS:
STATUS POST ANTERIOR CERVICAL DISKECTOMY AND FUSION AT C4-5 AND C5-6 WITH
STAND-ALONE CAGES BY A DIFFERENT SURGEON AT MT. SINAI WITH PSEUDOARTHROSIS,
RECURRENT RADICULOPATHY, KYPHOSIS, AND PERSISTENT CENTRAL AND FORAMINAL
STENOSIS.
OPERATION:
1.COMPLEX ANTERIOR CERVICAL RIGHT-SIDED CORPECTOMY OF C5 WITH REMOVAL OF
ANTERIOR CERVICAL CAGES AT C4-5 AND C5-6 THAT WERE STRYKER STAND-ALONE CAGES.
2.ANTERIOR CERVICAL FUSION AT C4-5.
3.ANTERIOR CERVICAL FUSION AT C5-6.
4.ANTERIOR CERVICAL DISKECTOMY AND FUSION AT C6-7.
5.ANTERIOR CERVICAL PLATING C4 THROUGH 7 WITH A BIOMET MAXAN GREEN PLATE.
6.A STRUCTURAL FRESH FROZEN ILIAC CREST ALLOGRAFTING.
7.LOCAL AUTOLOGOUS BONE GRAFTING.
8.DEMINERALIZED BONE MATRIX PLUS EXTRA-EXTRA SMALL BMP GRAFTING.
9.MICRODISSECTION FOR CORPECTOMY.
ASSISTANT:
SIMON MORR, MD.
ANESTHESIA:
Anesthesia general tracheal.
BLOOD LOSS:
150 mL.
COMPLICATION:
None.
INDICATION FOR PROCEDURE:

Columbia University Medical Center

NewYork-Presbyterian

| MRN: 484 51 27<br>Visit: 000011289 909<br>Age: 51y [redacted]1969) | CHAN, KI<br>Gender: Female | NY-Presbyterian CPMC<br>Current Location:<br>AR2W-2067-01 |
|---|---|---|

*No haloperidol given - Jan 7-8, 2019 surgery*

**References:**
1. Data Referenced From "Anesthesia PACU Discharge Documentation" 1/7/2019 08:02 PM

**********************************************************************************************

**Order Reconciliation [Charted Location: AR2W-2067-01] [Authored: 07-Jan-2019 21:06]- for Visit: 000011289 909**, *Complete, Entered, Signed in Full, General*

**Reconciliation Type: Admission requested on behalf of Rashid, Aleena (PA) done by Rashid, Aleena (Physician Asst)**

**Admission - Reconciliation: 07-Jan-2019 21:06 by: Rashid, Aleena (Physician Asst)**

| Home Medications | Entered | Last Dose Taken | Reconciled with current Order | Reconciliation Comment/ Additional Information |
|---|---|---|---|---|
| Flexeril 10 mg oral tablet 10 milligram(s) orally every 8 hours, As Needed -Indication: pain | 07-Jan-2019 | 05-Jan-2019 | | Reviewed and Reconciled |
| gabapentin 300 mg oral capsule 1 orally once a day, As Needed -Indication: pain | 07-Jan-2019 | December, 2018 | | Reviewed and Reconciled |
| levothyroxine 25 mcg (0.025 mg) oral tablet 1 tab(s) orally once a day -Indication: thyroid supplements | 07-Jan-2019 | 07-Jan-2019 8:00 AM | | Reviewed and Reconciled |

| Additional Current Orders |
|---|
| Acetaminophen Tab 975 mg Oral q8h-(6,14,22). Do not exceed 4 g acetaminophen in a 24 hr period. |
| Adult PCA Hydromorphone (CONTINUOUS)--Basic Continuous Dose: 0 mg/hrDuration of Continuous Infusion: 24hr ContinuousConcentration: 0.2 mg/mlRoute: IV PCA20 mg |
| Adult PCA Hydromorphone (DEMAND ONLY)--Basic Demand Bolus = PCA Demand Dose: 0.2 mg, Demand BolusDose Lock out: 10 MinutesConcentration: 0.2 mg/mlRoute: IV PCA20 mg, Total dose per period1 Hr Limit: 1.2 mg/hr |
| Benzocaine-Menthol Oral 1 lozenge Oral q4h PRN for Sore Throat |
| ceFAZolin Sodium Inj 2000 mg in D5W 100 mL infuse over 30 min IV PiggyBack q8hr for patients weight < 120 kg. Refrigerate. Medication Indication: 02. Surgical/procedural prophylaxis |
| Cyclobenzaprine Oral 10 mg Oral q8hr PRN for spasms Hold for m-POSS >/= 2 or RASS </= -2, respiratory rate < 11 per minute, and BP < 110/68 notify the NP/PA/MD B 80458 |
| Dexamethasone Inj 1 mg infuse over 2 min X:2 Doses IV Push q6hr |

| | | |
|---|---|---|
| MRN: 484 51 27<br>Visit: 000011289 909<br>Age: 51y [redacted]1969) | CHAN, KI<br>Gender: Female | NY-Presbyterian CPMC<br>Current Location:<br>AR2W-2067-01 |

*No haloperidol given - Jan 7-8, 2019 surgery*

| Additional Current Orders |
|---|
| Dexamethasone Inj 2 mg infuse over 2 min X:3 Doses IV Push q6hr |
| Dexamethasone Inj 3 mg infuse over 2 min X:3 Doses IV Push q6hr |
| Dexamethasone Inj 4 mg infuse over 2 min X:3 Doses IV Push q6hr |
| Docusate Sodium Cap 100 mg Oral tid-(9,13,17) Hold for loose stool |
| Gabapentin Cap 300 mg Oral Bedtime (Adults) 9pm |
| HYDROmorphone Inj 0.2 mg infuse over 3 min X:3 Doses IV PUSH q10 min PRN for PACU-Pain, Mild Scale 1-3 Give only if not tolerating PO While in the PACU, PRN orders for pain or nausea/vomiting will not be valid unless they specify for "PACU". Once outside of the PACU, orders designating "PACU" are no longer valid. |
| HYDROmorphone Inj 0.3 mg infuse over 3 min X:3 Doses IV PUSH q10 min PRN for PACU-Pain, Moderate Scale 4-6 Give only if not tolerating PO While in the PACU, PRN orders for pain or nausea/vomiting will not be valid unless they specify for "PACU". Once outside of the PACU, orders designating "PACU" are no longer valid. |
| HYDROmorphone Inj 0.4 mg infuse over 3 min X:3 Doses IV PUSH q10 min PRN for PACU-Pain, Severe Scale 7-10 Give only if not tolerating PO While in the PACU, PRN orders for pain or nausea/vomiting will not be valid unless they specify for "PACU". Once outside of the PACU, orders designating "PACU" are no longer valid. |
| Influenza Virus Vaccine Inj >3 Years Old 0.5 ml X:1 Doses IntraMUSCULAR Once Administer during Hospitalization |
| Ketorolac Inj 15 mg infuse over 0.5 min X:10 Doses IV PUSH q6hr |
| Lactated Ringers 1000 ml IV Cont Infusion at 75 ml/hr |
| Levothyroxine Sodium Oral 25 microgram Oral daily 6am |
| Naloxone HCl Inj 80 microgram IntraVENOUS q2 min PRN for m-POSS>=2,RASS<= -2,RR<8/min Dilute 0.4 mg with 9 ml of NS:Give 2 ml (80 mcg) |
| Ondansetron Inj 4 mg infuse over 2 min IV PUSH q6hr PRN for PACU-Nausea or Vomiting Give only if not tolerating PO While in the PACU, PRN orders for pain or nausea/vomiting will not be valid unless they specify for "PACU". Once outside of the PACU, orders designating "PACU" are no longer valid. |
| Pantoprazole Delayed Release Tab 40 mg Oral daily 9am |
| Pneumococcal Polysaccharide Vaccine (23-valent) (Pneumovax 23) Inj 0.5 ml X:1 Doses Subcutaneous Once Administer during Hospitalization. 25mcg= 0.5ml |
| Polyethylene Glycol Oral 1 packet Oral bid-(9,17) PRN for Constipation At beginning of POD1 hold after first BM and notify MD/NP/PA |
| Senna Oral 17.2 mg Oral bid-(9,17) Hold for loose stool. 2 tablets = 17.2 mg |
| Sodium Chloride 0.9% Neb Soln 3 ml INHALATION q4h PRN for Cough |

*****************************************************************************************

**Pain Service Free Text Note [Charted Location: AR2W-2067-01] [Authored: 07-Jan-2019 23:07]- for Visit: 000011289 909,** *Complete, Entered, Signed in Full, General*

**Preferred Language:**
Preferred Language English(1)

**Pain Service Free Text:**

MRN: [redacted]

# Chan, Ki Sau

**No haloperidol given - September 19, 2019 surgery**
**No nausea, no PONV**



**Qureshi, Sheeraz, MD**
Physician
Orthopedic Surgery

Op Note
Signed

Date of Service: 9/19/2019 12:00 AM

THE HOSPITAL FOR SPECIAL SURGERY
OPERATIVE RECORD

Patient Name: Chan, Ki MR# [redacted] Date: 9/19/2019

ATTENDING SURGEON: Sheeraz A. Qureshi, M.D.

OPERATING SURGEON: SHEERAZ QURESHI, M.D.

ASSISTANT: M. JIMENEZ, P.A.

PREOPERATIVE DIAGNOSIS: LEFT LOWER EXTREMITY RADICULOPATHY SECONDARY TO L2-3 FAR LATERAL DISK HERNIATION CAUSING COMPRESSION ON THE L2 NERVE WITH POSSIBLE L1-2 DISK HERNIATION.

POSTOPERATIVE DIAGNOSIS: FAR LATERAL L2-3 DISK HERNIATION.

NAME OF OPERATION: EXTREME LATERAL APPROACH TO L2-3 DISK USING DIRECT VISUALIZATION AND EMG AND MOTOR EVOKED POTENTIAL MOTORING FOLLOWED BY FAR LATERAL DISKECTOMY ON LEFT HAND SIDE AT L2-3 TO DECOMPRESS THE L2 NERVE ROOT. USE OF OPERATING MICROSCOPE FOR LUMBAR SPINE SURGERY.

ANESTHESIA: GENERAL ENDOTRACHEAL.

FLUIDS: FROM ANESTHESIA.

ESTIMATED BLOOD LOSS: MINIMAL.

DRAINS: NONE.

HARDWARE: NONE.

DISPOSITION: STABLE TO RECOVERY ROOM MOVING ALL EXTREMITIES TO COMMAND.

INDICATIONS FOR PROCEDURE:
The patient is a 50 year-old female who was referred by a spine surgeon at Mt. Sinai. She reports a long history of left lower extremity symptoms that started in 2017. While they initially responded to non-surgical methods, they did require her to visit the Emergency Room due to her pain level on at least one occasion. Intermittently, in between the time that her leg symptoms began, she developed cervical spinal issues for which she required two different surgeries and is now feeling like she is finally recovering. As she is recovering, she developed 100% left anterior thigh pain which she reported being a constant stabbing, burning. She rated this a 10/10 on the pain scale. She stated that she had attempted physical therapy, medication and injections and, with her most recent injections and physical therapy, she felt her symptoms got worse instead of better. On her physical exam preoperatively, she had a tremendous amount of pain with hip flexion as well as left lateral bending. She had 4/5 weakness in her hip flexors as well as the upper portion of her quadriceps. She also reported diminished sensation to light touch of the left thigh in an L2 distribution. Otherwise, the remainder of her physical exam seemed appropriate. MRI was performed at HSS following the office visit which confirmed findings on a previous outside MRI; specifically, there was a far lateral disk herniation at L2-3. This was located further out laterally than even normal far lateral disk herniation and appeared to be causing compression on the L2 nerve root over the posterior third to half of the disk space. There was also question of a disk herniation at L1-2. The decision

Name: Ki Sau Chan | DOB: [redacted] MRN: [redacted] | PCP: Billy Li, MD | Legal Name: Ki Sau Chan

*No haloperidol given - September 19, 2019 surgery*
*No nausea, no PONV*

# Anesthesia Event - Sep 19, 2019

with Elaine Yang at Hospital for Special Surgery Operating Room

## After Visit Summary®

## AFTER VISIT SUMMARY

**Ki S. Chan** MRN: [redacted]
CEID: [redacted]

9/19/2019 Hospital for Special Surgery Operating Room 212-606-1000

## Today's Visit

You saw Wendy Smart-Lazare on Thursday September 19, 2019.

### Medications Given

acetaminophen (OFIRMEV) Last given 9/19/2019 4:18 PM
bupivacaine PF (MARCAINE) Last given 9/19/2019 3:20 PM
ceFAZolin (ANCEF) Last given 9/19/2019 3:35 PM
dexamethasone (DECADRON) Last given 9/19/2019 3:29 PM
famotidine Last given 9/19/2019 3:29 PM
fentaNYL (SUBLIMAZE) Last given 9/19/2019 4:39 PM
ketorolac (TORADOL) Last given 9/19/2019 4:18 PM
lactated Ringer's
lidocaine PF (XYLOCAINE) Last given 9/19/2019 3:17 PM
midazolam (VERSED) Last given 9/19/2019 3:12 PM
ondansetron (ZOFRAN) Last given 9/19/2019 4:18 PM
propofol (DIPRIVAN) Last given 9/19/2019 3:13 PM
propofol (DIPRIVAN) Stopped 9/19/2019 4:13 PM
succinylcholine (ANECTINE) Last given 9/19/2019 3:17 PM

## What's Next

You currently have no upcoming appointments scheduled.

## How to Contact this Office

If you have any questions about this visit, please contact our office at 212-606-1400. You may also send a message to your provider via MyHSS (see the MyHSS section for instructions on how to log in.)

Office of Wendy N Smart-Lazare, CRNA
535 EAST 70TH STREET
NEW YORK NY 10021-

HSS

HSS Main Hospital
535 E. 70th Street
New York NY 10021-4823

Chan, Ki Sau
MRN: [redacted] DOB: [redacted] Legal Sex: F
Adm: 9/19/2019, D/C: 9/19/2019

***No haloperidol given - September 19, 2019 surgery***
***No nausea, no PONV***

## 09/19/2019 - Admission (Discharged) in 4th Floor Post Anesthesia Care Unit (continued)

**Anesthesia on 09/19/19 (continued)**

Electronically signed by Yang, Elaine I, MD at 9/19/2019 4:49 PM

**Anesthesia Postprocedure Evaluation**

**Kitchens, Michael D, MD at 9/19/2019 1841**

Author: Kitchens, Michael D, MD
Filed: 9/19/2019 6:42 PM
Editor: Kitchens, Michael D, MD (Resident)

Service: —
Date of Service: 9/19/2019 6:41 PM

Author Type: Resident
Status: Signed

Patient: Ki Sau Chan

### Procedure Summary

Date: 09/19/19
Anesthesia Start: 1512
Procedure: DISCECTOMY ( L2-3 FAR LATERAL DISCECTOMY) (Posterior Spine Lumbar)

Surgeon: Qureshi, Sheeraz, MD
Anesthesia Type: general

Room / Location: OR MAIN24 / HSS MAIN OR
Anesthesia Stop: 1649
Diagnosis:
Lumbar disc herniation
(Lumbar disc herniation [M51.26])
Responsible Provider: Yang, Elaine I, MD
ASA Status: 2

Anesthesia Type: general
Last vitals

| | |
|---|---|
| BP | BP: 150/77 (09/19/19 1800) |
| Temp | 37 °C (09/19/19 1800) |
| Pulse | 81 (09/19/19 1800) |
| Resp | 14 (09/19/19 1800) |
| SpO2 | 97 % (09/19/19 1800) |

### Anesthesia Post Evaluation

Patient participation: **patient participated**
Mental Status: **awake and alert**
Pain management: **adequate**
Airway patency: **patent**
Anesthetic complications: **no**
Cardiovascular status: **acceptable**
Respiratory status: **acceptable**
Post Op Hydration: **acceptable**
PONV Status: **none**

Electronically signed by Kitchens, Michael D, MD at 9/19/2019 6:42 PM



42 CFR part 2 prohibits unauthorized disclosure of these records.

*No haloperidol given - December 17, 2020 surgery*
*No nausea, no PONV*

## Chan, Ki S

MRN: [redacted]

**Elliott, Andrew J, MD**
Physician
Foot & Ankle

Op Note
Signed

Date of Service: 12/17/2020 12:00 AM

THE HOSPITAL FOR SPECIAL SURGERY
OPERATIVE RECORD

Patient Name: Chan, Ki MR# [redacted] Date: 12/17/2020

ATTENDING SURGEON: Andrew Elliott, M.D.

OPERATING SURGEON: ANDREW ELLIOTT, M.D.

ASSISTANT: ALEX ANATONE, M.D.

PRELIMINARY DIAGNOSIS: RIGHT POSTERIOR TIBIAL TENDON DYSFUNCTION STAGE 2 A.

POSTOPERATIVE DIAGNOSIS: RIGHT POSTERIOR TIBIAL TENDON DYSFUNCTION STAGE 2A WITH SPRING LIGAMENT TEAR.

NAME OF OPERATION:
1. RIGHT POSTERIOR CALCANEAL MEDIALIZING OSTEOTOMY (APPROXIMATELY 8 MM).
2. RIGHT FIRST MEDIAL CUNEIFORM OPENING WEDGE OSTEOTOMY (COTTON OSTEOTOMY APPROXIMATELY 5 MM).
3. RIGHT POSTERIOR TIBIAL TENDON REPAIR.
4. RIGHT FLEXOR DIGITORUM LONGUS TRANSFER TO NAVICULAR.
5. RIGHT SPRING LIGAMENT REPAIR.
6. FLUOROSCOPY 1 HOUR FOR JUDGMENT OF PLACEMENT OF HARDWARE AND CORRECTION.
7. iliac crest aspirate for production of BMAC.

ANESTHESIA: SPINAL AND POPLITEAL.

INDICATIONS: The patient has had longstanding medial ankle pain. Despite nonoperative treatment, she has continued to have continued pain. She had a flatfoot reconstruction on the other side with some good results. After discussion with the patient of risks and benefits of operative vs. nonoperative intervention, we elected to proceed with operative intervention.

FINDINGS OF PROCEDURE:

ESTIMATED BLOOD LOSS: APPROXIMATELY SOMEWHERE BETWEEN 5 AND 10 ML.

SPECIMENS REMOVED: NONE.

IMPLANT: 4.5 X APPROPRIATE LENGTH SCREWS FROM THE ARTHREX TITANIUM SCREW CADDY, RIGHT 2.0 THREE-HOLE PLATE WITH CORRESPONDING LENGTH

Name: Ki Sau Chan | DOB: [redacted] | MRN: [redacted] | PCP: Billy Li, MD | Legal Name: Ki Sau Chan

*No haloperidol given - December 17, 2020 surgery*
*No nausea, no PONV*

# Anesthesia Event - Dec 17, 2020

with Christopher Dimeo at Hospital for Special Surgery Wilson Family Surgical Center

## After Visit Summary®

Language
English

HSS

# AFTER VISIT SUMMARY

**Ki S. Chan** MRN: [redacted]
CEID: [redacted]

12/17/2020 Hospital for Special Surgery Wilson Family Surgical Center
212-606-1000

## Today's Visit

You saw Daniel Wolfanger on Thursday December 17, 2020.

### Medications Given

- acetaminophen (OFIRMEV) Last given 12/17/2020 12:06 PM
- bupivacaine PF (MARCAINE) Last given 12/17/2020 9:00 AM
- bupivacaine PF (MARCAINE) Last given 12/17/2020 8:55 AM
- bupivacaine PF (MARCAINE) Last given 12/17/2020 12:29 PM
- ceFAZolin (ANCEF) Last given 12/17/2020 8:55 AM
- dexamethasone (DECADRON) Last given 12/17/2020 9:34 AM
- ePHEDrine Last given 12/17/2020 9:31 AM
- famotidine Last given 12/17/2020 9:34 AM
- ketamine (KETALAR) Last given 12/17/2020 8:52 AM
- ketorolac (TORADOL) Last given 12/17/2020 12:05 PM
- lactated Ringer's
- midazolam (VERSED) Last given 12/17/2020 8:49 AM
- ondansetron (ZOFRAN) Last given 12/17/2020 9:34 AM
- propofol (DIPRIVAN)
- propofol (DIPRIVAN) Last given 12/17/2020 9:02 AM
- tranexamic acid Last given 12/17/2020 9:06 AM

## What's Next

You currently have no upcoming appointments scheduled.

## How to Contact this Office

HSS

HSS Main Hospital
535 E. 70th Street
New York NY 10021-4823

Chan, Ki Sau
MRN: [redacted] DOB: [redacted] Legal Sex: F
Adm: 12/17/2020, D/C: 12/17/2020

*No haloperidol given - December 17, 2020 surgery*
*No nausea, no PONV*

## 12/17/2020 - Admission (Discharged) in First Floor PACU (continued)

**Anesthesia on 12/17/20 (continued)**

No complications documented.

### Anesthesia Post Evaluation

Patient participation: **patient participated**
Mental Status: **awake and alert**
Pain management: **adequate**
Airway patency: **patent**
Cardiovascular status: **acceptable**
Respiratory status: **acceptable**
Post Op Hydration: **acceptable**
PONV Status: **none**

Electronically signed by Dimeo, Christopher A, MD at 12/17/2020 2:35 PM

**Anesthesia Preprocedure Evaluation**

**Dimeo, Christopher A, MD at 12/17/2020 0806**

Author: Dimeo, Christopher A, MD | Service: — | Author Type: Anesthesiologist
Filed: 12/17/2020 8:20 AM | Date of Service: 12/17/2020 8:06 AM | Status: Signed
Editor: Dimeo, Christopher A, MD (Anesthesiologist)

## Pre-Anesthesia Evaluation

NPO status as per HSS protocol: reviewed.

**Patient's Medical History/Review of Systems:**
Patient's allergies, history, medications and substance history reviewed.
Negative ROS: Cardiovascular and no history of anesthetic complications.
The patient currently is not a cigarette smoker.
Patient has no history of motion sickness.

**Physical Exam:**
Patient BMI Class: normal weight (18.5-24.9).
**Dentition:**
Teeth & Dentures: normal
**Neurologic:**
Mental Status: A&Ox3.
**Airway:**
Mallampati: II
TM distance: <3 FB
Neck ROM: full
**Pulmonary:** - pulmonary exam normal
(-) dyspnea.

HSS

HSS Main Hospital
535 E. 70th Street
New York NY 10021-4823

Chan, Ki S
MRN: [redacted] DOB: [redacted] Sex: F
Adm: 6/3/2021, D/C: 6/4/2021

***No haloperidol given – June 3–4, 2021 surgery***
***No PONV***

**Op Note signed by Elliott, Andrew J, MD at 6/4/2021 7:56 AM (continued)**

ANESTHESIA: SPINAL/POPLITEAL.

INDICATIONS: The patient is status post flatfoot reconstruction. Postoperatively, the patient has been having persistent hindfoot varus as well as medial column plantar flexion. Despite physical therapy, she still has a fair amount of pain medially. After having had PRP to the area, after discussion with the patient on multiple occasions, multiple e-mail message, as well as preoperative evaluation by 2 other surgeons, we have discussed the above plan and elected to proceed with operative intervention.

FINDINGS OF PROCEDURE:

ESTIMATED BLOOD LOSS: SOMEWHERE BETWEEN 10-15 ML.

SPECIMENS REMOVED: HARDWARE.

PREPARATION: CHLORAPREP.
POSITION: SUPINE.
ANTIBIOTIC: ANCEF 1 GRAM IV PRIOR TO USE OF TOURNIQUET.
TOURNIQUET: A COMBINATION OF A THIGH TOURNIQUET INFLATED TO 250 MMHG FOR 36 MINUTES, FOLLOWED BY AN ESMARCH BANDAGE OVER COPIOUS WEBRIL PADDING FOR 45 MINUTES, FOLLOWED BY A THIGH TOURNIQUET INFLATED TO 250 MMHG FOR 49 MINUTES.
IMPLANT: ARTHREX 4.5 CANNULATED SCREWS OF APPROPRIATE LENGTH X2 (TITANIUM), ARTHREX 2.0 THREE-HOLE PLATE AND CORRESPONDING LENGTH SCREWS (TITANIUM), ARTELON FLEXBAND GRAFT WITH CORRESPONDING ANCHORS.

PROCEDURE:
The patient was brought to the operating room and laid supine on the operating table. After instillation of adequate spinal/popliteal block anesthesia, the right hip region was prepped and draped in normal sterile fashion. We then went ahead and placed the trocar into the inner table to remove 60 mL of marrow, which was then processed in the Angel harvester, and brought back on the field in concentrated fashion, used later to inject the deltoid ligament, as well as soak the Artelon graft in it. We then dressed the area with a sterile dressing and prepped and draped the right lower extremity in standard fashion. We then went ahead and, utilizing fluoroscopy, I isolated the heads of the screw. We made incisions over these areas. Used the wire to be able to feed up inside the screw, and appropriate screwdriver to back the screws out.

At this juncture, we then went ahead and inflated the thigh tourniquet to 250 mmHg for 36 minutes. We made a longitudinal incision along the medial midline calf. We dissected down through subcutaneous tissue with blunt dissection. Care was taken to identify and protect the saphenous nerve and vein complex. We identified the Achilles fascia and entered this. We used blunt digital dissection to create the plane between the soleus and the gastrocnemius, then used a knife to carefully release just the tendinous portion of the gastrocnemius muscle unit. We then were able to much more plantarflex the foot after releasing.

We then removed the instrumentation and then went ahead and made a longitudinal incision in the old incision on the lateral calcaneus. We dissected down through subtendinous tissues with a combination of sharp and blunt dissection. We identified the lateral aspect of the calcaneus. The stepoff was visible where the last osteotomy had been performed. We then placed 2 K-wires in the proposed osteotomy site. Happy with their positioning, we then utilized the microsagittal saw to create the osteotomy just perforating the medial side and taking care to protect the dorsal plantar structures with baby Bennett and baby Hohmann retractors.



42 CFR part 2 prohibits unauthorized
disclosure of these records.

Name: Ki Sau Chan | DOB: [redacted] | MRN: [redacted] | PCP: Billy Li, MD | Legal Name: Ki Sau Chan

*No haloperidol given – June 3–4, 2021 surgery*
*No PONV*

# Anesthesia Event - Jun 03, 2021

with Ellen Soffin at Hospital for Special Surgery Wilson Family Surgical Center

After Visit Summary®

Language
English

## AFTER VISIT SUMMARY

**Ki S. Chan** MRN: [redacted]
CEID: [redacted]

6/3/2021 Hospital for Special Surgery Wilson Family Surgical Center 212-606-1000

## Today's Visit

You saw Alina Boltunova on Thursday June 3, 2021.

### Medications Given

acetaminophen (OFIRMEV)
bupivacaine PF (MARCAINE) Last given 6/3/2021 8:45 AM
bupivacaine PF (MARCAINE) Last given 6/3/2021 8:51 AM
bupivacaine PF (MARCAINE) Last given 6/3/2021 8:33 AM
ceFAZolin (ANCEF)
dexAMETHasone sodium phos (PF) (DECADRON) Last given 6/3/2021 8:45 AM
ePHEDrine Last given 6/3/2021 10:10 AM
famotidine Last given 6/3/2021 8:56 AM
ketamine (KETALAR) Last given 6/3/2021 8:59 AM
ketorolac (TORADOL) Last given 6/3/2021 12:20 PM
lactated Ringer's
midazolam (VERSED) Last given 6/3/2021 8:30 AM
ondansetron (ZOFRAN) Last given 6/3/2021 8:56 AM
propofol (DIPRIVAN) Stopped 6/3/2021 12:23 PM
tranexamic acid

## What's Next

You currently have no upcoming appointments scheduled.

## How to Contact this Office

If you have any questions about this visit, please contact our office at 646-797-8540. You may also send a message to your provider via MyHSS (see the MyHSS section for

Office of Alina Boltunova, MD
535 EAST 70TH STREET

HSS

HSS Main Hospital
535 E. 70th Street
New York NY 10021-4823

Chan, Ki Sau
MRN: [redacted] DOB: [redacted] Legal Sex: F
Adm: 6/3/2021, D/C: 6/4/2021

***No haloperidol given – June 3–4, 2021 surgery***
***No PONV***

**06/03/2021 - Admission (Discharged) in 11th Floor North Inpatient Unit (continued)**

**Anesthesia on 06/03/21 (continued)**

Patient participation: **patient participated**
Mental Status: **awake and alert**
Pain management: **adequate**
Airway patency: **patent**
Cardiovascular status: **acceptable**
Respiratory status: **acceptable**
Post Op Hydration: **acceptable**
PONV Status: **none**

Electronically signed by Ruby, Jordan, MD at 6/3/2021 1:50 PM

**Anesthesia Preprocedure Evaluation**

**Soffin, Ellen M, MD at 6/3/2021 0756**

Author: Soffin, Ellen M, MD  Service: Anesthesiology  Author Type: Anesthesiologist
Filed: 6/3/2021 8:12 AM  Date of Service: 6/3/2021 7:56 AM  Status: Addendum
Editor: Soffin, Ellen M, MD (Anesthesiologist)

## Pre-Anesthesia Evaluation

NPO status as per HSS protocol: verified.

**Patient's Medical History/Review of Systems:**
Patient's allergies, history, labs/tests, medications, EKG and substance history reviewed.
Positive ROS: Endo/Other (hypothyroid).
Negative ROS: Cardiovascular and no history of anesthetic complications.
The patient currently is not a cigarette smoker.
Patient has no history of motion sickness.

**Pulmonary:** - negative
**Neuro/Psych:** - negative
**Cardiovascular:** - negative
Exercise tolerance: >4 METS
**GI/Hepatic/Renal:** - negative
**Endo/Other:**
(+) thyroid problem- hypothyroidism,

**Hematologic Disorders:** - negative hematology ROS

**Physical Exam:**
Patient BMI Class: normal weight (18.5-24.9).
**Dentition:**
Teeth & Dentures: normal
**Neurologic:**
Mental Status: A&Ox3.



42 CFR part 2 prohibits unauthorized
disclosure of these records.

*NYU Langone Health System*

TH HIM
1 Park Avenue
3rd Floor
NEW YORK NY 10016
IntraOp Report

Chan, Ki
MRN: [redacted] DOB: [redacted] Sex: F
Adm: 8/5/2022, D/C: 8/5/2022
***No haloperidol given - August 5, 2022 surgery***
***No nausea, no PONV***

## CASE INFORMATION

**Patient Information**

| Patient Name | Account | ID # | Gender | DOB | Age at Discharge |
|---|---|---|---|---|---|
| Chan, Ki | [redacted] | [redacted] | Female | [redacted] | 53 yrs |

**Brief Op Notes - Operative Notes**

**Brief Op Notes by Nicole Lashley, PA at 8/5/2022 8:04 AM**

Author: Nicole Lashley, PA
Filed: 8/5/2022 10:17 AM
Editor: Nicole Lashley, PA (Physician Assistant)
Service: Orthopedics
Creation Time: 8/5/2022 10:16 AM
Author Type: Physician Assistant
Status: Signed
Cosigner: Justin Tsai, MD at 8/5/2022 6:03 PM

**RIGHT ANKLE FLEXER DIGITORUM DEBRIDEMENT,REPAIR WITH ALLOGRAFT,POSSIBLE ARTHRODESIS,BONE MARROW HARVEST OF ILIAC CREST Procedure Note**

**Ki Chan**
**8/5/2022**

**PRE-OP DIAGNOSIS:** Flat feet [M21.41, M21.42]

**POST-OP DIAGNOSIS:** Same as above

**PROCEDURE(S):** Procedure(s):
RIGHT ANKLE FLEXER DIGITORUM DEBRIDEMENT,REPAIR WITH ALLOGRAFT,POSSIBLE ARTHRODESIS,BONE MARROW HARVEST OF ILIAC CREST

**ANESTHESIA:** Monitored Anesthesia Care (IV Sedation)

**SURGEON(S):** Surgeon(s) and Role:
* Justin Tsai, MD - Primary

**STAFF:** Circulator: Jeannie Gotera, RN
Physician Assistant: Nicole Lashley, PA
Surg Tech: Princess Findley

**FINDINGS:** See op note

*Required Data*

| | |
|---|---|
| **Emergency Procedure?** | Elective Scheduled Procedure |
| **Trauma-Related Procedure?** | Not Trauma Related Procedure |
| **Laparoscopy / Endoscopy?** | No laparoscope or endoscope used |
| **Closure Type:** | Primary closure |
| **Wound Class:** | Clean |

**ESTIMATED BLOOD LOSS:** * No values recorded between 8/5/2022 7:33 AM and 8/5/2022 10:16 AM *

Name: Ki Sau Chan | DOB: [redacted] | MRN: [redacted] | PCP: Billy Li, MD | Legal Name: Ki Sau Chan

*No haloperidol given - August 5, 2022 surgery*
*No nausea, no PONV*

# Anesthesia Event - Aug 05, 2022

with Kourosh R Noorbaksh, MD at Essex Crossing Outpatient Surgery

After Visit Summary®

## AFTER VISIT SUMMARY

NYU Langone Health

**Ki S. Chan** DoB: [redacted]

8/5/2022 Essex Crossing Outpatient Surgery

## Today's Visit

You saw Marny Shoham, MD on Friday August 5, 2022.

### Medications Given

- ceFAZolin (ANCEF) Last given 8/5/2022 7:56 AM
- fentaNYL (SUBLIMAZE) Last given 8/5/2022 7:36 AM
- lactated ringers (LR)
- midazolam (VERSED) Last given 8/5/2022 7:36 AM
- ondansetron (ZOFRAN) Last given 8/5/2022 7:57 AM
- propofol (DIPRIVAN) Stopped 8/5/2022 10:01 AM
- ropivacaine (NAROPIN) (2 administrations) Last given 8/5/2022 7:48 AM
- tranexamic acid (CYKLOKAPRON)

## What's Next

OCT 27 2026

New Patient Appointment with Milan Amin, MD
Tuesday October 27 1:15 PM
Depending on your medical needs, you may also see a Speech-Language Pathologist (SLP) as part of your visit.

NYU Langone Otolaryngology Associates
222 East 41st Street
8th Floor
New York NY 10017-6739
646-501-7906

## Your Medication List

Notice
A record of your medication list is currently not available. If you need access to this

Name: Ki Sau Chan | DOB: [redacted] | MRN: [redacted] | PCP: Billy Li, MD | Legal Name: Ki Sau Chan

*No haloperidol given - August 5, 2022 surgery*
*No nausea, no PONV*

# Anesthesia Postprocedure Evaluation

Updated Oct 15, 2022

## Anesthesia Postprocedure Evaluation by David Furgiuele, MD at 8/5/2022 10:24 AM

**Patient:** Ki Chan

**Procedure(s) Performed:** RIGHT ANKLE FLEXER DIGITORUM DEBRIDEMENT,REPAIR WITH ALLOGRAFT,ARTHROERESIS,BONE MARROW HARVEST OF ILIAC CREST (Right: Foot)

**Final Anesthesia Type:** regional block

**Last vitals:**
BP: (!) 90/59
**Heart Rate: 71**
Resp: 17
SpO2: 97 %
Temp: 36.6 °C (97.9 °F)

**Anesthesia Post-Procedure / Post-Op Note**

**Patient location:** PACU.

**Neuro status:** awake, alert, strong.

patient able to participate in post-op/follow-up care and report

**Respiratory Status:** breathing well, no wheezing, no rales.

**Cardiovascular Status:** hemodynamically stable: note vital signs above.

**Post-Operative Nausea & Vomiting:** no PONV.

**Post-op pain:** 0.

**Post-Operative Hydration Status:** euvolemic.

***No haloperidol given - August 5, 2022 surgery***
***No nausea, no PONV***

There were no known notable events for this encounter.

MyChart® licensed from Epic Systems Corporation© 1999 - 2026

**Northwell Health** | **Greenwich Village Ambulatory Surgery Center**
Address: 200 W 13th St New York, NY | 4th Floor | Phone: (929)292-3700

*No haloperidol given - Sept 14, 2023 surgery*
*No nausea, no PONV*

**Patient Name:** CHAN, KI

**Date of Birth:** [redacted]

**M.R.N :** [redacted]

**Date of Surgery:** 09/14/23

**Date of Discharge:** 09/14/23

**Physician Name:** Justin Tsai, M.D.

**Preoperative Diagnoses:**

1. Right ankle flexor digitorum longus tendonitis
2. Right ankle tibialis anterior tendonitis
3. Right ankle synovitis and anteromedial impingement

**Postoperative Diagnoses:** Same as preoperative

**Procedures Performed:**

1. Right hip iliac crest bone marrow aspirate concentrate harvest.
2. Right ankle arthroscopy and synovectomy.
3. Right ankle tibial cheilectomy,
4. Right ankle tibialis anterior tendon debridement, augmentation with amnion
5. Right ankle flexor digitorum longus debridement and augmentation with semitendinosus allograft and amnion

**Anesthesia:** General with popliteal block augmentation.

**Postop Condition:** Stable.

Lenox Hill Hospital
100 East 77th St , New York, NY 100751850

*No haloperidol given - Sept 14, 2023 surgery*
*No nausea, no PONV*

KI CHAN ID#: [redacted] Physician: Justin Tsai DOS: 09/14/2023

## Anesthesia Billing Print Set - Anesthesia

### Anesthesia Start Time

Start Time:07:30
Anesthesia Provider : Kevin Davis, MD
Supervising Provider : N/A

### Vitals Anesthesia - The Graph(2)

Primary Anesthesia Type: General w/ Nerve Block
Secondary Anesthesia Type: None
ASA Score: 2
Temperature Unit: Fahrenheit

| Date: 09/14/2023 | 07:30 | 07:35 | 07:40 | 07:45 | 07:50 | 07:55 | 08:00 | 08:05 | 08:10 | 08:15 | 08:20 | 08:25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sevoflurane % | | | | 1.6 | 1.1 | 1.5 | 2.1 | 2.4 | 2.6 | 2.8 | 2.7 | 2.7 |
| O2 L/min | | | 10 | 10 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| FiO2 | | | 74.3 | 96.8 | 95.2 | 96 | 96 | 96 | 96 | 96 | 96 | 96 |
| Ketorolac | | | | | | | | | | | | |
| Lidocaine Inj | | | 50 | | | | | | | | | |
| OFIRMEV | | | | | | | | | | | | |
| Ondansetron Inj | | | | | | 4 | | | | | | |
| Propofol Bolus (mg) | | | 150 | | | | | | | | | |
| Fentanyl | | | 100 | | | | 50 | | | | | |
| Rocuronium | | | 50 | | | | | | | | | |
| Dexamethasone | | | | | | 8 | | | | | | |
| SpO2 | | | 97 | 99 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| ETCO2 | | | 31 | 31 | 35 | 38 | 37 | 35 | 34 | 32 | 32 | 31 |
| Temp | | | | | | 95.2 | 95.5 | 95.7 | 95.7 | 95.8 | 96 | 96.1 |
| LOC | | | | | | | | | | | | |
| EBL | | | | | | | | | | | | |
| IV Fluids | | | | | | | | | | | | |
| Urine | | | | | | | | | | | | |
| Rhythm | | | SB | SR | SB | SR | SR | SR | SB | SB | SB | SB |
| Tidal Volume | | | | | 469 | | | | | 467 | | |
| Peak Pressure | | | | | 16 | | | | | 16 | | |
| PEEP | | | | | 4 | | | | | 4 | | |
| | 07:30 | 07:35 | 07:40 | 07:45 | 07:50 | 07:55 | 08:00 | 08:05 | 08:10 | 08:15 | 08:20 | 08:25 |

CPT © 2024 American Medical Association. All rights reserved.

Lenox Hill Hospital
100 East 77th St , New York, NY 100751850

*No haloperidol given - Sept. 14, 2023 surgery*
*No nausea, no PONV*

KI CHAN ID#: [redacted] Physician: Justin Tsai DOS: 09/14/2023

Ventilator Settings

| Time | Tidal Volume | Peak Pressure | PEEP |
|---|---|---|---|
| 07:50 | 469 | 16 | 4 |
| 08:15 | 467 | 16 | 4 |
| 08:40 | 467 | 16 | 4 |
| 09:05 | 436 | 16 | 4 |
| 09:30 | 439 | 16 | 4 |
| 09:55 | 373 | 16 | 4 |
| 10:20 | 267 | 5 | 0 |

Anesthesia Events/Notes

| Time | Notes |
|---|---|
| 08:11 | Tourniquet inflated. |
| 08:32 | Tourniquet deflated. |
| 08:33 | Tourniquet reinflated. |
| 08:40 | TOF 2/4 |
| 09:37 | TOF 4/4 |
| 09:28 | Tourniquet deflated. |
| 10:23 | Suctioned and extubated in the OR without complications. |

Signature History

| | |
|---|---|
| Kevin Davis, MD | 09/14/2023 10:15 |
| Kevin Davis, MD | 09/14/2023 08:12 |

## Anesthesia Stop Time

Stop Time:10:25
Anesthesia Provider : Kevin Davis, MD
Level of Consciousness: Alert
Post-Anesthesia Condition Stable, Released to: Phase 1
☑ Report Given
Notes:

CPT © 2024 American Medical Association. All rights reserved. Printed on 5/19/2024 21:21 EDT

# EXHIBIT G

Valley Hospital Operative Report, Carl Winkler, M.D., August 12, 2025 (signed Aug. 18, 2025)

Dkt. 81, Ex. 18 (Declaration ¶ 15)

**Significance:** Pre- and post-operative diagnosis: “Perforated appendicitis”; laparoscopic appendectomy converted to open laparotomy. This operative report actively omits the haloperidol and the Foley catheter.

The Valley Hospital
Valley Health System

**Name: Chan,Ki Sau** **Birthdate: [redacted]/1969**

**Report**

**Operative Report**

---

**The Valley Hospital**
**4 Valley Health Plaza**
**Paramus, NJ 07652**

**Gen Surg Operative Report**
**Signed**

Patient: Chan,Ki Sau
DOB: [redacted]1969
Age/Sex: 56 F
Loc: S7C
Attending: Susrut R. Usgaonker DO
Referred by:

MR#: M1822913
Acct: V012216314
ADM Date: 08/09/25
Transcribed Dt/Tm: 08/18/25 0902
Dictated by: Winkler,Carl MD
Date of Service: 08/18/25 0902

cc: Winkler,Carl MD~
**Operative Report**
Date of Procedure::

**Operation Date: 08/12/25 14:00**
*Actual Procedures*
Laparoscopic CONVERTED TO OPEN APPENDECTOMY(Not Applicable) - Carl Winkler, MD
**Post-Op Diagnosis:** PERFORATED APPENDICITIS

*Case Times*
Procedure Start: 08/12/25 14:52

Pre-op diagnosis: Perforated appendicitis
Surgeon:
Carl Winkler, MD

Assistant Present?: Yes
Assistant: Madan Mohan R Paluru
Assistant (additional):
Sam Kassirer, MD
Anesthesiologist Present?: Yes

**Name: Chan,Ki Sau** **Birthdate: [redacted]/1969**

**Report**

**Operative Report**

Anesthesiologist:

**Operation Date: 08/12/25 14:00**
*Case Staff*
Anesthesiologist: Bernstein,Kyra
Anesthesiologist: Owusu-Dapaah,Harry

Anesthesia: GETA
Procedure:
Diagnostic laparoscopy, lysis of adhesions, laparotomy, open appendectomy
Specimens: none sent (Appendix)
Estimated blood loss (ml):: 10
Condition: stable
Disposition: PACU
Complications: None
Post-op diagnosis: same
Narrative of operation (OP note)::
Patient was brought into the operating room and placed in the supine position on the operating table.
After induction of adequate general endotracheal anesthesia the abdomen was prepped and draped in the usual sterile fashion.
The patient had received antibiotics in the ED, and therefore no preincision dose was given.
A surgical timeout was performed in keeping with institutional protocol.

Local anesthesia was infiltrated at Palmer's point, and a 5 mm incision was made.
Intraperitoneal access was achieved with a Veress needle, and the abdomen was insufflated to a pressure of 15 mmHg, noting low initial insufflation pressures.
At this point a 5 mm optical trocar was used with a 30 degree camera to gain entry into the abdomen.
No injuries were noted on inspection of the abdomen.

At this point we turned our attention to right lower quadrant. The patient was placed in the Trendelenburg position with the right side up.
We placed 3 additional trocars under direct vision after infiltration with local anesthesia, all of which were 5 mm trocars, 1 each at the umbilicus, left lower quadrant, as well as the right upper quadrant.

There was severe inflammation in the right lower quadrant, and pelvis.
This included dense relatively chronic adhesions of the small bowel to the sigmoid colon, right adnexa, and uterus, as well as the cecum to the abdominal sidewall and Treves ligament.
These adhesions were carefully mobilized laparoscopically, including the white line of Toldt to medialize the cecum.
In this process an abscess was drained and then suction irrigated from the posterior cul-de-sac.

Despite extensive mobilization, we were unable to identify the appendiceal base due to the severe inflammation, and so converted to a low midline laparotomy.
At this point the cecum was eviscerated, and we were able to identify a relatively healthy appendiceal base.
The appendiceal tip was never identified clearly, and likely was necrotic within the drained abscess

**Name: Chan,Ki Sau** **Birthdate: [redacted]/1969**

**Report**

**Operative Report**

cavity.
The appendiceal base was circumferentially dissected with a right angle clamp.
The appendiceal base was ligated and divided with a single fire of the laparoscopic 45 mm Endo GIA gold load stapler.
The mesoappendix was ligated and divided with the Maryland LigaSure device, this required careful mobilization off of the cecal wall.
The appendix was passed off the field for permanent pathology.
The staple line appeared to be in excellent condition, without evidence of leak or bleeding.
At this point the bowel was returned to the abdominal cavity, ensuring no twist in the mesentery.

The remainder of the surgical bed was carefully inspected for evidence of ongoing bleeding or intestinal leak, and none was identified.
The right lower quadrant and pelvis were thoroughly irrigated and suctioned until the effluent ran clear.
The small bowel was run from the ileocecal valve to the ligament of Treitz, without other pathology identified.

The low midline fascia was approximated with 0 PDS knot loop suture using a small bite technique.
The skin was closed with loose staples, and a Mepilex dressing.
The patient was transported to the PACU in hemodynamically stable condition, breathing independently, in no acute distress.

Signed By: <Electronically signed by Carl Winkler MD> 08/18/25 0919

# EXHIBIT H

Valley Hospital Abdomen/Pelvis MRI Report, Glenn Krinsky, M.D., August 10, 2025

Dkt. 4-3, Ex. W (Declaration ¶ 15)

**Significance:** Valley's own MRI found a "5.2 cm collection/abscess" that "may reflect perforated appendicitis": possible perforation was reported the day before Appellant was given **contraindicated** barium sulfate.

The Valley Hospital
Valley Health System

**Name: Chan,Ki Sau** **Birthdate:** [redacted]

**Report**

**Abdomen MRI, Pelvis MRI**

---

**Patient Name: Chan,Ki Sau**
Patient DOB: [redacted] Birth Sex: F
Patient Status: ADM INO
Date of Service: 08/10/25
Accession: A0004297318VAH; A0004297319VAH
Modality: MR

**Unit Number: M1822913**
Patient Location: S7C /S7004-D
Account Number: [redacted]
Report Number: 0811-00086 @ Signed
Ordering Doctor: Zavadenko,Julie APN
Procedure(s): MRI abdomen wo/w con; MRI pelvis wo/w con

*Signed*

Reason for Procedure: abdominal pain

Admitting Diagnosis: "abnormal abd CT"
..................................................

MRI ABDOMEN WITHOUT AND WITH CONTRAST , MRI PELVIS WITHOUT AND WITH CONTRAST

Multisequence multiplanar MR imaging of the abdomen and pelvis was performed at 3 Tesla, both prior to and following intravenous gadolinium administration.

There is a prior outside abdominal/pelvic CT however this is not available at the time of dictation

The liver, spleen, gallbladder, biliary tree, pancreas, adrenal glands and kidneys are normal.

The uterus is normal

Inflammatory changes abut both ovaries, without ovarian mass, and this process is contiguous with the cecum and sigmoid colon; tubular structure identified series 22 image 38 however it is unclear if this is the appendix or terminal ileum; there is a contiguous 5.2 cm collection/abscess in the anterior and posterior cul-de-sac draped over the uterus on sagittal images; findings may reflect perforated appendicitis or pathology related to the sigmoid colon; consider repeat pelvic CT as the images are not available to review at this time

The urinary bladder is normal.

There is no abdominal aortic aneurysm

IMPRESSION: Inflammatory changes abut both ovaries, without ovarian mass, and this process is contiguous with the

**Name: Chan,Ki Sau** **Birthdate:** [redacted]

**Report**

**Abdomen MRI, Pelvis MRI**

---

cecum and sigmoid colon; tubular structure identified series 22 image 38 however it is unclear if this is the appendix or terminal ileum; there is a contiguous 5.2 cm collection/abscess in the anterior and posterior cul-de-sac draped over the uterus on sagittal images; findings may reflect perforated appendicitis or pathology related to the sigmoid colon; consider repeat pelvic CT as the images are not available to review at this time

Electronically Signed by: Glenn Krinsky, MD 8/11/2025 11:22 AM

Approved By: Glenn Krinsky MD 08/11/25 0651

# EXHIBIT I

Valley Hospital Abdomen/Pelvis CT Report, Glenn Krinsky, M.D., August 11, 2025

(Declaration ¶ 15)

**Significance:** Records only “oral administration of contrast” and never names the agent: barium sulfate, which FDA labeling **states is contraindicated** in patients “with known or suspected perforation of the GI tract.” Found an “abnormal proximal appendix.”

**Name: Chan,Ki Sau** **Birthdate: [redacted]1969**

## Report

## Abdomen/Pelvis CT

**Patient Name: Chan,Ki Sau**
Patient DOB: [redacted]1969 Birth Sex: F
Patient Status: ADM IN
Date of Service: 08/11/25
Accession: A0004299139VAH
Modality: CT

**Unit Number: M1822913**
Patient Location: S7C /S7004-D
Account Number: V012216314
Report Number: 0812-00072 @ Signed
Ordering Doctor: Flowers,Raphael G. DO
Procedure(s): CT abdomen pelvis wo con

*Signed*

Reason for Procedure: 5.2 cm collection/abscess in the anterior and post

Admitting Diagnosis: "abnormal abd CT"
.....................................................

CT ABDOMEN AND PELVIS WITHOUT CONTRAST

A CT acquisition was performed from the xiphoid through the symphysis pubis following the oral administration of contrast. Intravenous contrast was not administered.
Dose reduction techniques were utilized (automated exposure control, mA/kV adjustment for patient size, iterative reconstruction) .

Comparison: Abdominal/pelvic MRI 8/10/2025

The liver, spleen, gallbladder, biliary tree, pancreas, adrenal glands and kidneys are normal.

The uterus is normal

The uterus and ovaries are contiguous with a stable 5 cm posterior cul-de-sac fluid collection

There is thickening of the terminal ileum which is seen in the midline series 3 image 186

Portions of an abnormal proximal appendix are identified measuring 14 mm series 3 image 194 the distal aspect of the appendix sits on the right ovary; there appears to be fistulous connection between the distal ileum and appendix series 4 image 66

IMPRESSION: Complex inflammatory process in the pelvis including abnormal proximal appendix are identified measuring 14 mm (series 3 image 194) the distal aspect of the appendix sits on the right ovary; there appears to be fistulous connection between the distal ileum and appendix (series 4 image 66)

**Name: Chan,Ki Sau** **Birthdate: [redacted]/1969**

**Report**

**Abdomen/Pelvis CT**

Electronically Signed by: Glenn Krinsky, MD 8/14/2025 6:58 AM

Approved By: Glenn Krinsky MD 08/12/25 0648

# EXHIBIT J

Valley Hospital Hospitalist Progress Note, Raphael G. Flowers, D.O., August 12, 2025

Dkt. 4-2, Ex. Q (Declaration ¶ 15)

**Significance:** Assessment: “Acute perforated appendicitis.” Lists ondansetron, **a routine anti-nausea drug, as ordered** August 10 with no dose administered, and lists no haloperidol (an antipsychotic), **which Defendants claimed is an anti-nausea rescue agent for Appellant**, among Appellant’s active medications.

The Valley Hospital
Valley Health System

**Name: Chan,Ki Sau** **Birthdate:** [redacted]

**Report**

## Hospitalist Progress Note

**The Valley Hospital**
**4 Valley Health Plaza**
**Paramus, NJ 07652**

**Hospitalist Progress Note**
**Signed with Addenda**

Patient: Chan,Ki Sau
DOB: [redacted]
Age/Sex: 56 F
Loc: S7C
Attending: Raphael G. Flowers DO
Referred by:

MR#: [redacted]
Acct: [redacted]
ADM Date: 08/09/25
Transcribed Dt/Tm: 08/11/25 0850
Dictated by: Flowers,Raphael G. DO
Date of Service: 08/11/25 0850

cc: ~

**ADDENDUM**

Patient was seen by surgery and no surgical intervention recommended at this moment
Due to the findings on pelvic MRI recommended to repeat CT scan of the abdomen/ pelvis, the patient said to be allergic to steroids and would be okay with taking Benadryl as premedication to IV contrast
Patient stated that she is allergic to steroids causes edema and she had been managed by an allergist.
Discussed with surgery will do CT abdomen pelvis with premedicate with IV Benadryl an hour before, will also give IV Pepcid and continue Benadryl as needed, patient given a diet and there is no current surgery planned

Addendum Signed By<Electronically signed by Raphael G. Flowers DO> 08/11/25 1328

# Subjective

**Subjective**

Interval history:

Patient is a 56-year-old female with past medical history significant for hypothyroidism presents with complaints of having right lower quadrant abdominal pain concerning for acute appendicitis, the patient related that she had symptoms about 3 weeks ago after eating a meal at a restaurant followed by

**Name: Chan,Ki Sau** **Birthdate:** [redacted]

## Report

## Hospitalist Progress Note

nausea vomiting diarrhea initial concern was she was having gastroenteritis she was referred to GI by her PCP and was noted to have elevated white count of 21,000 she was sent for outpatient CT of the abdomen which was done and was suspicious for acute appendicitis as a result she was recommended to come to the emergency room for further evaluation. Patient was admitted and surgery was consulted and recommended abdominal/ pelvic MRI.

Patient was seen this a.m. was ambulating in her room stated that she is still having discomfort in the lower abdomen she no longer has any nausea asking if she can take ice chips and she feels dry no chest pain no palpitation no shortness of breath or cough.

Head: Normocephalic/ atraumatic
Neck: Supple no JVD no adenopathy
Lungs: Clear to auscultation bilaterally no wheezes no rhonchi
Heart: Positive S1-S2 no murmurs
Abdomen: Soft + bowel sounds tender more so on the right but no longer lower abdomen to the left
Extremity: No clubbing no cyanosis no edema
Neurology: AAO×3, CN II-12 grossly intact and nonfocal

Assessment and plan:
1. Acute perforated appendicitis
2. Hypothyroidism

Patient had abdominal/ pelvic MRI
Shows inflammatory changes abut both ovaries without ovarian mass and this process is contiguous with the cecum and sigmoid colon
Tubular structure identified series 22 image 38 however it is unclear if this is the appendix or terminal ileum. There is contiguous
5.2 cm collection/ abscess in the anterior and posterior cul-de-sac draped over the uterus and sagittal imaging. This may reflect perforated appendicitis or
Pathology related to the sigmoid colon. Consider repeat CT as images are not available for to review at this time.
Will follow-up with surgical recommendation
In interim we will remain n.p.o. in anticipation she will be going for appendectomy
Continue with empiric antibiotic
Continue with IV fluids

Continue with levothyroxine as taken as an outpatient

Patient is ambulatory

**Vitals**
Vitals:

**Vital Signs - 8 hr**

| | Temp | Pulse | Resp | BP | Pulse Ox |
|---|---|---|---|---|---|
| 08/11/25 05:17 | 92.7 F L | 53 L | 18 | 108/53 L | 100 |

**Name: Chan,Ki Sau** **Birthdate:** [redacted]

**Report**

**Hospitalist Progress Note**

# Objecive Data

**Medication**

Meds:

**Active Medications**

| Generic Name<br>Trade Name | Dose Route<br>Freq PRN Reason | Start<br>Stop | Last Admin<br>Dose Admin |
|---|---|---|---|
| Acetaminophen<br><br>Acetaminophen 325 Mg Tablet | 650 mg<br><br>PO<br><br>Q6H PRN<br>Pain, Moderate (5-6) | 08/10/25<br>09:06 | 08/11/25<br>05:14<br>650 mg<br><br>Administration |
| Ceftriaxone Sodium/ Dextrose<br><br>Ceftriaxone 1 Gm/D5w | 1 gm in 50 mls @ 150 mls/hr<br><br>IVPB<br><br>DAILY SCH | 08/10/25<br>10:00<br>08/14/25<br>09:59 | 08/10/25<br>11:40<br>Infused<br><br>Infusion |
| Metronidazole<br><br>Flagyl Ivpb | 500 mg in 100 mls @ 200 mls/hr<br>IVPB<br><br>Q12HR SCH | 08/09/25<br>22:00<br>08/13/25<br>21:59 | 08/10/25<br>23:46<br>Infused<br><br>Infusion |
| Sodium Chloride<br><br>Sodium Chloride 0.9% | 1,000 mls @ 75 mls/hr<br><br>IV<br>.Q13H20M SCH | 08/09/25<br>18:00 | 08/11/25<br>01:22<br>75 mls/hr<br>Administration |
| Levothyroxine Sodium<br><br>Levothyroxine 50 Mcg Tablet | 50 mcg<br><br>PO<br>MOWEFR@0600 SCH | 08/11/25<br>06:00 | 08/11/25<br>05:14<br>50 mcg<br>Administration |
| Ondansetron HCl<br><br>Ondansetron Inj 4 Mg/2 Ml Vial | 4 mg<br><br>IVP<br><br>Q6H PRN<br>Nausea And Vomiting | 08/10/25<br>09:07 | |

**Impressions**

Impression:

**ITS Impressions**

Pelvis MRI 08/10/25 15:14

IMPRESSION: Inflammatory changes abut both ovaries, without ovarian mass, and this process is

**Name: Chan,Ki Sau** **Birthdate:** [redacted]

**Report**

**Hospitalist Progress Note**

contiguous with the cecum and sigmoid colon; tubular structure identified series 22 image 38 however it is unclear if this is the appendix or terminal ileum; there is a contiguous 5.2 cm collection/abscess in the anterior and posterior cul-de-sac draped over the uterus on sagittal images; findings may reflect perforated appendicitis or pathology related to the sigmoid colon; consider repeat pelvic CT as the images are not available to review at this time

## Assessment/Plan

**Time Spent With Patient**

Total Time spent with Patient::

Total time (face-to-face and unit/floor) spent with patient was [] minutes, with more than 50% spent in counseling and coordination of care.

Signed By: <Electronically signed by Raphael G. Flowers DO> 08/11/25 0901

# EXHIBIT K

Valley Hospital Emergency Department Note, Juxhesta Cakrani, M.D., August 9, 2025 (excerpt, pp. 1–4)

(Declaration ¶ 15)

**Significance:** Dr. Cakrani wrote "we do not recommend any imaging at this time" and "we will hold off on imaging" (p. 3), and falsely labeled Appellant as having "limited health care literacy" (p. 4).

The Valley Hospital
Valley Health System

**Name: Chan,Ki Sau** **Birthdate: [redacted]/1969**

**Report**

**Emergency Room Visit Notes**

**The Valley Hospital**
**4 Valley Health Plaza**
**Paramus, NJ 07652**

**Emergency Department Note**
**Signed**

Patient: Chan,Ki Sau
DOB: [redacted]1969
Age/Sex: 56 F
Loc: S7C
Attending: Anatoly Apel MD
Referred by:

MR#: M1822913
Acct: V012216314
ADM Date: 08/09/25
Transcribed Dt/Tm: 08/09/25 1811
Dictated by: Cakrani,Juxhesta MD
Date of Service: 08/09/25 1811

cc: ~

# General Information

### General Information

Time Seen by Provider: 08/09/25 14:37
Stated Complaint: "abnormal abd CT"
Chief Complaint: Abnormal Labs/Diagnostics
Triage Attestation:
Reviewed by Hossam H. Hanna on August 9, 2025 17:18

# HPI

### History of Present Illness

HPI Narrative:
Chart dictated at time of ED visit, however may be proofread and electronically signed at a later date/time. Triage assessment reviewed by me at time of evaluation.Chart dictated at time of ED visit, however may be proofread and electronically signed at a later date/time. Triage assessment reviewed by me at time of evaluation.

-------------------- HISTORY OF PRESENT ILLNESS --------------------

History Provided by: Patient

**Name: Chan,Ki Sau** **Birthdate: [redacted]1969**

**Report**

**Emergency Room Visit Notes**

Chief Complaint: RLQ abd pain

56-year-old with a PMHx and PSHx as listed below, presenting to the ED for with a chief complaint of right lower quadrant abdominal pain. Patient states that her symptoms have been constant for the last 3 weeks. This occurred after she had a meal at a restaurant. She developed abdominal pain as well as nausea and vomiting and diarrhea. Initially she thought she had food poisoning however her pain persisted. She went to her PCP who sent her to gastroenterologist and she had labs done showing a leukocytosis of 21,000, she had a noncontrast CT done as she is allergic to contrast and steroids she explains that she developed swelling and pain by her daughter today and a rash all over. CT was done yesterday showing possible appendicitis. She came in because she has been having consistent pain. She denies any blood in stool or blood in urine, denies any urinary symptoms denies any chest pain or shortness of breath denies any fevers or chills. She did endorse that she also had stool studies that showed an elevated fecal Cal protein as well. Pain is a 10 out of 10.

ROS:
As per HPI

Medical History: listed in patient's chart

Physical Examination:
Vital signs: reviewed. Afebrile , saturating well on RA, normal tensive
General: a/o x 3. Patient in no distress, non-toxic
Eyes: PERRL, EOMI
ENT: Clear and moist mucous membranes
Neck: supple, trachea midline
Pulm: Clear To Auscultation bilateral. No wheezing, rales or rhonchi, good effort. no retractions
CVS: Regular rate, regular rhythm , No murmur
GI: Soft, right lower quadrant tenderness noted on exam. There is no rebound or rigidity noted. Tenderness appreciated over the McBurney's point.
Back: No midline tenderness, no CVA tenderness
MSK: no edema, full ROM of all extermities
Neuro: No focal defect noted, no facial paresis, moving all extremities appropriately. Gross motor and sensory intact.
Integumentary: Warm and dry

ED Course:
Patient observed and evaluated in the ER. Patient remained hemodynamically stable while in the ER. 56-year-old female presents to the emergency department with a chief complaint of right lower quadrant abdominal pain. The review of her paperwork did review her CT read that showed potentialappendicitis. Her CT read patient stated "arising from the cecum there appears to be a tubular structure which may represent the appendix. This measures 9 mm and contains a punctate appendicolith. There is mild surrounding inflammatory stranding/edema as well. These findings are suspicious but not definitive for acute appendicitis. Along the posterior aspect of the pelvis there appears to be a low-attenuation area measuring 22 x 50 x 32 mm. This may represent a uterine fibroid." Physical exam. Right lower quadrant tenderness over the McBurney's point. We did order basic labs did give the patient IV Dilaudid

**Name: Chan,Ki Sau** **Birthdate: [redacted]1969**

**Report**

**Emergency Room Visit Notes**

for pain as well as IV fluids. I did reach out to general surgery and spoke with Dr. Winkler. He is recommending IV antibiotics and admission to the hospitalist at this time we do not recommend any imaging at this time. However his recommendations were to treated as appendicitis with IV antibiotic coverage at this point in time.. Labs reviewed and independently interpreted by myself showing no leukocytosis, CMP showed an AST of 50, lipase within normal limits. Lactate was also within normal limits. UA negative for any signs of infection. Unable to obtain a CT with IV contrast given her allergy. At this time per recommendations of general we will hold off on imaging. They will evaluate the patient either today or tomorrow. Patient was started on IV Rocephin and IV Flagyl. Additional IV morphine push was given for her pain. Also given 4 mg of IV Zofran for nausea.

Consider for admission: yes

Time: 1603

EP has discussed the case with Dr. [Hanna] (Hospitalist) via phone consult who is made aware and will evaluate the patient at bedside. Accepts admission. Patient is hemodynamically stable at this time.

---------------------- MEDICAL DECISION MAKING -----------------------

This patient presented with a chief complaint of: RLQ abd pain

Vital signs were reviewed and are significant for: . Overall unremarkable vitals within normal limits

History was obtained from the patient and the following independent historian: []

Old records were independently reviewed.

Nursing notes were reviewed and utilized during the patient encounter.

The patient´s medication list was independently reviewed by me.

DDX considered: Appendicitis, colitis, diverticulitis
EKG not obtained as it is not indicated
Labs were ordered and reviewed by me.

The patient's available past medical records and past encounters were reviewed.

The following labs/imaging were considered but not ordered: None

xDiscussion regarding this patient was had with the following:

x Dr. Hanna(Hospitalist)

Dr. Winkler general surgery

**Name: Chan,Ki Sau** **Birthdate: [redacted]/1969**

**Report**

**Emergency Room Visit Notes**

The following medications were ordered and administered during the ED stay: IV Rocephin, IV Flagyl, IV Zofran, IV Dilaudid, IV morphine

The following medications were prescribed: None

The following social determinants of health impacted this patient´s care: limited health care literacy

----------------------- IMPRESSION AND DISPOSITION --------------------

IMPRESSION
Right lower quadrant pain

DISPOSITION

Disposition: Admit

Patient condition: Fair

----------------------------- COUNSELING -----------------------------

Counseling: The emergency provider has spoken with the patient and discussed today´s findings, in addition to providing specific details for the plan of care. Questions are answered. There is agreement with the plan.

## Past Medical,Fam,Soc History

**Past Medical History**
Neurological: Vertigo
Musculoskeletal: Herniated Disc and Tendonitis
Endocrine: Hypothyroidism
Hematology: Anemia
Infectious Diseases: Chickenpox (Varicella)
**Reproductive History**
Patient Pregnant: No
**Past Surgical History**
Musculoskeletal: Orthopedic Surgery
**Family History**
Family History: Mother (Arthritis)
**Social History**
Use Drugs and/or Alcohol: No
Smoking Status: Never Smoker
Substance Use Type: Alcohol
Consumption Amount: Occasionally

# EXHIBIT L

Valley Hospital Hospitalist History & Physical, Hossam H. Hanna, M.D., August 9, 2025
(excerpt, pp. 1, 5)

(Declaration ¶ 15)

**Significance:** Valley's admitting hospitalist charted "Appendicitis: Status: Acute" and "Psychiatric: normal." No psychiatric basis for an antipsychotic.

The Valley Hospital
Valley Health System

**Name: Chan,Ki Sau** **Birthdate: [redacted]1969**

**Report**

## Hospitalist History and Physical

**The Valley Hospital**
**4 Valley Health Plaza**
**Paramus, NJ 07652**

**Hospitalist History & Physical**
**Signed**

Patient: Chan,Ki Sau
DOB: [redacted]1969
Age/Sex: 56 F
Loc: R-EDMED
Attending: Hossam H. Hanna MD
Referred by:

MR#: M1822913
Acct: V012216314
ADM Date: 08/09/25
Transcribed Dt/Tm: 08/09/25 1729
Dictated by: Hanna,Hossam H. MD
Date of Service: 08/09/25 1729

cc: ~

# History of Present Illness

**History of Present Illness**

Chief complaint: Abdominal pain

History of present illness:

Ms. Chan is a 56 year old female with past medical history significant for hypothyroid, patient presented to emergency department for evaluation of right lower quadrant abdominal pain, she had an outpatient CT however that with IV contrast showed potential appendicitis then had a PMD referred her to the emergency room for further evaluation, patient stated her symptoms started 3 weeks ago after she had a meal at a restaurant then she develops abdominal pain with vomiting and diarrhea and she suspected that she had food poisoning, she was evaluated by her PMD at the time who referred her to gastroenterologist and workup showed leukocytosis with WBC 21,010 patient was given referral for CT abdomen and pelvis which was done yesterday which showed possible appendicitis that is the reason patient was referred to the emergency department, patient stated that nausea vomiting and diarrhea has resolved however she continued to have intermittent right lower quadrant abdominal pain, she denies any fever, patient is allergic to IV iodine dye as well as she is allergic to dexamethasone and the prednisone so she cannot be premedicated to have IV imaging study done. At the emergency department labs showed WBC 8.28 hemoglobin 12.2 platelets 489 sodium 136 potassium 5.6 BUN 10 creatinine 0.59 lactic acid is pending total bilirubin 0.4 AST 50 ALT 45 alkaline phosphatase 60 lipase 51, urine analysis showed clear appearance nitrate negative urine leukocyte esterase negative urine WBC 0, surgeon Dr. Winkler consulted from the emergency department who advised to start IV antibiotic treatment for probable appendicitis and he will evaluate the patient. Patient referred to the hospitalist

**Name: Chan,Ki Sau** **Birthdate: [redacted]/1969**

**Report**

**Hospitalist History and Physical**

| | |
|---|---|
| Urine Glucose (UA) | Negative |

# Assessment/ Plan

**Assessment and plan**

(1) Appendicitis:

Status: Acute

Qualifiers:

**Appendicitis type:** other **Qualified Code(s):** K36 - Other appendicitis

Assessment/ Plan:

Patient presented to the emergency department for evaluation of right lower quadrant abdominal pain, CT scan of the abdomen and pelvis without contrast done as an outpatient yesterday showed potential appendicitis, patient cannot have IV contrast due to allergy and she cannot be premedicated because she is allergic to prednisone and dexamethasone, admitting labs noted for normal WBC patient has no fever, surgery consultation called from the emergency room was Dr. Winkler who advised to admit the patient and start IV antibiotics and he will evaluate patient in a.m., is not planning for emergent surgery so we will start patient on liquid diet and continue with IV antibiotics ceftriaxone and metronidazole

(2) Hypothyroid:

Status: Chronic

Qualifiers:

**Hypothyroidism type:** unspecified **Qualified Code(s):** E03.9 - Hypothyroidism, unspecified

Assessment/ Plan:

Continue Synthroid 50 mcg p.o. daily

# PMFSH

**Past Medical History**

Endocrine: Hypothyroidism

**Past Surgical History**

Musculoskeletal: Orthopedic Surgery

**Family History**

Family History: Mother (Arthritis)

**Social History**

Use Drugs and/or Alcohol: No

Smoking Status: Never Smoker

Substance Use Type: Alcohol

Consumption Amount: Occasionally

Lives With: Spouse

Traveled Outside the Country Within the Last 30 Days or Have Been In Household Contact With Someone Who Traveled Outside the Country Within the Last 30 Days: Unknown

**Marital Status**

Marital Status: married

Signed By: <Electronically signed by Hossam H. Hanna MD> 08/09/25 1754

# EXHIBIT M

Valley Hospital General Surgery History & Physical, Shmuel Kassirer, M.D., with attestation of Carl Winkler, M.D., August 9, 2025 (excerpt, pp. 1, 5)

(Declaration ¶ 15)

**Significance:** The surgical team planned MRI “to rule out perforated appendicitis” and wrote “Consider other imaging options including MRI or US,” the same night the emergency note withheld imaging.

The Valley Hospital
Valley Health System

**Name: Chan,Ki Sau** **Birthdate: [redacted]1969**

**Report**

## General Surgery History & Physical

**The Valley Hospital**
**4 Valley Health Plaza**
**Paramus, NJ 07652**

**General Surg History&Physical**
**Signed**

Patient: Chan,Ki Sau
DOB: [redacted]1969
Age/Sex: 56 F
Loc: S7C
Attending: Julie Zavadenko APN
Referred by:

MR#: M1822913
Acct: V012216314
ADM Date: 08/09/25
Transcribed Dt/Tm: 08/09/25 2201
Dictated by: Kassirer,Shmuel MD
Date of Service: 08/09/25 2201

cc: ~
*<Statement entered by Carl Winkler, MD - 08/10/25 15:50>*
I have seen and evaluated the patient. I reviewed the resident's note and agreed with findings and plan as documented in the resident's note.

Will obtain MRI with contrast abdomen pelvis to rule out perforated appendicitis. Although she has had symptoms on and off for 3 weeks, seems as though the acute localization to the right lower quadrant happened 4 or 5 days ago. She has previously had MRI with contrast without issue. Continue with antibiotics and fluid resuscitation for now. Okay for diet from my perspective, n.p.o. at midnight in case of need for appendectomy tomorrow. CT disc given to floor MA for upload into our PACS system. Report from August 8, 2025 noncontrast CT consistent with but not diagnostic of acute appendicitis.

Tender in the right lower quadrant on exam, no diffuse peritonitis.

### History of Present Illness

Chief Complaint:
RLQ abdominal pain
History of present illness:
Patient is a 56 year old woman with 3 weeks of abdominal pain, nausea, vomiting, bloating, and diarrhea, after a meal she had in a restaurant. She arrived to the ED following an outpatient CT that showed possible appendicitis and a lab workup showing leukocytosis with WBC 21,010, elevated calprotectin and platelet count. The nausea, vomiting, and diarrhea has since subsided but she continues to have RLQ abdominal pain. She does not have fever or pain when urinating.

**Name: Chan,Ki Sau** **Birthdate: [redacted]1969**

**Report**

**General Surgery History & Physical**

| | | |
|---|---|---|
| ALT | 45 U/L (10-49) | 08/09/25 14:46 |
| Alkaline Phosphatase | 60 U/L (45-117) | 08/09/25 14:46 |
| Total Protein | 7.1 g/dL (5.7-8.2) | 08/09/25 14:46 |
| Albumin | 3.7 g/dL (3.2-4.8) | 08/09/25 14:46 |
| Lipase | 51 U/L (12-53) | 08/09/25 14:46 |
| Urine Color | Straw (Yellow) | 08/09/25 15:19 |
| Urine Clarity | Clear (Clear) | 08/09/25 15:19 |
| Urine pH | 6.5 (5.0-8.0) | 08/09/25 15:19 |
| Ur Specific Gravity | 1.003 (1.003-1.035) | 08/09/25 15:19 |
| Urine Protein | Negative mg/dL (Neg - Trace) | 08/09/25 15:19 |
| Urine Glucose (UA) | Negative mg/dL (NEGATIVE) | 08/09/25 15:19 |
| Urine Ketones | Negative mg/dL (Negative) | 08/09/25 15:19 |
| Urine Occult Blood | Negative (Negative) | 08/09/25 15:19 |
| Urine Nitrate | Negative (Negative) | 08/09/25 15:19 |
| Urine Bilirubin | Negative mg/dL (NEGATIVE) | 08/09/25 15:19 |
| Urine Urobilinogen | <2.0 mg/dL (<2.0) | 08/09/25 15:19 |
| Ur Leukocyte Esterase | Negative Leu/uL (Negative) | 08/09/25 15:19 |
| Urine RBC | 0 /HPF (0-5) | 08/09/25 15:19 |
| Urine WBC | 0 /HPF (0-5) | 08/09/25 15:19 |
| POC Urine HCG, Qual | Negative | 08/09/25 19:29 |

## Assessment/ Plan

**Plan**

Plan:

Assessment:

Patient is a 56 year old woman with 3 weeks of abdominal pain. Outpatient CT scan of the abdomen showed potential appendicitis. Patient is allergic to Iodine, prednisone and dexamethasone complicating available imaging options. Patient has a normal WBC, PLT of 489, Stable VS, and no fever.

Plan:

Patient admitted

IV antibiotics

Pain medication

Obtain outpatient Imaging

Consider other imaging options including MRI or US

Discussed with DR. Winkler who will see patient in the AM

Signed By: <Electronically signed by Shmuel Kassirer MDRESIDENT> 08/09/25 2226

<Electronically signed by Carl Winkler, MD> 08/10/25 1550

# EXHIBIT N

Valley Hospital Hospitalist Progress Note, Julie Zavadenko, APN, August 10, 2025 (excerpt, pp. 1–3)

(Declaration ¶ 15)

**Significance:** APN Zavadenko charted "Appendicitis: Status: Acute" and "Psych: calm and cooperative," on the same day she canceled emergency imaging as "Discharged" (Exhibit O).

**Name: Chan,Ki Sau** **Birthdate: [redacted]/1969**

**Report**

## Hospitalist Progress Note

**The Valley Hospital**
**4 Valley Health Plaza**
**Paramus, NJ 07652**

**Hospitalist Progress Note**
**Signed with Addenda**

Patient: Chan,Ki Sau
DOB: [redacted]1969
Age/Sex: 56 F
Loc: S7C
Attending: Julie Zavadenko APN
Referred by:

MR#: M1822913
Acct: V012216314
ADM Date: 08/09/25
Transcribed Dt/Tm: 08/10/25 0905
Dictated by: Zavadenko,Julie APN
Date of Service: 08/10/25 0905

cc: ~

****ADDENDUM****

EKG personally reviewed and revealed SB at 59bpm. No acute ischemic changes. Normal EKG. Patient has no contraindication from medical stand point for lap appendectomy tomorrow. No further work up is indicated.

Addendum Signed By<Electronically signed by Julie Zavadenko APN> 08/10/25 1617

****ADDENDUM****

Case was d/w surgeon, plan for MRI abdomen/pelvis with contrast now. NPO after MN for potential lap appendectomy if patient is not feeling better. EKG was ordered for pre-op clearance.

Addendum Signed By<Electronically signed by Julie Zavadenko APN> 08/10/25 1517

## Subjective

**Name: Chan,Ki Sau** **Birthdate: [redacted]/1969**

## Report

## Hospitalist Progress Note

**Subjective**
Interval history:
This is a 56 year old female with a PMH of hypothyroid, who is been admitted with right lower quadrant abdominal pain concerning for acute appendicitis on outpatient images.
Patient's symptoms started 3 weeks ago after eating meal at a restaurant followed by nausea, vomiting and diarrhea. Initial concern was for gastroenteritis and patient was referred to GI by her PCP. At the time of work up her WBCs were up to 21k and she was sent for outpatient CT abdomen/pelvis which was done on 8/8/25 and was suspicious for acute appendicitis.
Initial blood work was significant no leukocytosis, hemoglobin 12.2, platelets 489, sodium 136,potassium 5.6, BUN 10, creatinine 0.59, lactic acid 1.02, total bilirubin 0.4, AST 50, ALT 45, alkaline phosphatase 60, lipase 51. UA was unremarkable. Patient brought CD with CT abdomen, pending surgery evaluation.
Resting in bed, c/o feeling bloated and lower abdominal pressure. She feels like need to move her bowels but nothing came out. No nausea or vomiting. Last BM was yesterday and reportedly normal.

# ROS

**Review of Systems**
Review of systems:
see hpi

**Vitals**
Vitals:

**Vital Signs - 8 hr**

| | Temp | Pulse | Resp | BP | Pulse Ox | O2 Del Method |
|---|---|---|---|---|---|---|
| 08/10/25 05:41 | 97.9 F | 57 L | 17 | 99/68 L | 99 | Room Air |

**Exam**
Exam:
VS reviewed
General: awake, nad, resting in bed
HEENT: NC/AT, PERRL, neck supple
Heart: S1, S2, RRR, no m/r/g
Lungs: diminished BLL
Abdomen: soft, nd, lower abdominal ttp, hypoactive bsx4
Extremities: no edema, no clubbing or cyanosis
Neurological:awake, alert, oriented, conversive, moving all extremities
Psych: calm and cooperative

# Objecive Data

**Medication**
Meds:
**Active Medications**

**Name: Chan,Ki Sau** **Birthdate: [redacted]/1969**

**Report**

**Hospitalist Progress Note**

| Generic Name<br>Trade Name | Dose Route<br>Freq PRN Reason | Start<br>Stop | Last Admin<br>Dose Admin |
|---|---|---|---|
| Ceftriaxone Sodium/Dextrose<br><br>Ceftriaxone 1 Gm/D5w | 1 gm in 50 mls @ 150 mls/hr<br><br>IVPB<br><br>DAILY SCH | 08/10/25 10:00<br>08/14/25 09:59 | |
| Metronidazole<br><br>Flagyl Ivpb | 500 mg in 100 mls @ 200 mls/hr<br>IVPB<br><br>Q12HR SCH | 08/09/25 22:00<br>08/13/25 21:59 | 08/09/25 22:13<br>Infused<br><br>Infusion |
| Sodium Chloride<br><br>Sodium Chloride 0.9% | 1,000 mls @ 75 mls/hr<br><br>IV<br>.Q13H20M SCH | 08/09/25 18:00 | 08/10/25 08:09<br>75 mls/hr<br>Administration |
| Levothyroxine Sodium<br><br>Levothyroxine 50 Mcg Tablet | 50 mcg<br><br>PO<br><br>MOWEFR@0600 SCH | 08/11/25 06:00 | |

## Assessment/Plan

**Assessment and plan**

(1) Abdominal pain, acute, right lower quadrant:
Status: Acute

(2) Hypothyroid:
Status: Chronic
Qualifiers:
**Hypothyroidism type:** unspecified **Qualified Code(s):** E03.9 - Hypothyroidism, unspecified

(3) Appendicitis:
Status: Acute
Qualifiers:
**Appendicitis type:** other **Qualified Code(s):** K36 - Other appendicitis

**Plan**

Lower abdominal pain and bloating, outpatient images concerning for possible acute appendicitis, pending surgical evaluation, cont IV Rocephin and Flagyl, IVF and NPO until surgical evaluation, start antiemetics and Tylenol for pain control
Anemia, Hgb down to 10.8, etiology is not clear, will obtain iron profile
Hypothyroid, cont Synthroid
Cont supportive care, follow labs in am

**Time Spent With Patient**

Total Time spent with Patient::

# EXHIBIT O

Valley Hospital Patient Order Summaries, emergency abdominal imaging orders canceled by APN Julie Zavadenko with stop reason "Discharged," August 10, 2025

Dkt. 4-3 at 2–6 (Amended Complaint Ex. U) (Declaration ¶ 15)

**Significance:** APN Zavadenko canceled emergency abdominal imaging with the stop reason "Discharged" while Appellant remained admitted with acute appendicitis.

The Valley Hospital
Valley Health System

**Patient Order Summary**

**Page:** 45 of 146
**Date:** 08/20/25 02:14
Fernandez, Alessandra

V012216314 Chan,Ki Sau
56/F

**Attending:** Usgaonker,Susrut R., DO
**Reason:** "abnormal abd CT"

**Location:** South 7C: Med/Surg

**Medical Record Number:** M1822913
**Account Number:** V012216314
**Registration:** 08/09/25

| Category | Order | Status | Start | Ord Provider | Entered By |
|---|---|---|---|---|---|
| | | | | **Old:** In Process | |
| MRI | 250810-151532243 | Cancelled | 08/10/25 15:14 | Zavadenko,Julie, APN | Zavadenko,Julie, APN |
| **MRI abdomen w con** | | | | Stat | **Order Source:** Physician Order |

**Stop Reason:** Order edited - Discontinuing original order

**Reason For Exam** abdominal pain

**Order Site** The Valley Hospital

**Contrast** Initiate Contrast Protocol

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 08/10/25 15:15 | Zavadenko,Julie, APN | TVH-MJOK7XDX | Order is Entered and Signed | Y |
| 1 | 08/10/25 15:15 | Zavadenko,Julie, APN | TVH-MJOK7XDX | Reflex Set: MRI Checklist generated | Y |
| 2 | 08/10/25 15:15 | Daemon,Background | VAH-BG16 | Status changed: **New:** Transmitted **Old:** Verified | NA |
| 3 | 08/10/25 15:15 | Daemon,Background | VAH-CM03 | Status changed: **New:** Logged **Old:** Transmitted | NA |
| 4 | 08/10/25 15:25 | Zavadenko,Julie, APN | TVH-MJOK7XDX | Stop Request | Y |
| 5 | 08/10/25 15:25 | Zavadenko,Julie, APN | TVH-MJOK7XDX | Copied to MRI abdomen w con 250810-152557936 | NA |
| 6 | 08/10/25 15:26 | Daemon,Background | VAH-CM03 | Request Denied | Y |
| 7 | 08/10/25 15:33 | Bauer,Pauline, RN | VAH-CM03 | Status changed: **New:** Cancelled **Old:** Logged | Y |
| 8 | 08/10/25 16:36 | Liebman,Lynn, RN | TVH-MJ0JFWXO | Order acknowledged | NA |

| Category | Order | Status | Start | Ord Provider | Entered By |
|---|---|---|---|---|---|
| ECG | 250810-151554906 | Resulted | 08/10/25 15:15 | Zavadenko,Julie, APN | Zavadenko,Julie, APN |
| **ECG 12 Lead EKG** | | | | Routine | **Order Source:** Physician Order |

**Reason For Exam** pre-op evaluation

| Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|

Continued on Next Page

The Valley Hospital
Valley Health System

**Patient Order Summary**



V012216314 Chan, Ki Sau
56/F

**Attending:** Usgaonker, Susrut R., DO
**Reason:** "abnormal abd CT"

**Location:** South 7C: Med/Surg

**Medical Record Number:** M1822913
**Account Number:** V012216314
**Registration:** 08/09/25

| Category | Order | Status | Start | Ord Provider | Entered By |
|---|---|---|---|---|---|

| # | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 08/10/25 15:15 | Zavadenko, Julie, APN | TVH-MJ0K7XDX | Order is Entered and Signed | Y |
| 2 | 08/10/25 15:16 | Daemon, Background | VAH-BG16 | Status changed: **New:** Transmitted **Old:** Verified | NA |
| 3 | 08/10/25 15:16 | Daemon, Background | VAH-CM03 | Status changed: **New:** Logged **Old:** Transmitted | NA |
| 4 | 08/10/25 15:56 | Daemon, Background | VAH-CM03 | Status changed: **New:** Completed **Old:** Logged | NA |
| 5 | 08/10/25 16:36 | Liebman, Lynn, RN | TVH-MJ0JFWXO | Order acknowledged | NA |
| 6 | 08/11/25 12:57 | Daemon, Background | VAH-CM03 | Status changed: **New:** Resulted **Old:** Completed | NA |

MRI 250810-152557920 Cancelled 08/10/25 15:25 Zavadenko, Julie, APN Zavadenko, Julie, APN
**MRI pelvis w con** Stat **Order Source:** Physician Order
**Stop Reason:** Changed to 08/10 1525 MR / PLVZ

**Reason For Exam** abdominal pain

**Order Site** The Valley Hospital

**Contrast** Initiate Contrast Protocol

| # | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 08/10/25 15:25 | Zavadenko, Julie, APN | TVH-MJ0K7XDX | Order is Entered and Signed | Y |
| 1 | 08/10/25 15:25 | Zavadenko, Julie, APN | TVH-MJ0K7XDX | Reflex Set: MRI Checklist generated | Y |
| 2 | 08/10/25 15:26 | Daemon, Background | VAH-BG16 | Status changed: **New:** Transmitted **Old:** Verified | NA |
| 3 | 08/10/25 15:26 | Daemon, Background | VAH-CM03 | Status changed: **New:** Logged **Old:** Transmitted | NA |

Continued on Next Page

The Valley Hospital
Valley Health System

**Patient Order Summary**

**Page:** 47 of 146
**Date:** 08/20/25 02:14
Fernandez,Alessandra

V012216314 Chan,Ki Sau
56/F

**Location:** South 7C: Med/Surg
**Attending:** Usgaonker,Susrut R., DO
**Reason:** "abnormal abd CT"

**Medical Record Number:** M1922913
**Account Number:** V012216314
**Registration:** 08/09/25

| Category | Order | Status | Start | Ord Provider | Entered By | |
|---|---|---|---|---|---|---|
| 4 | 08/10/25 16:36 | Liebman,Lynn, RN | TVH-MJ0JFWXO | | Order acknowledged | NA |
| 5 | 08/10/25 21:49 | O'Donnell,Pamela, RN | VAH-CM03 | | Copied to MRI pelvis wo/w con 250810-214942853 | NA |
| 6 | 08/10/25 21:49 | O'Donnell,Pamela, RN | VAH-CM03 | | Status changed:<br>**New:** Cancelled<br>**Old:** Logged | Y |
| 7 | 08/10/25 22:01 | Graham,Brittney, RN | TVH-MJ0J63RM | | Order acknowledged | NA |

Patient Care Or 250810-152557929 Completed 08/10/25 15:25 Zavadenko,Julie, APN Zavadenko,Julie, APN
MRI/MRA Checklist NOW **Order Source:** Physician Order
**Stop Reason:** Discharged

| Date Time | Frequency |
|---|---|
| 08/10/25 15:25 | NOW |

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 08/10/25 15:25 | Zavadenko,Julie, APN | TVH-MJ0K7XDX | Order is Entered and Signed | Y |
| 1 | 08/10/25 15:25 | Zavadenko,Julie, APN | TVH-MJ0K7XDX | Reflex Order generated from MRI pelvis w con 250810-152557920 | Y |
| 2 | 08/10/25 15:26 | Daemon,Background | VAH-BG16 | Status changed:<br>**New:** In Process<br>**Old:** Verified | NA |
| 3 | 08/10/25 16:36 | Liebman,Lynn, RN | TVH-MJ0JFWXO | Order acknowledged | NA |
| 4 | 08/12/25 17:22 | Kassirer,Shmuel, MDRESIDENT | VAH-BG17 | Manage Transfer - Order is set to continue upon transfer | NA |
| 5 | 08/12/25 17:22 | Kassirer,Shmuel, MDRESIDENT | VAH-BG17 | Manage Transfer - Transfer Provider added: Kassirer, Shmuel, MDRESIDENT | NA |
| 6 | 08/12/25 19:39 | Kassirer,Shmuel, MDRESIDENT | TVH-MJ0J6QQG | Manage Transfer - Order is continued upon transfer | Y |
| 7 | 08/12/25 19:39 | Smith,Nicole, RN | TVH-MJ0J6QQG | Process Transfer | NA |
| 8 | 08/12/25 19:52 | Smith,Nicole, RN | TVH-MJ0JFWXO | Order acknowledged | NA |
| 9 | 08/17/25 15:22 | Daemon,Background | VAH-BG16 | Status changed:<br>**New:** Completed<br>**Old:** In Process | NA |

The Valley Hospital
Valley Health System

**Patient Order Summary**

**Page:** 98 of 146
**Date:** 08/20/25 02:14
Fernandez,Alessandra

V012216314 Chan,Ki Sau
56/F

**Attending:** Usgaonker,Susrut R., DO
**Reason:** "abnormal abd CT"

**Location:** South 7C: Med/Surg

**Medical Record Number:** M1822913
**Account Number:** V012216314
**Registration:** 08/09/25

| Category | Order | Status | Start | Ord Provider | Entered By |
|---|---|---|---|---|---|
| MRI | 250810-152557936 | Cancelled | 08/10/25 15:14 | Zavadenko,Julie, APN | Zavadenko,Julie, APN |

**MRI abdomen w con**

Stat

**Stop Reason:** Changed to 08/10 1514 MR / ABD2

**Order Source:** Physician Order

**Reason For Exam** abdominal pain

**Order Site** The Valley Hospital

**Scheduler Comment to Tech** MRI abdomen/pelvis

**Contrast** Initiate Contrast Protocol

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 08/10/25 15:25 | Zavadenko,Julie, APN | TVH-MJ0K7XDX | Order created because of edit(s) | Y |
| 1 | 08/10/25 15:25 | Zavadenko,Julie, APN | TVH-MJ0K7XDX | Copied from MRI abdomen w con 250810-151532243 | Y |
| 2 | 08/10/25 15:25 | Zavadenko,Julie, APN | TVH-MJ0K7XDX | Order is Signed by Zavadenko,Julie, APN | Y |
| 3 | 08/10/25 15:26 | Daemon,Background | VAH-BG16 | Status changed: **New:** Transmitted **Old:** Verified | NA |
| 4 | 08/10/25 15:26 | Daemon,Background | VAH-CM03 | Status changed: **New:** Logged **Old:** Transmitted | NA |
| 5 | 08/10/25 16:36 | Liebman,Lynn, RN | TVH-MJ0JFWXO | Order acknowledged | NA |
| 6 | 08/10/25 21:49 | O'Donnell,Pamela, RN | VAH-CM03 | Copied to MRI abdomen wo/w con 250810-214921750 | NA |
| 7 | 08/10/25 21:49 | O'Donnell,Pamela, RN | VAH-CM03 | Status changed: **New:** Cancelled **Old:** Logged | Y |
| 8 | 08/10/25 22:01 | Graham,Brittney, RN | TVH-MJ0J63RM | Order acknowledged | NA |

The Valley Hospital
Valley Health System

**Patient Order Summary**

**Page:** 49 of 146
**Date:** 08/20/25 02:14
Fernandez,Alessandra

V012216314 Chan,Ki Sau
56/F

**Attending:** Usgaonker,Susrut R., DO
**Reason:** "abnormal abd CT"

**Location:** South 7C: Med/Surg

**Medical Record Number:** M1822913
**Account Number:** V012216314
**Registration:** 08/09/25

| Category | Order | Status | Start | Ord Provider | Entered By |
|---|---|---|---|---|---|
| MRI | 250810-214921750 | Resulted | 08/10/25 15:14 | Zavadenko,Julie, APN | Zavadenko,Julie, APN |
| MRI abdomen wo/w con | | | | Stat | **Order Source:** Physician Order |

**Reason For Exam** abdominal pain

**Order Site** The Valley Hospital

**Scheduler Comment to Tech** MRI abdomen/pelvis

**Contrast** Initiate Contrast Protocol

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 08/10/25 21:49 | O'Donnell,Pamela, RN | VAH-CM03 | Order created because of edit(s) | Y |
| 1 | 08/10/25 21:49 | O'Donnell,Pamela, RN | VAH-CM03 | Copied from MRI abdomen w con Stat 250810-152557936 | Y |
| 2 | 08/10/25 21:49 | Zavadenko,Julie, APN | VAH-CM03 | Order is Signed by Zavadenko,Julie, APN | Y |
| 3 | 08/10/25 22:01 | Graham,Brittney, RN | TVH-MJ0J63RM | Order acknowledged | NA |
| 4 | 08/10/25 22:16 | Creutz,Christina | VAH-CM03 | Status changed: **New:** Taken **Old:** Logged | NA |
| 5 | 08/11/25 07:15 | Daemon,Background | VAH-CM03 | Status changed: **New:** Completed **Old:** Taken | NA |
| 6 | 08/11/25 11:27 | Daemon,Background | VAH-CM03 | Status changed: **New:** Resulted **Old:** Completed | NA |

| Category | Order | Status | Start | Ord Provider | Entered By |
|---|---|---|---|---|---|
| MRI | 250810-214942853 | Resulted | 08/10/25 15:25 | Zavadenko,Julie, APN | Zavadenko,Julie, APN |
| MRI pelvis wo/w con | | | | Stat | **Order Source:** Physician Order |

**Reason For Exam** abdominal pain

**Order Site** The Valley Hospital

Continued on Next Page

Case 2:26-cv-03358-MCA-AME Document 4-3 Filed 04/09/26 Page 6 of 9 PageID: 140

# EXHIBIT P

Valley Defendants' February 6, 2026 State-Court Opposition Brief (Robert G. Veech, III, Esq.), with Certification of Janet M. Zicarelli, Esq., R.N. (February 5, 2026) and Defendants' Exhibit B (haloperidol records and surgical consent form) (excerpts)

Dkt. 5 at 32–37, 40–41, 52–57 (Amended Complaint Ex. B); Dkt. 81, Exs. 7, 8, 11 (Declaration ¶¶ 16, 28–30)

**Significance:** Ms. Zicarelli and Mr. Veech both acknowledged the Flags. Valley defended withholding the Flags under HIPAA and certified that "any potential flags were not used by any medical/administrative staff in rendering care and treatment to the patient," and therefore need not be disclosed under HIPAA; it never denied the Flags exist. Valley's counsel also claimed in this February 6, 2026 opposition brief that the haloperidol "was given as needed for nausea," "for the off-label purpose of nausea" (Dkt. 5 at 35). Defendants' own Exhibit B confirms the haloperidol was ordered by Defendant Dr. Kyra Bernstein and administered by Defendant RN Elizabeth Sattely, and the consent form lists no Foley catheter and no haloperidol.

Case: 26-3345 Document: 8 Page: 140 Date Filed: 10/23/2026

# FARKAS & DONOHUE, LLC

**-Counselors at Law-**
25A Hanover Road, Suite 320
Florham Park, New Jersey 07932
(973) 443-9400
(973) 443-4330 Fax
Email: Office@FarkasandDonohue.com
www.FarkasandDonohue.com

**EVELYN CADORIN FARKAS***
**DAVID C. DONOHUE #***
**ROBERT J. MORMILE ****
**BETH A. HARDY***
**CHARLES E. MURRAY III +**
**EILEEN M. KAVANAGH +**
**JENNIFER SALFI GIANETTI ◆**
**GUY M. MAGNUSSON ◆**
**ROBERT G. VEECH III +**
**DOUGLAS F. CIOLEK*◆**

*** Certified By The Supreme Court of New Jersey as a Certified Civil Trial Attorney**
**** Admitted in NJ & PA**
**+ Admitted in NJ & NY**
**# Admitted in NJ & AZ**
**◆ Of Counsel**

February 6, 2026

*Via eCourts Filing*
Superior Court of New Jersey
Civil Division | Bergen County
ATTN: The Honorable. John D. O'Dwyer, P.J. Cv.
10 Main Street, 3rd Floor
Rotunda
Hackensack, New Jersey 07601

**Re: Ki Sau Chan v. Valley Health System, et al.**
**Docket No.: BER-L-3-26**
**Our File No.: VH349**

Dear Judge O'Dwyer:

This firm has been retained to represent defendants, Valley Health System, Valley Hospital, and Valley Medical Group, in connection with the above-mentioned matter. Returnable on February 20, 2026 is *pro se* plaintiff's application for a declaratory injunctive relief (Transaction ID No.: LCV20261641). Kindly accept this letter opposition in lieu of more formal papers. **Pursuant to the January 6, 2026 Order, Oral argument is scheduled for February 20, 2026.**

An "[i]njunction is primarily a preventive remedy intended to afford relief against future acts or conduct which are against equity and good conscience . . . rather than to remedy what is past and done or to punish for wrongs already committed." Devine v. Devine, 20 N.J. Super. 522, 527, 90 A.2d 126 (Ch.Div.1952) (citing Soc'y for Establishing Useful Mfrs. v. Morris Canal & Banking Co., 1 N.J. Eq. 157, 191 (Ch.1830)). A party seeking a permanent injunction is required to demonstrate that its "legal right to such relief has been established and that the injunction is necessary to prevent a continuing, irreparable injury." Verna v. Links at Valleybrook Neighborhood Ass'n, Inc., 371 N.J. Super. 77, 89 (App. Div. 2004). Final injunctive relief will be imposed only when the party seeking such relief demonstrates liability of the other party, the need for injunctive relief, "and the appropriateness of such relief on a balancing of equities." Rinaldo v. RLR Inv., LLC, 387 N.J. Super. 387, 397, 904 A.2d 725 (App. Div. 2006). The non-exclusive factors the court considers are:

> (1) the character of the interest to be protected;
> (2) the relative adequacy of the injunction to the plaintiff as compared with other remedies;
> (3) the unreasonable delay in bringing suit;
> (4) any related misconduct by plaintiff;
> (5) the comparison of hardship to plaintiff if relief is denied, and hardship to defendant if relief is granted;
> (6) the interests of others, including the public; and
> (7) the practicality of framing the order or judgment.

Sheppard v. Township of Frankford, 261 N.J. Super. 5, 10 (App. Div. 1992) (citing *Restatement (Second) of Torts* § 936 (A.L.I. 1977)). *Pro se* plaintiff's reliance on Crowe v. De Gioia, 90 N.J. 126, 132-34 (1982) is also misplaced as those factors apply to preliminary injunction and not a final injunction.

Here, without even considering the appropriate factors, *pro se* plaintiff has failed to establish a settled legal right to amend their hospital records. Estate of F.W.K. v. M.A.-V., 473 N.J. Super. 379, 382-85 (Law. Div. 2021) (applicant not entitled to injunctive relief when law

was well-settled against applicant's position.). In fact, the court may not order health care professionals to pursue a course which they believe is inappropriate or unsafe and against their own professional practices and ethics. Couch v. Visiting Home Care Serv., 329 N.J. Super. 47, 53 (App. Div. 2000). See also, N.J.A.C. §13:35-6.5(b)[1] (Licensees[2] shall prepare contemporaneous, **permanent professional treatment records.**) (emphasis added). Despite not having a legal claim for a final injunctive relief, *pro se* plaintiff also fails to demonstrate a majority of the necessary considerations for the same.

Plaintiff's contention that the defendants rely on and disseminate "undisclosed behavioral/psychiatric 'flag ' or alert' entries" is without merit or evidence. In reviewing the voluminous filings of plaintiff (over 700+ pages), plaintiff has also provided evidence to substantiate that the defendants are not legally obligated to maintain such notations as part of the designated record set, pursuant to HIPAA. See *Pltf. Exhibit V-2*. Specifically, defendants advised plaintiff that such "flags" and "alerts" are **not used for purposes of rendering medical judgment/decisions as to the care and treatment of the patient**. Ibid. Valley sent a detailed email to plaintiff explaining their medical record process and HIPAA regulations. Despite being advised this, plaintiff is not satisfied and thus filed the instant application. A review of the brief supplied is devoid of any legal authority or evidence to substantiate plaintiff's claims for injunctive relief.

Moreover, plaintiff mistakenly believes that the use of the medication Haloperidol Lactate (also known as Haldol) can only be used for psychiatric issues. A review of the FDA approved off label uses for the medication indicates that such medication can be used to treat

---

[1] Administrative Code Title "Preparation of patient records, computerized records, access to or release of information; confidentiality, transfer or disposal of records"
[2] Licensee is defined in N.J.A.C. §13:35-6.5(a) as "any person licensed or authorized to engage in a health care profession regulated by the Board of Medical Examiners."

nausea. See *Exhibit A*. In fact, a review of the medical record demonstrates that the medication was given as needed for nausea. See *Exhibit B*. Simply because a medication has a recommended use does not negate the fact that there are known off-label uses for medications. Therefore, there can be no logical inference that the plaintiff was given this medication due to any psychiatric issue, but rather for the off-label purpose of nausea. Nevertheless, such contention is outside the scope of the requested relief sought. The fact that Haldol was used during her admission to the Valley Hospital despite her alleged requests not to use the same is not relevant to the instant application.

Secondly, plaintiff improperly relies on a nurse to provide a standard of care with respect to the use of a foley catheter post-surgery. See Rosenberg by Rosenberg v Cahill, 99 N.J. 318, 325 (1985) (quoting Sanzari v. Rosenfeld, 34 N.J. 128, 134-35 (1962) ("the standard of care must be established by expert testimony, and that a jury generally lacks the 'requisite special knowledge, technical training and background to be able to determine the applicable standard of care without the assistance of an expert.'"). In Hill Int'l v. Atl. City Bd. of Educ., 2014 N.J. Super. LEXIS 177, 1 (App. Div. Dec. 30, 2014) the Court reiterated that it would be contrary to

> allow a licensed nurse to serve as a qualified affiant against a licensed physician who, for example, negligently took and recorded a patient's blood pressure. Although nurses and physicians are both trained and authorized to take blood pressure readings, they are each still held professionally accountable under the standards of care of their own individual professions. It would thwart the screening objectives [] to allow a nurse to vouch for a medical malpractice claim asserted against a physician, and vice-versa.

Id. at 29-31. While plaintiff seeks to proffer that improper medical treatment was rendered, **plaintiff has not filed a medical malpractice action**. Instead, plaintiff has sought injunctive relief in seeking to restrain defendants from "relying upon, acting pursuant to, or considering any

undisclosed behavioral, psychiatric, or similar 'flag' or alert' entries when making clinical, administrative, or treatment decisions concerning plaintiff." See Proposed Order. Therefore, any reliance on care and treatment as it pertains to any contraindication of Barium administration, the use of a foley catheter, the use of Haldol, or refusal of disability accommodation is irrelevant to the present litigation.

While not an issue before the Courts, it should also be noted that plaintiff's claims of lack of informed consent are also inapplicable to the instant litigation and are also incorrect. A review of the August 12, 2025 signed consent form regarding plaintiff's diagnostic laparoscopy indicates that she also understood additional procedures (such as a foley catheter) might be required, due to unforeseen conditions that may arise during the procedure. *Exhibit A*. For plaintiff to advise that there was no informed consent is, again, not true.

Any downstream harm provided by a medical provider not related to these defendants is also without merit. Plaintiff argues that Dr. Ng of Prism Vision failed in their medical judgment to render appropriate care and/or treatment. However, there is no causal connection between a subsequent provider allegedly failing to render appropriate care and the undisclosed "flags" from the Valley admissions.

Additionally, the alleged "flags" began when plaintiff was seen at Hospital of Specialty Services in NY. However, plaintiff is only seeking recourse as to the Valley defendants. It is uncertain whether plaintiff is pursuing any action in NY as to HSS, where the alleged incident originated.

Perhaps most importantly, there is no ongoing irreparable harm that is befalling plaintiff. As noted above, any subsequent treatment by physicians not at Valley Hospital will have their own medical judgment to use when treating and caring for the plaintiff. It is not a fact that

subsequent providers review the patients entire hospital admission prior to engaging in care and treatment. Furthermore, plaintiff was successfully treated while at the Valley Hospital for chronic appendicitis. There is no progression of the illness that has been provided as evidence (no subsequent medical treatment). Therefore, for plaintiff to proffer that there is ongoing (life-threatening) injury is simply not true. Plaintiff is not at risk for imminent and ongoing, but rather speculation. As such, plaintiff is unable to satisfy the standard required in order to obtain the requested relief. See Ispahani v. Allie Domecq Retail, 320 N.J. Super. 494 (App. Div. 1999) (applicant for preliminary injunction must show that irreparable injury would ensue if the relief were denied **that the claim is based on a settled legal right**, that the material facts are substantially undisputed and that [she] will suffer greater harm if the relief is denied than the opposing party will if it is granted.). See also Loigman v. Twp. Comm. of Middletown, 185 N.J. 566, 593 (2006).

Specifically, plaintiff's prayer for relief is improper and not supported by legal justification. First, the Valley defendants have already provided plaintiff with all designated records in accordance with HIPAA. Second, the Valley defendants detailed the record process and the compliance with HIPAA and further advised that no medical or administrative care is rendered because of such alleged "flags" or "alerts." Finally, there is no public interest that requires the issuance of an injunction in the instant case.

Based on the aforementioned, it is respectfully submitted that plaintiff's request for injunctive relief be denied with prejudice in accordance with

Very Respectfully,

Robert G. Veech, III, Esq.
Rveech@farkasanddonohue.com

RGV/al
CC: Ki Sau Chan (via email and mail)

**FARKAS & DONOHUE, LLC**
Robert G. Veech, III, Esq. – 317592020
25 A Hanover Road, Suite 320
Florham Park, New Jersey 07932
973-443-9400
973-443-4330 – Fax
Attorneys for Defendants, Valley Health System, Valley Hospital, and Valley Medical Group
Our File No: VH-349

| | |
|---|---|
| KI SAU CHAN,<br><br>Plaintiffs,<br><br>vs.<br><br>VALLEY HEALTH SYSTEM; VALLEY HOSPITAL; VALLEY MEDICAL GROUP; and JOHN/JANE DOES 1-50,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION – BERGEN COUNTY<br>DOCKET NO.: BER-L-3-26<br><br>Civil Action<br><br>**CERTIFICATION OF JANET M. ZICARELLI** |

I, Janet M. Zicarelli, Esq., R.N., CPHRM, CPPS, by way of Certification in lieu of oath or affidavit, says:

1. I am the Director of Risk/Claims Management with the Valley Health System, and, as such, I am fully and personally familiar with the facts set forth within.

2. I have been in this position since February 1, 2016.

3. I make this Certification in support of defendants' opposition to *pro se* plaintiff's request for permanent injunctive and declaratory relief (Transaction ID No.: LCV20261641).

4. *Pro se* plaintiff has attempted on numerous occasions to obtain her designated medical records. Despite providing her with the same, she continues to demand additional records that are not kept in accordance with hospital policies, procedures, as well as HIPAA regulations.

5. In fact, on November 12, 2025, our HIPAA compliance Manager and Privacy Officer, Connie Wright, advised plaintiff that the items she was requesting was not a part of the

designated medical record. She was also advised that any potential flags were not used by any medical/administrative staff in rendering care and treatment to the patient.

6. Despite these representations, *pro se* plaintiff did not find the answer acceptable and filed the request for injunctive relief.

7. Valley Health System has gone above and beyond to assist *pro se* plaintiff with the medical record request.

8. Furthermore, the filing of the instant application demonstrates harassment onto these defendants, despite their continued cooperation to assist with *pro se* plaintiff's request.

9. It is respectfully requested that the instant application for final injunction be denied with prejudice.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: February 5, 2026

By: *Janet M. Zicarelli*
Janet M. Zicarelli, Esq., R.N., CPHRM, CPPS

# EXHIBIT B
# (Confidential Filing)

The Valley Hospital
Valley Health System

**Patient Order Summary**


**Date:** 08/20/25 02:14
Fernandez, Alessandra

V012216314 Chan, Ki Sau
56/F

**Location:** South 7C: Med/Surg
**Attending:** Usgaonker, Susrut R., DO
**Reason:** "abnormal abd CT"

**Medical Record Number:** M1822913
**Account Number:** V012216314
**Registration:** 08/09/25

| Category | Order | Status | Start | Ord Provider | Entered By | |
|---|---|---|---|---|---|---|
| | | | | | transfer | |
| 7 | 08/12/25 17:22 | Kassirer, Shmuel, MDRESIDENT | | VAH-BG17 | Manage Transfer - Transfer Provider added: Kassirer, Shmuel, MDRESIDENT | NA |
| 8 | 08/12/25 19:00 | Daemon, Background | | VAH-CM03 | Status changed: **New:** Completed **Old:** Pha Verified | NA |
| | | | | | Order acknowledged | NA |
| 9 | 08/12/25 19:05 | Sattely, Elizabeth, RN | | TVH-MZ01VTTT | Bernstein, Kyra, MD | |
| Medications | 250812-150155781 | Completed | 08/12/25 15:10 | Bernstein, Kyra, MD | **Order Source:** Physician Order | |

**haloperidoL INJ**

**Stop Reason:** Patient Left PACU

| Medication | Dose | Per |
|---|---|---|
| haloperidoL INJ | 0.5 MG | |

| Route | Frequency | Sched | PRN Reason | Days | Hours | Total Doses | Clinical Indication |
|---|---|---|---|---|---|---|---|
| IVP | PACU ONLY** Q30M | PRN | Nausea | | | 2 | |

**Stop Date/Time:** 08/13/25 01:00
**Discontinued:** 08/12/25 19:01

**Protocol text:**
Default order of administration (10min between doses)
- Ondansetron 4 mg (if not given in the OR)
- Haloperidol 0.5mg (if not given in the OR)
- Diphenhydramine 12.5 mg
- Ondansetron 4mg
- Haloperidol 0.5mg
- Diphenhydramine 12.5 mg
- Prochlorperazine 5 mg OR Metoclopramide 10 mg (as directed by Anesthesiologist)

**Dose Instruction:** Rate of IV administration not well defined; rates of a maximum of 5 mg/minute and 0.125 mg/kg over 1 to 2 minutes have been reported.

**Label Comments:** FOR PACU/SDS USE ONLY - PHASE 1 AND 2 ORDER 2nd LINE AGENT. 1st LINE IF ONDANSETRON GIVEN INTRA-OP ALLOW 10 MINUTES BETWEEN NAUSEA INTERVENTIONS

| Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|

Continued on Next Page

DATE: 08/18/25 @ 0003
USER: PHABKGJOB

Valley Hospital *Live* PHA
Medication Discharge Summary Report

| | | |
|---|---|---|
| 08/18/25 | Medication Discharge Summary | |
| Name Chan,Ki Sau | Unit Num M1822913 | Account Num V012216314 |

| ADMINISTRATION PERIOD 0700 08/12/25 to 0659 08/13/25 (continued) | START/ STOP | |
|---|---|---|
| haloperidoL INJ (haloperidoL INJ 5 MG/ML VIAL)<br>0.5 MG IVP PACU ONLY** Q30M/PRN<br>PRN Reason: Nausea<br>Total Doses: Max 2 (1 of 2 Given)<br>Dose Ins: Rate of IV administration not well defined; rates of a maximum of 5 mg/minute and 0.125 mg/kg over 1 to 2 minutes have been reported.<br>Comments: FOR PACU/SDS USE ONLY - PHASE 1 AND 2 ORDER<br>2nd LINE AGENT. 1st LINE IF ONDANSETRON<br>GIVEN INTRA-OP<br>ALLOW 10 MINUTES BETWEEN NAUSEA INTERVENTIONS<br>RX #: 20101395 | 08/12/25<br>08/13/25 | ED 1511 OMERCAD<br>ED 1511 OMERCAD<br>ACK 1840 ESATTEL<br>1840 ESATTEL at 1840 GAVE: 0.5 MG<br>Barcode Medication: haloperidoL INJ<br>NDC/DIN: 6332317400 (SOURCE: eMAR)<br>Rule: MAR.IVP.D - MAR: IVP Policy/DNR Warning<br>Rule: MAR.IVP.D - MAR: IVP Policy/DNR Warning<br>Override Comment: Given by PACU/SDS RN<br>DC 1903 ESATTEL<br>ACK 1905 ESATTEL |
| DiphenhydrAMINE INJ (DiphenhydrAMINE INJ 50 MG/ML VIAL)<br>12.5 MG IVP PACU ONLY** Q30M/PRN<br>PRN Reason: Nausea<br>Total Doses: Max 2 (0 of 2 Given)<br>Dose Ins: Administer IV at a rate not exceeding 25 mg/min<br>Comments: FOR PACU/SDS USE ONLY - PHASE 1 AND 2 ORDER<br>3rd LINE AGENT. 1ST LINE IF ONDANSETRON and<br>HALOPERIDOL GIVEN IN OR.<br>ALLOW 10 MINUTES BETWEEN NAUSEA INTERVENTIONS<br>RX #: 20101393 | 08/12/25<br>08/13/25 | ED 1510 OMERCAD<br>ED 1510 OMERCAD<br>CAN 1903 ESATTEL<br>ACK 1905 ESATTEL |

*** Continued on Page 30 ***

THE VALLEY HOSPITAL
Paramus, New Jersey

V012216314
Chan,Ki Sau
ATTEND: Hanna,Hossam H.
ADM: 08/09/25
M1822913

DOB: [redacted] 1969
AGE: 56
SEX: F
SVD: 08/09/25
SVC: Med

**Informed Consent For Surgery or Special Procedures**

Rev. 07/25
1 of 3

1. **Authorization**. I, Chan (Name of Patient) authorize Winkler (Name of Practitioner) and any appropriate designees selected by my Practitioner, to perform the following surgery or special procedure(s) (the "Procedure"):
**Name and Description of the Procedure (must be completed by Practitioner):**

diagnostic laparoscopy
possible appendectomy
possible bowel resection or ostomy

☐ Right ☐ Left ☒ N/A

2. **Surgery or Special Procedure**. The following information has been discussed with me about the Procedure listed above: (a) the nature and intended purpose; (b) the potential risks, benefits and side effects, including any possible duration of incapacity and potential problems that may occur during recovery from the Procedure; (c) the reasonable alternatives, including the potential risks, benefits and side effects related to those alternatives; (d) the risks and consequences of not receiving the Procedure; and (e) the possible or likely results of the Procedure, including my likelihood of achieving treatment goals.

3. **Additional Procedures**. I understand that during the course of the Procedure, unforeseen conditions may arise that require additional or different procedure(s) other than the Procedure listed in Paragraph 1. I authorize and request that my Practitioner and any appropriate designees perform such other procedures as necessary in the exercise of their professional judgment. This authority extends to treating all conditions that are unknown to me at the time the Procedure is undertaken.

4. **Blood Transfusions**. I understand that I may need a transfusion(s) of blood and/or blood products in connection with the Procedure. I have been given and have read the Patient Information Sheet on Blood Transfusions, and my Practitioner has discussed with me the following information about blood transfusions:

   (a) The reason(s) I may need one; the nature and intended purpose; the potential risks, benefits and side effects, including any potential problems that may occur during recovery from the transfusion(s); the reasonable alternatives, including the potential risks, benefits and side effects related to those alternatives; the possible options including autologous, homologous and directed donation; any possible duration of incapacity; the risks and consequences of not receiving a transfusion(s); and the possible or likely results of the transfusion(s), including my likelihood of achieving treatment goals.

   (b) That a blood transfusion is not always successful and that no guarantee or assurance has been made to me or anyone concerning the benefits or results of a transfusion, and that I may be subject to ill effects as a result of receiving blood and/or blood products.

   (c) That this consent applies to all transfusions I may receive related to the Procedure.

Patient Information Includes:
Pt. Info. Sheet - Anesthesia - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Blood Recovery - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Blood Transfusion - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Conscious Sedation - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Radiation - Given to patient. Not part of permanent record.

Consent_TVHBlank_Rev_July2025

**THE VALLEY HOSPITAL**
Paramus, New Jersey

V012216314
Chan,Ki Sau
ATTEND: Hanna,Hossam H.
ADM: 08/09/25
M1822913

DOB: [redacted]1969
AGE: 56
SEX: F
SVD: 08/09/25
SVC: Med

## Informed Consent For Surgery or Special Procedures

Rev.

**For blood transfusions, I have decided:**

(a) If my Practitioner deems appropriate in the exercise of his/her professional judgment, I CONSENT to receive blood and or blood products. ☒ Yes ☐ No

(b) I DO NOT CONSENT to receive blood and blood products. I understand that my refusal to have a blood transfusion may cause serious illness and possible death. I further understand that I will be offered registration in the Blood Alternative Program. ____________ (Patient must initial if refusing blood and blood products.)

5. **Anesthesia**. I have been given and have read the Patient Information Sheet on Anesthesia and I consent to the administration and management of such anesthesia as the anesthesiologist and/or certified registered nurse anesthetist assigned to my Procedure deems appropriate. I have also been given and have read the Patient Information Sheet on Moderate Sedation/Analgesia ("Conscious Sedation") and I understand that moderate sedation may be administered by a doctor other than an anesthesiologist or certified registered nurse anesthetist, or by a nurse under the direction of a doctor, and I consent to the administration and management of such moderate sedation as the doctor deems appropriate. I have been informed of the risks most commonly associated with the administration of anesthesia and moderate sedation. I am aware that complications from all forms of anesthesia and moderate sedation are rare but may occur.

6. **Radiation**. I have been given and have read the Patient Information Sheet on the use of x-rays during my Procedure. I consent to the administration of x-rays as my Practitioner deems appropriate. I have been informed of the risks most commonly associated with the exposure to radiation.

7. **Specimens**. I consent to the examination and disposal of any specimens, tissues, and/or parts removed in the performance of the Procedure. I understand that once they are disposed, they cannot be retrieved. I understand and agree that the Hospital may use such specimens, tissues, and/or parts for medical education. I further understand that the law allows my specimens and/or tissues to be used for research without my authorization if my identity is not linked to the specimens and/or tissues. If my identity will be linked to my specimens and/or tissues, they will not be used for research unless I provide authorization.

8. **Vendors**. I understand that vendors and/or sales representatives associated with equipment and supplies used for the Procedure may observe or be present during the Procedure.

9. **Photography**. I consent to the use of photography or videotaping relating to my medical condition. I understand that any images may be used for my treatment and/or medical education. If used for medical education, at no time will my identity or any information linked to my identity be disclosed. The confidentiality of my images will be protected in accordance with applicable federal and state privacy laws.

10. **Acknowledgement**. I understand the practice of medicine and surgery is not an exact science, and that the Procedure may not have the benefit or results intended. I acknowledge that no guarantees or assurances have been made to me concerning the benefits or results of the Procedure.

Patient Information Includes
Pt. Info. Sheet - Anesthesia - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Blood Recovery - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Blood Transfusion - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Conscious Sedation - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Radiation - Given to patient. Not part of permanent record.

Consent_TVHBlank_Rev_July2025

THE VALLEY HOSPITAL
Paramus, New Jersey

V012216314
Chan,Ki Sau
ATTEND: Hanna,Hossam H.
ADM: 08/09/25
M1822913

DOB: [redacted]1969
AGE: 56
SEX: F
SVD: 08/09/25
SVC: Med

## Informed Consent For Surgery or Special Procedures

Rev. 07/25
3 of 3

**Statement of Patient or Patient's Representative.** I certify the following to be true:

A. I have read and understand the information in this informed consent form.
B. The information referred to in this informed consent form has been explained to me by my Practitioner.
C. I have had the opportunity to ask and have had answered to my satisfaction all of my questions about the Procedure.
D. I believe that I know enough about the Procedure to make an informed decision and that by signing below I give my consent for the Procedure.
E. I acknowledge that the facility is a teaching facility and resident physicians, fellows, and students may work with my physician and practitioners. Resident physicians, fellows, and students who participate in my care will be supervised by my physician, practitioner and/or their designees.

[signature] 8/12/25 1359
Patient's Signature | Date | Time

**Only if Patient is unable to consent, complete the following:**

Name of Patient's Authorized Representative | Relationship to Patient

Signature of Patient's Authorized Representative | Date | Time

Reason Patient Cannot Consent

Name of Witness | Signature of Witness

**Statement of Practitioner Obtaining Consent:** I certify that I have had the informed consent discussion with the patient or patient's representative and have answered any questions related to the Procedure.

[signature] 8/12/25 1359
Practitioner's Signature | Date | Time

Patient Information Includes
Pt. Info. Sheet - Anesthesia - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Blood Recovery - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Blood Transfusion - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Conscious Sedation - Given to patient. Not part of permanent record.
Pt. Info. Sheet - Radiation - Given to patient. Not part of permanent record.

Consent_TVHBank_Rev_July2025

# EXHIBIT Q

Certification of Eileen M. Kavanagh, Esq., with Supplemental Certification of Janet M. Zicarelli, Esq., R.N. (February 25, 2026)

Dkt. 5 at 63–64 (Amended Complaint Ex. D); Dkt. 81, Ex. 9 (Declaration ¶ 29)

**Significance:** Ms. Zicarelli’s complete reversal: “There are no ‘flags’ or ‘alerts’ in plaintiffs electronic medical record.” It never explains how the Flag entries, present since the August 2025 surgery and withheld by Valley since Appellant’s first HIPAA request in October 2025, ceased to exist.

**FARKAS & DONOHUE, LLC**
Eileen M. Kavanagh, Esq. – 031901994
25 A Hanover Road, Suite 320
Florham Park, New Jersey 07932
973-443-9400
973-443-4330 – Fax
Attorneys for Defendants, Valley Health System, Valley Hospital, and Valley Medical Group
Our File No: VH-349

| | |
|---|---|
| KI SAU CHAN,<br><br>Plaintiffs,<br>vs.<br><br>VALLEY HEALTH SYSTEM; VALLEY HOSPITAL; VALLEY MEDICAL GROUP; and JOHN/JANE DOES 1-50,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION – BERGEN COUNTY<br>DOCKET NO.: BER-L-3-26<br><br>Civil Action<br><br>**CERTIFICATION OF JANET M. ZICARELLI, R.N., ESQ.** |

I, Janet M. Zicarelli, Esq., R.N., CPHRM, CPPS, by way of supplemental Certification in lieu of oath or affidavit, says:

1. It is unclear what "flag" or "alert" entries plaintiff is referring to but all electronic medical records have been produced to the plaintiff.

2. There are no "flags" or "alerts" in plaintiff's electronic medical record.

3. Upon information and belief, there are no undisclosed "flag or alert entries, behavioral notations, psychiatric designation or similar alerts in plaintiff's electronic medical record maintained by the defendants".

4. The Valley Hospital provided plaintiff with a complete copy of her electronic medical record.

5. There is no other separate electronic medical record maintained by The Valley Hospital which has not been produced to the plaintiff.

Case: 26-3345 Document: 8 Page: 156 Date Filed: 10/13/2026

6. There are no "undisclosed behavioral, psychiatric or similar 'flag' or 'alert' entries" contained within plaintiff's electronic medical record.

7. The Valley Hospital has complied with plaintiff's record request.

8. The Valley Hospital will maintain plaintiff's electronic medical records in compliance with the statutory and regulatory guidelines established by the State of New Jersey.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: *Janet M. Zicarelli*
Janet M. Zicarelli, Esq., R.N., CPHRM, CPPS.

Dated: February 25, 2026

# EXHIBIT R

Letter of Valley HIPAA Compliance Manager and Privacy Officer Constance Wright (November 12, 2025), and her November 25, 2025 email refusing a litigation hold

Dkt. 4 at 6, 14 (Amended Complaint Exs. F, H); Dkt. 81, Ex. 6 (Declaration ¶ 28)

**Significance:** Valley's Privacy Officer addressed the "flag or alert entries" as outside the HIPAA designated record set, and therefore not required to be disclosed under HIPAA, rather than denying them, and refused to implement a litigation hold.

Valley Health System

November 12, 2025

Ki Sau Chan
403 McGuigan Place
Harrison, NJ 07029

Dear Ms. Chan:

We have corrected and sent the missing pages of your hospital records, and we have confirmed that the updated copy is a complete version of your designated record set as it exists in our EMR. Those records should be sent to you shortly.

In response to your concerns about omitted categories, please note that the records provided contain all nursing notes which are part of your designated record set. There are no other nursing notes or communications documented in your designated record set other than what has been provided. As noted previously in response to your additional request for "flag or alert entries" and "audit/access logs," any such tools or logs are not part of your or any other patient's designated record set. As defined by HIPAA, these entries and logs are not "records" used, whether in whole or in part, to make decisions about individuals. Record for purposes of HIPAA means "any item, collection or grouping of information that includes PHI and is maintained, collected, used or disseminated by or for a covered entity."

Our system appears to be automatically encrypting your messages because it detects sensitive information in the content. This is a standard security feature designed to protect patient privacy. I am working with Information Systems to adjust this setting and streamline access for you, but in the meantime, to process your request, our Medical Group Records team requires the specific dates of service or a date range for the records you are seeking. Please let us know which Valley Medical Group providers and encounter dates you would like us to include. You can also enter your request directly through your Valley Medical Group Patient Portal: https://5622-34.portal.athenahealth.com/ or The VMG Record Request System: https://www.valleyhealth.com/patients-visitors/health-information-management.

I am also attaching copies of all the correspondence we have sent to you via email.

If you would like to discuss this further, please contact the Privacy Office at 201-291-6329 or by email at PrivacyOffice@ValleyHealth.com.

Very truly yours,

Constance Wright
Privacy Officer
Valley Health System
4 Valley Health Plaza – Corporate Compliance
Paramus, NJ 07652

**Ki Chan <ki.chan@alumni.stanford.edu>**

---

## RE: Litigation Hold – Preservation of All EMR Data, Internal Flags, Audit Trails, and Related Records for Patient: Ki Sau Chan

1 message

---

**Wright, Constance M.** <CWRIGHT@valleyhealth.com> Tue, Nov 25, 2025 at 12:48 PM
To: Ki Chan <ki.chan@alumni.stanford.edu>

Thank you for your message. Valley does not implement litigation holds or provide litigation-related confirmations unless and until a formal legal complaint has been filed. Your request does not trigger those processes.

**Connie Wright**

HIPAA Compliance Manager & Privacy Officer

Valley Health System

cwright@valleyhealth.com

(201) 270-4570

---

**From:** Ki Chan <ki.chan@alumni.stanford.edu>
**Sent:** Tuesday, November 25, 2025 10:00 AM
**To:** Wright, Constance M. <CWRIGHT@Valleyhealth.com>; PrivacyOffice <privacyoffice@valleyhealth.com>
**Cc:** Ki Chan <ki.chan@alumni.stanford.edu>
**Subject:** Litigation Hold – Preservation of All EMR Data, Internal Flags, Audit Trails, and Related Records for Patient: Ki Sau Chan

**CAUTION:** This email originated from outside of the organization. **DO NOT** click links or open attachments unless you recognize the sender and have confirmed that the content is safe. If you believe this email is suspicious, please click the **PHISH ALERT** button on the menu bar.

**Patient: Ki Sau Chan**

# EXHIBIT S

Valley Defendants' March 23, 2026 State-Court Reply (Eileen M. Kavanagh, Esq.)

Dkt. 4 at 2–4 (Amended Complaint Ex. E); Dkt. 81, Ex. 10 (Declaration ¶ 29)

**Significance:** Ms. Kavanagh admits in writing that she asked Ms. Zicarelli to draft the supplemental certification reversing Valley's position on the Flags.

# FARKAS & DONOHUE, LLC

**-Counselors at Law-**
25A Hanover Road, Suite 320
Florham Park, New Jersey 07932
(973) 443-9400
(973) 443-4330 Fax
Email: Office@FarkasandDonohue.com
www.FarkasandDonohue.com

**EVELYN CADORIN FARKAS***
**DAVID C. DONOHUE #***
**ROBERT J. MORMILE ****
**BETH A. HARDY***
**CHARLES E. MURRAY III +**
**EILEEN M. KAVANAGH +**
**JENNIFER SALFI GIANETTI ◆**
**GUY M. MAGNUSSON ◆**
**ROBERT G. VEECH III +**
**DOUGLAS F. CIOLEK*◆**

*** Certified By The Supreme Court of New Jersey as a Certified Civil Trial Attorney**
**** Admitted in NJ & PA**
**\+ Admitted in NJ & NY**
**\# Admitted in NJ & AZ**
**◆ Of Counsel**

March 23, 2026

*Via eCourts Filing*
Superior Court of New Jersey
Civil Division | Bergen County
ATTN: The Honorable. John D. O'Dwyer, P.J. Cv.
10 Main Street, 3rd Floor
Rotunda
Hackensack, New Jersey 07601

**Re: Ki Sau Chan v. Valley Health System, et al.**
**Docket No.: BER-L-3-26**
**Our File No.: VH349**

Dear Judge O'Dwyer:

On behalf of defendants, Valley Health System, Valley Hospital, and Valley Medical Group, please accept the following letter brief in lieu of a more formal reply to plaintiff's opposition to defendants' cross motion. These motions are returnable before Your Honor on March 27, 2026. **Oral argument is requested.**

First, procedurally, it should be noted that defendants' cross motion was timely filed. Pursuant to R. 1:6-3, cross motions must be filed 8 days before the return date, which was done in this case.

Second, substantively, the only issue before this Court is whether defendants complied with a Court order. Defendants complied with that court order on March 4, 2026. Yet plaintiff continues to raise issues not before the Court. She still argues that defendants are withholding information and she is unable to identify the scope and nature of the flags. Both by way of Certification and defendants' response to the Order, plaintiff has been placed on notice that there are no flags or alerts in her medical records. She simply won't accept this reality. She also attempts to make credibility decisions, which are not within her ambit or discretion. She states that The Valley defendants have taken inconsistent positions and thus they are not credible. While this issue is not before the Court, it must be addressed because plaintiff continually brings it up. The Valley defendants have never taken inconsistent positions. Instead, plaintiff continues to misconstrue the communications and Certifications from Valley. Because plaintiff repeatedly stated in her prior papers that Valley inferred that flags or alerts existed, I asked Janet Zicarelli to draft a supplemental Certification to specifically combat plaintiff's statements and put this matter to rest, which it did.

Multiple times throughout plaintiff's papers, she states defendants' position "constitutes perjury and is a brazen disregard for the integrity of the court's proceedings". Plaintiff cannot be allowed to make slanderous statements against Janet Zicareeli, an officer of the Court as well as defense counsel, with utterly baseless assertions. Accusing someone of perjury cannot be taken lightly and is offensive.

Once again, plaintiff brings up issues regarding Haldol use, foley catheters, audio recordings from HSS, etc., which are not before the court and must be disregarded. Simply because plaintiff does not like defendants' response that no flags or alerts exist, does not entitle her to file motions and multiple supplemental briefs. Because there are no flags or alerts, it

Case: 26-3345 Document: 8 Page: 163 Date Filed: 10/13/2026


logically follows that defendants cannot supply "the full content of each entry, author, date of creation, source, associated notes, metadata or audit trail information". Additionally, plaintiff appears to seek new relief in her supplemental brief requesting an independent forensic audit, additional sworn Certifications, etc. Again, this requested relief is not properly before the Court but is a moot issue.

Finally, plaintiff states that defense counsel acted in bad faith because the response was sent by an assistant and not by counsel and she insists that page 2 of the defendants' response be provided to her. Her comments regarding service made by an assistant are baseless and without merit and plaintiff has been advised by this office that there is no second page for the defendants' response.

Conversely, plaintiff has acted in bad faith because she continues to bring up issues not before the court, refuses to acknowledge that defendants have certified that there are no flags or alerts and lodges damaging comments against Janet Zicarelli and defense counsel, defendants' thus, cross motion for fees must be granted.

Pursuant to court rules, plaintiff is not permitted to submit any responsive papers and defendants object to any additional filings.

Respectfully submitted,

*/s/ Eileen M. Kavanagh*

Eileen M. Kavanagh, Esq.

Cc: Ki Sau Chan, ki.chan@alumni.stanford.edu

# EXHIBIT T

Letter of Eric S. Latzer, Esq. (Cole Schotz P.C.), counsel for Dr. Elena Ng, to the N.J. State Board of Medical Examiners, File No. MED-2025-07831, December 1, 2025

Dkt. 32 at 32–35 (Ex. P-4) (Declaration ¶ 18)

**Significance:** Dr. Ng admits through counsel that she did not perform a scleral-depression examination on a high-risk retinal patient. Appellant's retinal tears then required emergency laser surgery by Dr. Vincent Ho.

Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
201.489.3000 201.489.1536 fax
—
New York
—
Delaware
—
Maryland
—
Texas
—
Florida
—
Washington, DC

COLE SCHOTZ P.C.

Eric S. Latzer
Member
Admitted in NJ and NY

Reply to New Jersey Office
Writer's Direct Line: 201.525.6281
Writer's Direct Fax: 201.678.6281
Writer's E-Mail: ELatzer@coleschotz.com

December 1, 2025

**Via E-mail**
State of New Jersey
Department of Law and Public Safety
Division of Consumer Affairs
State Board of Medical Examiners
P.O. Box 183
Trenton, NJ 08625-0183

Re: File: MED-2025-07831

Dear Sir/Madam:

We represent Elena M. Ng, M.D., and write in response to the complaint filed by Ki Sau Chan against Dr. Ng on or about October 7, 2025.[1] For the reasons explained below, the complaint has no merit and should be summarily dismissed.

**The Allegations in The Complaint**

Ms. Chan's complaint accuses Dr. Ng of "professional misconduct, financial fraud, violation of federal and state consumer protection laws and refusal to provide [Ms. Chan's] medical records in violation of state and federal law." Specifically, the complaint alleges that Ms. Chan presented to Dr. Ng with what Ms. Chan characterizes as "classic indicators of a retinal tear"—specifically, "clear symptoms of flashers, floaters, and hemorrhage[.]" In response, Dr. Ng allegedly "refused to perform a scleral depression exam"; "falsely told [Ms. Chan that her eyes] were 'healthy,'; and instructed [her] to 'come back in a year.'" Dr. Ng, the complaint further alleges, "then directed [Ms. Chan] to Dr. Paul Sonenblum and her office's optical center to purchase new corrective lenses instead of properly diagnosing [her] with retinal tears and treating them urgently and appropriately[.]" One week later, another doctor (Dr. Vincent Ho) allegedly diagnosed Ms. Chan "with a retinal tear and performed urgent laser retinopexy."

Separate and apart from her allegations concerning Dr. Ng's treatment, Ms. Chan alleges that Dr. Ng's office—Millennium Eye Care ("Millennium")—did not provide her with requested medical records. In this respect, Ms. Chan complains that: (i) Millennium staff told her she needed

[1] By email dated October 21, 2025, the Board of Medical Examiners (the "Board") agreed to extend Dr. Ng's time to respond to the complaint through December 1, 2025.

to "complete 'a medical release form' and sign it to obtain [her] own records"; (ii) a Millennium staff member said "they could not email the form because 'their computer was not working'"; (iii) another staff member "said they would mail the form," but Ms. Chan allegedly never received it; (iv) a staff member named Dawn told Ms. Chan she "would need to 'wait weeks or longer because USPS mail is slow'" (a point with which Ms. Chan disagrees); and (v) Ms. Chan allegedly made multiple written submissions to Millennium related to her medical records.

Also unrelated to her allegations concerning Dr. Ng's treatment, Ms. Chan complains about issues related to her visit with Paul Sonenblum, O.D. Specifically, Ms. Chan alleges that eyeglasses and contact lenses were "undelivered" despite her multiple requests.[2]

## Factual Background[3]

### A. Ms. Chan's Appointment with Dr. Ng

On September 9, 2025, Ms. Chan made an appointment, through Millennium's website, to see Dr. Ng as a new patient on September 15, 2025. Although the complaint alleges that Dr. Ng "directed" Ms. Chan to see Dr. Sonenblum, the reality is that Ms. Chan booked her appointment with Dr. Sonenblum *at the same time*—on September 9—that she booked her appointment with Dr. Ng.

At her September 15 appointment with Dr. Ng—the only time that Dr. Ng treated Ms. Chan—she presented with complaints of blurry vision and flashers that she had been experiencing for more than a year. Contrary to the complaint, the records do not reflect that Ms. Chan was suffering from a hemorrhage. Ms. Chan provided Dr. Ng with records reflecting that she had been seen in New York by a doctor who diagnosed her in 2024 with posterior vitreous detachment ("PVD") in her left eye.[4]

Dr. Ng dilated Ms. Chan's pupils before conducting a comprehensive examination of her eyes. Upon scanning her retinas, Dr. Ng saw no evidence of a retinal tear or a retinal detachment. Dr. Ng, however, cautioned Ms. Chan to call immediately if she experienced symptoms consistent with a tear or detachment, including increased floaters or flashers or decreasing peripheral vision.

### B. Ms. Chan's Requests for Medical Records

Much of Ms. Chan's complaint concerns her alleged requests for medical records. Although Dr. Ng was not directly involved with those requests, she understands that Millennium

---

[2] This response will not focus on the allegations which solely concern Dr. Sonenblum. Dr. Ng understands that Ms. Chan recently filed a complaint with the Board of Optometry against Dr. Sonenblum and that Dr. Sonenblum intends to submit a response to that complaint in due course.

[3] Ms. Chan's medical, billing, and other records are attached as Exhibit A.

[4] Dr. Ng's office did not have an opportunity to make a copy of the records relating to Ms. Chan's visit with a doctor in New York.

and PRISM Vision Group ("PRISM")—the administrative services organization with which Millennium is affiliated—have made repeated efforts to accommodate Ms. Chan and provide her with medical records. In fact, Millennium and PRISM provided Ms. Chan with the medical records she requested on *three separate instances*. Millennium first mailed Ms. Chan the requested records on October 6, 2023. After Ms. Chan claimed she did not receive the records, Millennium and PRISM accommodated Ms. Chan's request for a CD containing the requested medical records by purchasing a CD burner, copying the records onto a CD, verifying that the records were in fact on the CD, and sending the CD to Ms. Chan on October 23, 2025, via Fed Ex overnight delivery. Upon receiving the CD, Ms. Chan sent an email—on which she copied (among others) the Board—in which she claimed that the CD was "completely blank and contains no data or files of any kind."[5] PRISM, while disputing Ms. Chan's claim that the CD was "blank,"[6] offered Ms. Chan various alternative options for delivery of the requested medical records. From those options, Ms. Chan requested that PRISM upload the records to a secure OneDrive folder—a request that PRISM accommodated on October 31, 2025.

**<u>Why Mr. Chan's Complaint Should Be Summarily Dismissed</u>**

Ms. Chan's contention that Dr. Ng committed "professional misconduct" and "financial fraud" in connection with her September 15, 2025 appointment has no merit whatsoever.

Dr. Ng conducted a thorough examination of Ms. Chan's dilated pupils which did not reveal a retinal tear or a retinal detachment. Dr. Ng, moreover, was mindful that Ms. Chan had been suffering—without treatment and for more than a year—from PVD and that the symptoms of PVD, flashers and floaters, are consistent with the symptoms that Ms. Chan was experiencing. Thus, Dr. Ng reasonably concluded that PVD might be causing Ms. Chan's symptoms.

The fact that Ms. Chan was ultimately diagnosed, one week after Dr. Ng saw her, with a retinal tear is by no means evidence of "professional misconduct." Indeed, it is likely that the retinal tear developed and became visible *after* Dr. Ng treated Ms. Chan on September 15.

Ms. Chan appears to take issue with Dr. Ng's decision not to conduct a scleral depression exam. Dr. Ng's decision, however, was perfectly reasonable under the circumstances. A scleral depression exam is a highly invasive, painful, and uncomfortable procedure, which entails shining a bright light into the patient's eye and using a rod to press onto the patient's eyeball. Dr. Ng did not believe it was warranted to put Ms. Chan through a scleral depression exam, as she had a good view of Ms. Chan's retinas once her pupils were dilated.

Similarly without merit is Ms. Chan's contention that Dr. Ng "directed" her to see Dr. Sonenblum. In truth, Ms. Chan booked her appointment with Dr. Sonenblum *before* she ever saw Dr. Ng. Specifically, on September 9, 2025, Ms. Chan made separate appointments—each scheduled for the same day, September 15, 2025—to see Dr. Ng at Millennium's Freehold, New

---

[5] Attached as Exhibit B are various correspondence between Ms. Chan and PRISM. The correspondence, to the extent possible, are in chronological order.

[6] Contrary to Ms. Chan's claim, PRISM confirmed that the CD was not, in fact, blank.

Jersey office and Dr. Sonenblum at Millennium's Marlboro, New Jersey office. If, in fact, Dr. Ng "directed" Ms. Chan to see Dr. Sonenblum, the medical records would include a "trip report" evidencing Dr. Ng's referral of Ms. Chan to Dr. Sonenblum. No such record exists. In short, Ms. Chan's claim that Dr. Ng "directed" her to see Dr. Sonenblum is based on pure fiction.[7]

Finally, for the sake of completeness, Dr. Ng addresses Ms. Chan's allegations regarding her requests for medical records, despite the fact that Dr. Ng was not directly involved with those requests. As detailed above, PRISM and Millennium provided Ms. Chan with the records she requested on three separate instances. The correspondence attached as Exhibit B, moreover, evidence that Millennium and PRISM went out of their way to accommodate Ms. Chan—going so far as to purchase a CD burner to accommodate Ms. Chan's request that her records be provided on a CD. Unfortunately, Ms. Chan's near daily emails to PRISM, on which she has copied the Board, demonstrate that she appears more concerned with unfairly painting Dr. Ng (as well as Millennium and PRISM) in a negative light, rather than obtaining her medical records.

In sum, because the complaint against Dr. Ng is entirely baseless, we respectfully request that the Board dismiss it in its entirety with no finding of wrongdoing.

* * * *

Please contact me if you need additional information. Thank you.

Sincerely,

COLE SCHOTZ P.C.

*/s/ Eric S. Latzer*

Eric S. Latzer

ESL:
Enclosures

---

[7] Nor is there any merit to Ms. Chan's suggestion that Dr. Ng might somehow financially benefit from Ms. Chan purchasing eyeglasses from Millennium's optical shop. Dr. Ng does not benefit financially (or otherwise) if a patient purchases eyeglasses from Millennium's optical shop. It bears noting, moreover, that Ms. Chan was provided with a paper copy of her eyeglass prescription, which meant she could fill the prescription anywhere she chose. She also signed an Acknowledgment of Paper Prescription through which she confirmed her receipt of the paper prescription.

# EXHIBIT U

Aetna/eviCore healthcare preauthorization approval, Authorization No. A250826345, August 11, 2025

(Declaration ¶ 15)

**Significance:** During Appellant's acute appendicitis admission, an unrelated lumbar-spine MRI (CPT 72158) was requested and approved under the name "DR. JULIE ZAVADENKO," although Ms. Zavadenko is an APN. Appellant was never told of or asked about this order. Valley denied that the order existed (Exhibit V).

eviCore healthcare
PO Box 5620
Hartford, CT 06102

Date: 8/11/2025

KI SAU CHAN
403 MCGUIGAN PL
HARRISON, NJ 07029

JULIE ZAVADENKO
385 S MAPLE AVE STE 202
GLEN ROCK, NJ 07452

VALLEY HOSPITAL
4 VALLEY HEALTH PLZ
PARAMUS, NJ 07652

DOB: [redacted]
Member ID:
Health Plan: Aetna
Requesting Practitioner: DR. JULIE ZAVADENKO
Requested Provider: VALLEY HOSPITAL
Authorization Number: A250826345

## We approved your health care services

Dear KI SAU CHAN:

We have received the request for coverage for service from the provider listed above. This notice is to inform you that the coverage for the requested service has been approved, subject to the requirements in this letter.

| | |
|---|---|
| **Authorized Service:** | CPT 72158 - Magnetic Resonance Imaging (MRI) Lumbar Spine without and with Contrast, a special picture study of the lower part of the spine both without and with injected dye |
| **Authorization Valid from/to:** | 8/11/2025 - 2/7/2026 |

| Procedure | Description | Units Requested | Units Approved |
|---|---|---|---|
| 72158 | Magnetic Resonance Imaging (MRI) Lumbar Spine without and with Contrast, a special picture study of the lower part of the spine both without and with injected dye | 1 | 1 |

**How we made our coverage decision**
We use clinical guidelines from the Centers for Medicare & Medicaid Services (CMS), any applicable Aetna® clinical and supplemental policies and the member's plan to support these coverage decisions. You can find the Aetna clinical and supplemental policies at **https://go.aetna.com/aetnamedicareguidance**.

**Coverage Approvals**

We have approved coverage for the requested services based on the following:

- You are eligible for coverage under the plan.
- Your plan provides coverage for this service (does not determine whether you have exhausted this benefit).
- Services meet the criteria for medical necessity.

Any additional services that are not listed in this letter may also need authorization and/or precertification. For more information, call us at the number on your ID card.

Prior authorization/precertification requests are reviewed for medical necessity and plan benefits. All prior authorizations/precertifications are administered in accordance with applicable federal law.

**We Protect Your Privacy:**
Protecting the privacy of your health information is our top priority. If you call us with questions, we will confirm your identity first. We ask for your name, ID number and date of birth.

**Report fraud or abuse:**
If you suspect fraud or abuse involving your health benefits, call the toll free hotline at 1-800-338-6361 or email us at **AetnaSIU@Aetna.com**.

**We're here to help**
If you have questions, just call us at **1-800-282-5366 (TTY: 711)**. We're available 8 AM to 8 PM Eastern Time, 7 days a week.

Sincerely,

Aetna Medicare

We also sent a copy of this letter to:
CC: DR. JULIE ZAVADENKO
VALLEY HOSPITAL

Information for both participating and non-participating provider/practitioner: Please confirm the member's eligibility prior to service. The service is authorized only if the member is eligible at the time of service.

Information only for non-participating provider/practitioner: Reimbursement to non-participating providers will be based on Medicare laws, rules and regulations. Medicare regulations generally provide that non-participating providers must accept, as payment in full, the amounts that the provider could collect if the Medicare Advantage plan member were enrolled in original Medicare. (See, 42 C.F.R. § 422.214(a)).

All payments made to non-participating providers are subject to the CMS payment policies applicable to original Medicare.

See Evidence of Coverage for a complete description of plan benefits, exclusions, limitations and conditions of coverage. Plan features and availability may vary by service area.

Participating physicians, hospitals and other health care providers are independent contractors and are neither agents nor employees of Aetna. The availability of any particular provider cannot be guaranteed, and provider network composition is subject to change.

Out-of-network/non-contracted providers are under no obligation to treat plan members, except in emergency situations. Please call our customer service number or see your Evidence of Coverage for more information, including the cost-sharing that applies to out-of-network services.

Esta información está disponible en otros idiomas de manera gratuita. Comuníquese con Servicios al Cliente al 1-800-282-5366 (TTY: 711). Horario de atención: de 8 a. m. a 8 p. m., los siete días de la semana.

Aetna Medicare is a PDP, HMO, PPO plan with a Medicare contract. Our SNPs also have contracts with State Medicaid programs. Enrollment in our plans depends on contract renewal. Our dual-eligible Special Needs Plan is available to anyone who has both Medical Assistance from the state and Medicare. See Evidence of Coverage for a complete description of plan benefits, exclusions, limitations and conditions of coverage. Plan features and availability may vary by service area.

# EXHIBIT V

Transcript of Appellant's August 11, 2025 recorded telephone call with Valley Patient Relations representative "Nicole" (audio recording available)

(Declaration ¶ 15)

**Significance:** Recorded contemporaneously on Appellant's iPhone, with metadata preserved. Valley Patient Relations stated **repeatedly: "I don't even see an order for that [MRI lumbar spine]." This contradicts the third-party Aetna/eviCore preauthorization, which shows that APN Zavadenko posed as a physician, "DR. JULIE ZAVADENKO" [sic], in capital letters she herself entered as her identity to Aetna, and that the insurer had approved the lumbar-spine MRI order (Exhibit U).** Appellant also holds contemporaneous audio recordings of night nurse Nicole Smith, Dr. Shmuel Kassirer, Dr. Abraham, and pre-operative nurse Justin Madamba (Declaration ¶¶ 5, 16). In them, Dr. Abraham and Nurse Madamba acknowledged Appellant's refusal of haloperidol; Nurse Smith acknowledged the Foley catheter; and Dr. Kassirer acknowledged both the haloperidol and the Foley catheter administered to Appellant while she was in surgery.

## EXHIBIT V-6-B

**AUDIO RECORDING AND VERBATIM TRANSCRIPT of PHONECALL WITH PATIENT RELATIONS REPRESENTATIVE “NICOLE”**
**Denial of Lumbar Spine MRI Order Despite Insurer Preauthorization Documentation**
**August 11, 2025 11:56am EST (Specific time from metadata)**

**Location:** Valley Hospital, Room 7S-0004
**Participants:**
- Ki Sau Chan (Plaintiff)
- "Nicole," Valley Hospital Patient Relations Representative

**Duration:** 5 minutes 3 seconds
**Format:** MP3 (converted from original for e-filing compatibility)

---

**PROVENANCE & AUTHENTICATION**
- Lawfully recorded by Plaintiff as a participant in the conversation (N.J.S.A. 2A:156A-4)
- Audio recorded contemporaneously by Plaintiff on personal mobile device during active inpatient hospitalization
- Original, unaltered, accurate recording of conversation as it occurred
- Native file with metadata preserved and available for inspection
- Plaintiff has personal knowledge and can authenticate if called to testify
- Johnny Yau (Plaintiff’s life partner) was present and can independently verify accuracy

---

**DESCRIPTION**

This exhibit consists of an audio recording *(submitted separately as Exhibit V-6-C)* and verbatim transcript of Plaintiff's phone call to Valley Hospital Patient Relations and spoke with representative who identified herself as “Nicole” on the morning of August 11, 2025, while Plaintiff was an inpatient in Room 7S-0004 for acute appendicitis. Plaintiff contacted Patient Relations after discovering through her Aetna insurance portal that Valley physician Dr. Julie Zavendenko had requested preauthorization for a lumbar spine MRI (CPT 72158)—an imaging study unrelated to Plaintiff's presenting emergency condition of acute appendicitis and abdominal pain. Plaintiff expressly informed Nicole Plaintiff had not been informed of this order, had not consented to it, and had not been asked about her lumbar spine.

During the call, Patient Relations representative "Nicole" repeatedly stated that she did not see any order for a lumbar spine MRI, despite documented insurer preauthorization approval. (*See Exhibit V-6-A: Aetna/eviCore Preauthorization for Lumbar Spine MRI.)*

---

**RELEVANCE**
This recording demonstrates:

- Plaintiff's contemporaneous discovery that an **unrelated lumbar spine MRI had been ordered and preauthorized without Plaintiff’s knowledge or consent** during Plaintiff’s emergency admission for acute appendicitis — **while Plaintiff’s emergency diagnostic imaging for abdomen was delayed or canceled;**
- **Defendants’ Patient Relations' denial** that any such order existed, despite documented insurer preauthorization *(See Exhibit V-6-A);*
- A discrepancy between what Defendants told Plaintiff and what the insurer's records reflect; and
- Context relevant to whether **undisclosed flags influenced diagnostic decisions unrelated to Plaintiff's emergency presentation**; and
- Defendants' **apparent concealment of the nonconsensual lumbar spine MRI order** — denied when Plaintiff inquired and omitted from medical records produced to Plaintiff

This exhibit is submitted in support of Plaintiff’s application for preliminary injunctive relief and is relevant to issues of **informed consent, documentation accuracy, procedural fairness,** and the **completeness of Defendants’ medical records.** (Key relevance: **denial despite insurer authorization**; **concealment of nonconsensual medical intervention)**

**Contents**

- Page 1: Cover page
- Pages 2–3: Verbatim transcript


---

(Transcript follows)

**FULL TRANSCRIPT**
**Phone Call with Valley Hospital Patient Relations (Nicole)**
**Regarding Lumbar Spine MRI Order During Acute Appendicitis Admission**

Date: August 11, 2025 morning
Approximate Time: During inpatient stay
Location of Caller: Room 7S-0004, Valley Hospital, Paramus, New Jersey
Call Participants:
• Ki Sau Chan (Plaintiff, inpatient)
• "Nicole," Patient Relations representative, Valley Hospital

**Recording Provenance:**
This audio recording was made contemporaneously by Ki Sau Chan on her iPhone with metadata while she made phonecall during an active inpatient hospitalization at Valley Hospital. New Jersey is a one-party consent state.

Transcript Accuracy Statement:
This transcript is a true and accurate transcription of the audible portions of the recording to the best of the transcriber's ability. Minor inaudible portions are noted where applicable.

Recording Length: Approximately 5 minutes, 3 seconds

**[Timestamp 00:01]**
Ki: "Hi, what's your name again?"

Nicole: "My name is Nicole."

Ki: "OK, hi **I'm actually inpatient right now at Valley so I just checked my Aetna.** They sent me an email regarding a document so I went online and it says that one of your doctors that was on the floor yesterday, **Dr. Z,** it starts with Z, she **had apparently requested MRI from my lumbar spine? She never asked me or informed me about getting an MRI for my lumbar spine so I'm curious what that's about because all I know is that they got the MRI for my abdomen 'cause I have suspected acute appendicitis which is why" [**Nicole cut me off]

Nicole: "What is your name?"

Ki: "my last name is Chan C-H-A-N. First name is Ki. Ki Sau Chan."

Nicole: "My question is why am I being recorded?"

Ki: "Oh, you're not."

Nicole: "Cause it, something said that I was"

Ki: "Yeah that was wrong."

Nicole: "Okay that was a little strange. I prefer not to be recorded."

Ki: "Yeah, it's not, it's not. Don't worry about it."

Nicole: "Ah, let me look. **Who told you it's a lumbar spine?"** [Nicole's voice sounds like she's stifling laughter]

Ki: “Uh, **Aetna insurance they sent me a document** and **it says in my pre-authorizations it says she requested two MRIs one for my”** [Nicole cut me off]

Nicole: “Did you talk to your social worker or your case manager?”

Ki: “No, there's no I don't have a case manager or social worker”

Nicole: “Okay"

Ki: “Am I supposed to have one cause I don't know” [Nicole cuts me off]

Nicole: “I don't even I don't even see.”

Ki: “Okay”

Nicole: **“I don’t even see an order for that.”**

Ki: “Okay cause that's what Aetna just sent me that there are two pre-authorizations and they approved both of them because I am under the care of my spine surgeon Dr. Qureshi but he's over at HSS and he already ordered a lumbar spine MRI for me last week and which I did. So”

Nicole: **“yeah, I don't know why because I don’t see an order. I’m not in the clinical area but I don’t see an order for that.”**

Ki: “**Okay yeah because I'm just surprised because out of the blue I see that there is two MRI approvals for a pre- authorization. One of them is for my abdomen and the other one for the lumber spine and I was never asked about my lumbar spine.”**

[a male voice in background]

Nicole: [mumbled something]

Ki: “Ok, should I? Who should I speak to you about this because it says it was ordered by Dr. let me see her last name hold on a second, last name is Zavenko, **Z-A-V-E-N-D-E-N-K-O”**

Nicole: “One moment, okay?”

Ki: “Okay, great.”

Nicole: “I'm looking”

Ki: “Okay”

Nicole: “Um um, can you hold on? I'm gonna call the clinical area, hold on.”

Ki: “Okay, great”

[auto music from phone]

Automated message: “Thank you for calling Valley…”

# EXHIBIT W

Aetna Medicare letter to Appellant, October 27, 2025

Dkt. 32 at 27 (Declaration ¶ 19)

**Significance:** PRISM/Millennium Eye Care told Aetna that Appellant was “never seen by Dr. Ng” and that there was “no record of seeing Dr. Elena NG.” Aetna accepted PRISM’s false account over Appellant’s truthful one without checking its own claims records, which show it had paid for Dr. Ng’s September 15, 2025 examination (Exhibit X). Appellant was disbelieved even by a third-party insurer, **which Appellant contends is due to the false Flags that PRISM/Dr. Ng conveyed to Aetna but refuses to produce to Appellant, so that she cannot see or challenge the fabricated Flags.**

aetna®

P.O. Box 14834
Lexington, KY 40512

October 27, 2025

KI SAU CHAN
403 MCGUIGAN PL
HARRISON, NJ 07029

Member ID Number: [redacted]
Member Name: KI SAU CHAN

Dear KI SAU CHAN:

This letter is in response to your grievance (complaint) that you filed with us on October 17, 2025.

Based upon our review, you expressed dissatisfaction with the services provided by Millennium Eye Care, citing fraudulent misrepresentation and improper billing.

We take such concerns very seriously and have conducted a thorough review of your case.

I have reviewed your concerns, I have spoken with the office of Millennium Eye care c/o Dr. Elena NG and were advised that you were never seen by Dr. Ng, office confirmed multiple appointments with DR Vincent HO, and stated the only complaint was about your eye glasses, amount $669.75 , you complained about the location not open every day for you to pick up, they offered to mail eye glasses to your home and that's when you requested the refund. Again advised no record of seeing Dr. Elena NG, next appointment showing November 21, 2025 in

# EXHIBIT X

Aetna Medicare letter to Appellant, November 13, 2025 (Reference No. C2503455030)

Dkt. 32 at 29–30 (Declaration ¶ 19)

**Significance:** Aetna never checked its own records on its own. Only after Appellant complained to the Centers for Medicare and Medicaid Services and the State Board of Medical Examiners, submitted her audio recording of Dr. Ng and Johnny Yau’s affidavit, and pointed Aetna to its own records showing it had paid Dr. Ng for the September 15, 2025 visit did Aetna reinvestigate. It then wrote: “We contacted the provider and confirmed that you were seen by both of these providers,” and “We submitted this information to our Special Investigations Unit (SIU).” PRISM’s statement to Aetna was false.

aetna

P.O. Box 14834
Lexington, KY 40512

November 13, 2025

KI SAU CHAN
403 MCGUIGAN PL
HARRISON, NJ 07029

Reference Number C2503455030

Dear KI SAU CHAN:

We received the complaint you placed with the Centers for Medicare and Medicaid Services on November 03, 2025. We completed an investigation of your issue. We've tried calling, but haven't been able to reach you by phone.

The results of our investigation are as follows:

Your complaint stated that your grievance was closed, and you received a letter that stated that you were never seen by Dr. Ng and Dr. Sonenblum at Millennium Eye Care and Prism Vision Group.

Upon research we found that on 09/15/2025, we received medical claim ID EQADQ5FHC for date of service 09/15/2025 from Associated Retinal Consultants, LLC. The amount billed is $1,035.00, the amount the plan paid is $220.43, the member responsibility is $0.00. The claim is final. This claim is for Dr. Ng.

On 09/16/2025, we received medical claim ID EGADQ1KJ6 for date of service 09/16/2025 from Eyemed Vison Care. The amount billed is $70.00, the amount the plan paid is $70.00, the member responsibility is $0.00. The claim is final. This claim is for Dr. Sonenblum.

On 09/22/2025, we received medical claim ID EG37Q0B67 for date of service 09/22/2025 from Associated Retinal Consultants, LLC. The amount billed is $2,269.00, the amount the plan paid is $471.19, the member responsibility is $0.00. The claim is final.

We submitted this information to our Special Investigations Unit (SIU). It will be investigated, and the results will remain confidential.

The grievance (G25290676713) will be reviewed, and coaching will be provided if necessary.

We contacted the provider and confirmed that you were seen by both of these providers.

We apologize for any inconvenience this may have caused.

**We're here to help you**

If you need more information about our response, call me at 959-230-8825 . If you have other benefit questions, call Member Services at the number on your member ID card.

Sincerely,

Kaitlyn
Complaint Analyst
Medicare Complaint Team

See Evidence of Coverage for a complete description of plan benefits, exclusions, limitations and conditions of coverage. Plan features and availability may vary by service area.

©2019 Aetna Inc.

# EXHIBIT Y

Appellant's photograph of the two 450 mL bottles of READI-CAT 2 (Barium Sulfate) Oral Suspension given to her before her August 11, 2025 CT scan, taken in her Valley Hospital room 7S-0004 (original image file with metadata preserved)

Dkt. 4, Ex. P (Declaration ¶ 15)

**Significance:** No Valley record names the oral contrast agent; the CT report says only "oral administration of contrast" (Exhibit I). This photograph identifies it: READI-CAT 2 (Barium Sulfate) Oral Suspension. Its FDA labeling states that it is **contraindicated** in patients "with known or suspected perforation of the GI tract," and Valley's MRI the day before had reported possible perforation (Exhibit H). RN Gizem Akkus is recorded saying, "But I'm going to bring Barium first. You need to finish it up first, the bottle." and "After that you can go." (Exhibit Z).


BRACCO
Bracco Diagnostics
450 mL
NDC 32909-744-03
READI-CAT® 2
(BARIUM SULFATE)
ORAL SUSPENSION
(2% w/v)
For Oral Use Only
Rx only
Manufactured for
Bracco Diagnostics Inc.
Monroe Twp., NJ 08831
by E-Z-EM Canada Inc,
Anjou, Quebec H1J2Z4, Canada
COMPUTED TOMOGRAPHY STUDIES

# EXHIBIT Z

Transcript of Appellant’s August 11, 2025 audio recording of RN Gizem Akkus, Valley Hospital Room 7S-0004 (audio recording available)

(Declaration ¶ 15)

**Significance:** Recorded contemporaneously on Appellant’s iPhone, with metadata preserved. Before the CT scan, the nurse names the agent and conditions transport on drinking it: “But I’m going to bring Barium first. You need to finish it up first, the bottle.” and “After that you can go.” Valley’s CT report never names the barium (Exhibit I); its own MRI had reported possible perforation the day before (Exhibit H).

**EXHIBIT V-9-E**
**AUDIO RECORDING AND VERBATIM TRANSCRIPT**
**NURSE GIZEM – INSTRUCTION TO INGEST BARIUM SULFATE BEFORE CT SCAN**
**August 11, 2025**

**Location:** Valley Hospital, Room 7S-0004
**Duration:** 2 minutes 40 seconds
**Format:** MP3 (converted from original for e-filing compatibility)

---

**PROVENANCE & AUTHENTICATION:**

- Audio recorded contemporaneously by Plaintiff on personal mobile device
- Original, unaltered, accurate recording of conversation as it occurred
- Native file with metadata preserved and available for inspection
- Plaintiff has personal knowledge and can authenticate if called to testify
- Johnny Yau (Plaintiff's life partner) was present and can independently verify accuracy

---

DESCRIPTION

This exhibit consists of an audio recording and corresponding verbatim transcript of Plaintiff's interaction with Nurse Gizem, a nursing staff member, during Plaintiff's medical care.

---

RELEVANCE

• Instruction to Plaintiff to ingest barium despite known risk with suspected perforation.
• Occurred prior to CT scan.
• Relevant to lack of informed consent, and administering contraindicated treatment.

---

(Transcript follows)

**(Timestamp: 0:00 - 0:19 seconds)**
Ki: "Hi, again. Um..alright let me ask you something. "

Nurse Gizem: "Barium…"

Ki: "Uh, so what's up? Are they coming first of all? Are they coming to get me? Should I be changing to uh"

Nurse Gizem: "Yes, you need to change. You need to put on gown. **But I'm going to bring Barium first. You need to finish it up first, the bottle.**

Ki: Hmmhmm."

Nurse Gizem : "After that you can go."

Ki: "Okay, ah"

[Conversation about case manager follows]

# EXHIBIT AA

Stand Up Harrison-NJ Facebook post: campaign poster of the four endorsed candidates; and StandUpHarrison.com, pages 1–4, captured October 12, 2026

(Declaration ¶ 27)

**Significance:** Shows that Stand Up Harrison endorsed Appellant, who along with her life partner, Johnny Yau, are long-time Harrison residents and homeowners since 2001, as its write-in candidate for Harrison Town Council, Ward 3, and that as of October 12, 2026 it continues to list her as its endorsed candidate. Since the October 2, 2026 eye emergency, she has been unable to campaign actively (Declaration ¶ 27).


HARRISON NEEDS CHANGE
A Town Worth Believing In.
A CLEANER ★ A SAFER ★ A STRONGER ★ A MORE UNITED HARRISON
★ FOUR LOCAL LEADERS. A BRIGHTER FUTURE FOR OUR TOWN. ★
★ MICHAEL VERILE FOR MAYOR ★
A Stronger Harrison Together.
REAL IDEAS. REAL SOLUTIONS. A BRIGHTER TOMORROW.
Town of Harrison
A Mayor Who Puts People First.
A town government that listens and works for all Harrison residents.
Transparency, accountability and responsible use of tax dollars.
Support for local businesses, jobs and smart, sustainable growth.
Safer neighborhoods, cleaner streets and stronger community services.
More youth programs, parks, community events and a higher quality of life.
PEOPLE FIRST ★ TRANSPARENT GOVERNMENT ★ A STRONGER TOMORROW
★ DOMINICK RITORTO FOR WARD 1 COUNCIL ★
HARRISON, NJ
OUR TOWN. OUR PEOPLE. OUR FUTURE.
New Ideas. Real Solutions. A Stronger Ward 1.
Responsive to Ward 1 residents and their daily concerns.
Fact-based decision making and responsible budgeting.
Financial professional pursuing a Master's in Applied Statistics.
Better communication between residents and government.
Support for families, youth programs and community events.
COMMON SENSE ★ ACCOUNTABILITY ★ OPPORTUNITY FOR WARD 1
★ STEPHEN LANDFIELD FOR WARD 2 COUNCIL ★
A Stronger Harrison Together.
Protecting Our Environment. A Safer, Healthier Harrison.
Focus on flooding, drainage and infrastructure improvements.
Environmental protection and the Passaic River cleanup. No dewatering in Harrison.
16 years in environmental and fire-safety instruction.
Practical, common-sense solutions for a cleaner, safer, healthier Harrison.
Safer neighborhoods and a more resilient community.
A CLEANER TOWN ★ A SAFER TOWN ★ A HEALTHIER HARRISON
★ KI SAU CHAN FOR WARD 3 COUNCIL ★
HARRISON
Same Roots. New Neighbors. One Harrison.
Community, Opportunity. A Brighter Tomorrow.
Bachelor's degree in Human Psychology with a Biology minor.
Professional background in science and medicine; experience in healthcare administration and advocacy.
Conducted and published research in preventative medicine.
Focus on basic services, flooding, anti-bullying programs and improved parking.
Supports responsible redevelopment, PILOTs and the future of the Passaic River.
Committed to community programs and a more transparent, accessible Town Hall.
COMMUNITY ★ SCIENCE-BASED SOLUTIONS ★ A STRONGER WARD 3
A CHANCE TO SHAPE HARRISON'S FUTURE
★ ONE TOWN ★ ONE VOICE ★ 07029 STRONG ★
Learn more about the candidates, the issues and how to write in your choice:
StandUpHarrison.com
Stand Up Harrison
P.O. Box 07029
Harrison, NJ 07029
PRSRT STD
U.S. POSTAGE
PAID
HARRISON, NJ
PERMIT NO. 123
Stand Up Harrison-NJ
18h ·

Election Date: Tuesday, November 3rd

# ONE TOWN! ONE VOICE! STAND UP HARRISON! 2026

MEET THE CANDIDATES | OUR PLATFORM





DAYS UNTIL ELECTION DAY

21 DAYS | 01 HOURS | 13 MINUTES | 04 SECONDS

Tuesday, November 3rd, 2026

## /oting Information

ındidates and learn how to cast
the voting machine.

/erile • COUNCIL: Ki Sau Chan, Dominick Ritorto, Stephen Landfield

LEARN MORE

## ★ MEET THE CANDIDATES ★

ELECTION 2026





★ MAYOR




★ WRITE-IN, HARRISON TOWN COUNCIL - 1ST WARD




★ STAND UP HARRISON! ★ ≡

FULL PROFILE →

★ WRITE-IN, HARRISON TOWN COUNCIL - 2ND WARD




**Stephen Landfield**

FULL PROFILE →

★ WRITE-IN, HARRISON TOWN COUNCIL - 3RD WARD




**Ki Sau Chan**

FULL PROFILE →





★ ★

## YOUR VOTE IS YOUR VOICE

**TUESDAY, NOVEMBER 3RD**

Polls Open 6 AM – 8 PM

★ STAND UP HARRISON! ★

"Leadership You Can Trust!"

Home | Candidates | Write-In Candidates | Platform | Get Involved! | Contact



StandUpHarrison.com, pages 1–4, captured October 12, 2026

# EXHIBIT AB

Visit Note of Vincent Y. Ho, M.D. (NJ Retina), September 22, 2025

Dkt. 32, Ex. P-6, at 39–40; Dkt. 68, Ex. B (Declaration ¶ 19)

**Significance:** At Appellant's first visit ("New Patient"), six days after Dr. Elena Ng withheld scleral depression, Dr. Ho diagnosed a horseshoe retinal tear in her left eye and performed laser retinopexy the same day. As Appellant attests (Declaration ¶ 19), he performed the examination Dr. Ng had withheld, before his office accessed her records.

njretina PRISM

Nneka O. Brooks, MD
Rishabh C. Date, MD
David Dobbin, MD, PhD
Leonard Feiner, MD, PhD
Jonathan Greenberg, MD
Luis A. Gonzalez, MD
Paul Hahn, MD, PhD
Vincent Y. Ho, MD
David Y. Kim, MD
Tamara Lee Lenis, MD PhD
Steven A. Madreperla, MD, PhD
Akosua Nti, MD
Harris C. Sultan, MD
Vinod B. Voleti, MD
Marlene Wang, MD

| Name | Chart# | DOB | Race | Ethnicity | Pref. Language |
|---|---|---|---|---|---|
| Kisau Chan | 4802967 | [redacted] | Other Race | Patient Declined, | English |

| Gender | Date | Location | Refer Doctor | PCP | Insurance |
|---|---|---|---|---|---|
| Female | 9/22/2025 | NJR - Morristown - OFF | | DR. BILLY LI | AETNA (MEDICARE REPLACEMENT/ADVANTAGE - PPO) |

**Reason For Visit:** New Patient -

**HPI:** CC: Flashes OS. Duration of Problem: about 1 month. Location: peripheral vision. Associated Symptoms: floaters OD > OS. Quality: tugging sensation OD. Other: shadow OD . HPI obtained by Vincent Y Ho, MD

**Extended HPI:** pt referred by Dr. Constance Mei for PVD and retina eval.

**Allergies:** steroids (Difficulty breathing, palpitations, rash ). shellfish (Rash). nickel (Rash). iodine (rash ).

**Smoking Status:** Never Smoker.

**Systemic Meds:** Synthroid 50 MCG Oral Tablet 1 qweek. Meloxicam 7.5 mg Oral Tablet 1 tablet prn by mouth. licart patch 1 tablet prn. VITAMIN C 1 tablet qday by mouth. fluticasone 1 prn both nostrils. Scopolamine Patch 1 prn. Tylenol prn. platelet rich plasma PRP injections prn.

**VA OD:** Dcc20/20-1. PHNI. **OS:** Dcc20/125-1. PH20/50.
**IOP:** App **OD:** 12 **OS:** 14 2:30 PM
**Drops:** Proparacaine 0.5%
**Comments:** st
**OCT Macula: Findings OD:** Initial Evaluation. No Evidence of Macular Edema. No Subretinal Fluid. Staphyloma. **Findings OS:** Initial Evaluation. No Evidence of Macular Edema. No Subretinal Fluid. Staphyloma. Preretinal Findings Consistent with an Epiretinal Membrane.

**Impression:**

**Primary:** Horseshoe Tear of Retina Without Detachment OS. Epiretinal Membrane OS. Posterior Vitreous Detachment (PVD) OS. Nuclear Sclerosis OU.

**Plan:**

**Discussion:** I saw Kisau Chan for evaluation of photopsias in the left eye. She was diagnosed with a PVD in the left eye around April 2024, but recently developed increasing photopsias in the left eye. The hyaloid is attached on exam and OCT imaging in the right eye, and there is no peripheral thinning or breaks on that side. Given her symptoms, I did recommend laser retinopexy to this area and follow-up in one week's time. We told her to restrict her activities for the time being. The risks, benefits and alternatives of the treatment were discussed with her. Horseshoe Tear of Retina Without Detachment OS. HST at 10:30 for which I recommend laser retinopexy.Based on today's exam, diagnostic studies, and/or review of records, the determination was made for laser treatment today. Patient understands risks/benefits of laser procedure and elects to proceed. Laser treatment was tolerated well by patient.Retinal tear and detachment warning symptoms reviewed and patient instructed to call immediately if increasing floaters, flashes, or decreasing peripheral vision.Epiretinal Membrane OS. Recommended against surgery for now given good vision and lack of impact on activities of daily living.Recommended observation.Posterior Vitreous Detachment (PVD) OS. See plan above for management of HST.Nuclear Sclerosis OU. Recommended observation.

**Procedures:** Laser for Retinal Tear OS.

**Specialty Meds:**

- Refresh Optive 1 drop once a day

**Follow Up:** Dr. Ho 1 Week - Comprehensive Exam OU. OCT Macula OU.



628 Cedar Lane, Teaneck, NJ 07666, T. 201-837-7300, F. 201 836 6426
1044 Route 23 N, Suite 208, Wayne, NJ 07470, T 973 633 9898, F 973-633-3892
50 Newark Avenue, Suite 306, Belleville, NJ 07109, T 973-450 5100, F 973-450-9494
2952 Vauxhall Road, Vauxhall, NJ 07088, T 908-349-8155, F. 908-349-8134
3196 Kennedy Blvd, Suite 9, Union City, NJ 07087, T 201-867 2999, F 201-867-4440
200 S. Broad Street, Unit 8, Ridgewood, NJ 07450, T 201-445-6622, F 201-781-8418
182 South Street, Suite 5, Morristown, NJ 07960, T. 973-630-7700, F 973-605-5807
315 Elmore Avenue, Suite 202, Elizabeth, NJ 07208, T. 908-409 4900, F 908-355-7564
1005 Clifton Avenue, Suite 101, Clifton, NJ 07013, T 973 472 4114, F 973-475-5995

**Signed:** ______________________________
Electronically signed by Vincent Y Ho, MD



628 Cedar Lane
Teaneck, NJ 07666
T: 201-837-7300
F: 201-836-6426

1044 Route 23 N
Suite 208
Wayne, NJ 07470
T: 973-633-9898
F: 973-633-3892

50 Newark Avenue
Suite 306
Belleville, NJ 07109
T: 973-450-5100
F: 973-450-9494

2952 Vauxhall Road
Vauxhall, NJ 07088
T: 908-349-8155
F: 908-349-8134

3196 Kennedy Blvd
Suite 9
Union City, NJ 07087
T: 201-867-2999
F: 201-867-4440

200 S. Broad Street
Unit B
Ridgewood, NJ 07450
T: 201-445-6622
F: 201-781-8418

182 South Street
Suite 5
Morristown, NJ 07960
T: 973-630-7700
F: 973-805-5807

315 Elmore Avenue
Suite 202
Elizabeth, NJ 07208
T: 908-409-4900
F: 908-355-7564

1005 Clifton Avenue
Suite 101
Clifton, NJ 07013
T: 973-472-4114
F: 973-475-5995

# EXHIBIT AC

Transcript of Appellant's February 18, 2025 audio recording with pre-operative nurse Justin Madamba, Valley Hospital

Dkt. 81, Ex. 12 (Declaration ¶ 5)

**Significance:** Before her first surgery at Valley, Appellant tells Nurse Madamba that Dr. Abraham proposed adding Haldol, an antipsychotic, to Zofran, that she told him not to, and asks for a different anesthesiologist. Mr. Yau is present. Her refusal to Dr. Abraham itself was made in person and was not recorded.

# EXHIBIT 12

**Plaintiff's Verbatim Transcripts of February 18, 2025 Preoperative Audio Recordings — Plaintiff's First-Ever Valley Encounter (V-7-A, V-7-C, state-court provenance)**

**Legal significance:** These transcripts establish Plaintiff's express February 18, 2025 refusal of haloperidol (Haldol) and Valley's institutional knowledge of it. Plaintiff informed Nurse Justin Madamba on recording that Dr. Abraham said he would add Haldol to her Zofran; identified Haldol as an antipsychotic never received across nine prior surgeries; refused it; and requested a different anesthesiologist.

Dr. Abraham confirmed: "I just got a call, said you didn't want Haldol. We said we wouldn't be giving it." In that same conversation, Plaintiff requested a supraclavicular nerve block — the only request Dr. Abraham documented in his anesthesia report, omitting her Haldol refusal and anesthesiologist-change request (**Exhibit 13**).

Despite this recorded refusal, Valley administered haloperidol to Plaintiff while unconscious six months later (**Exhibit 11**). **A refusal known, selectively concealed, and overridden demonstrates that no protection short of injunctive relief will prevent recurrence.**

***Plaintiff has no evaluation, diagnosis, treatment, or referral for any condition warranting antipsychotic medication her entire 57 years of life.***

Case: 26-3345 Document: 8 Page: 194 Date Filed: 10/13/2026

## Exhibit V-7-A

### VERBATIM FULL TRANSCRIPT OF AUDIO RECORDING
### PREOPERATIVE/OR NURSE JUSTIN M. INTERACTION - FEBRUARY 18, 2025

*(Discussion of Proposed Haldol and Request for Different Anesthesiologist)*

**Recording Details:**

- Date: February 18, 2025
- Location: Valley Hospital, Paramus, NJ
- Duration: 3 minutes, 27 seconds
- Event: Shoulder surgery preoperative interaction
- Participants: Plaintiff Ki Sau Chan,
  Preoperative/OR nurse Justin M., and
  Johnny Yau (Plaintiff's life partner)

This exhibit is a true and accurate transcript of a contemporaneous audio recording made immediately prior to planned elective shoulder surgery during **Plaintiff's first-ever encounter with Valley Health System**.

**Plaintiff's life partner, Johnny Yau, was continuously present throughout all preoperative encounters with Valley staff on February 18, 2025.**

This transcript corresponds to audio recording Exhibit V-7-B (with authentication cover page V-7-B-1) submitted via Evidence Submission Module.

This audio transcript documents:

- Plaintiff **stating "no"** when Nurse Justin M. **asked whether she had signed the consent form**, in the presence of Plaintiff's life partner, Johnny Yau;
- Plaintiff informing Nurse Justin M. that anesthesiologist **Dr. Jacob Abraham proposed use of Haldol;**
- **Plaintiff's express refusal of Haldol;**
- **Plaintiff's request for a different anesthesiologist;**
- Nurse Justin M. stating that he would speak with the charge nurse regarding Plaintiff's request to change anesthesiologist; and
- **Medication-related and anesthesiology-related concerns** raised immediately prior to surgery, **before any observation or characterization of Plaintiff's behavior could be made.**

*(Key lines are bolded in the transcript for ease of review.)*

## Exhibit V-7-A

**Full Transcript (3:27 mins length)**
**Speaker identification:**
**"Justin" refers to Justin M., preoperative nurse at Valley Hospital.**

**(Timestamp: 0:00)**
Justin: "He's gonna pop in. Uh, so you have any additional questions? **Uh, did you sign the consent? Let me see."**
Ki: "**No,** what happened to the other assistant? Dr. Morales."
Justin: "Uh, who's the main surgeon that's be doing?
Ki: Dr. Ratliff. But Dr. Morales was supposed to assist. I'm the nurse in the room. So I'm not the assistant.
Justin: "Oh, okay. I'm gonna be circulating in the room."
Ki: "Oh, I see."
Justin: "Are you talking about surgery wise?"
Ki: "Yeah, surgerywise."
Justin: "I'm gonna be documenting so there's more people than Dr. Morales and Dr. Ratliff."
Ki: "Right."
Justin: "Dr. Jacob, the anesthesiologist you met, there's gonna be a scrub tech."
Ki: "No, **I didn't meet Dr. Jacobs. I met Dr. Abraham."**
Justin: **"That's his first name. Jacob Abraham?** Uh **I'm Justin, the nurse."**
Ki: "Hmm hmm"
Justin: "Morales should be there, and there's gonna be another surgical tech, her name is Kristen, okay?"
Ki: "Kristen."
Justin: "Uh just in case you got confused, I'm not gonna be replacing Dr. Morales. I'm gonna be the n, okay?
Ki: "Ok, I thought you meant you were surgically assisting"
Justin: "Oh, no, no, well, I'm assisting in the room."
Ki: "Right."
Justin: "Um, let's see."

**(Timestamp 1:00)**
Ki: "Okay, let me just ask you a question, **because I've never heard of this before. The** anesthesiologist, Dr. Abraham, he just said that he adds like, Haldol into Zofran and I told him not to do that because" [Justin cut me off]
**Justin: "Haldol?"**
**Ki: "Haldol is antipsychotic,** right? **Why would you put that into any? I've never had that. I've had nine surgeries before. I never had this, you know, medication."**
**Justin: "I'm not sure what he mentioned, but I haven't heard that either. They do their own medication, did he mention that?"**
Ki: "Yeah, yeah" [I reacted with surprise to hearing Haldol mentioned by anesthesiologist Dr. Abraham]
Justin: "**he said that?"** [Justin looks over at Johnny for confirmation that Dr. Abraham mentioned Haldol to us. Johnny looks in shock and nods his head]
Ki: "**so I said "Don't do that!"**
Justin: "And what did he say when you said that?"
Ki: "**He said okay, but then, you know, I just wanna make sure because now I'm like not trusting him much because I've never heard of anybody doing this."**
Justin: "Yeah. Do you want me to tell him to speak to you again?

**1:42**

## Exhibit V-7-A

Ki: "**can I ask for another anesthesiologist?"**
Justin: "**Uh, I mean, we can try it. I I'll ask the charge nurse if we can.**
Ki: "Yeah."
Justin: "um but let me see."
Ki: "**Because that's weird."**
**Justin: "We can try."**
**Ki: "Okay."**

**01:55**
Justin: "Let's see. **So, you signed the consent, he still has to speak to you guys** [me and my life partner, Johnny]."
**Ki: "Yeah."**
**Justin: "uh, I'll see you regarding the anesthesiologist what we can do."**
Ki: "Okay"
Justin: Um, let's see, do you have any allergies?"
Ki: "Yeah"
Justin: "I see you have multiple allergies."
Ki: "Steroids."
Justin: "Yes."
Ki: "Nickel and iodine."
Justin: "last time you ate and drank anything was uh food ate liquids this morning..
Ki: "Yeah"
Justin: "Uh, previous surgery. **You had spine surgery.** Any other surgeries?"
Ki: "Yeah, foot surgeries."
Justin: "Okay. Anything else?"
Ki: "Nope, that's it."
Justin: "Uh, any complications regarding surgery?"
Ki: "No"
Justin: "Anesthesia?"
Ki: "No"

**02:24**
Justin: "**Okay, you were just questioning regarding what he mentioned regarding the Haldol."**
Ki: "**Yeah, what the heck!"** [I was still shocked as was Johnny with wide eyes in shock]
Justin: "what was it? **Haldol and the"**
Ki: "Well **Zofran is fine because that's anti nausea and I've had that before."**
Justin: "Okay"
Ki: "I even have pills at home for that."
Justin: "**Let me speak to the charge nurse and see if there's anyone free."**
Ki: "Yeah"
Justin: "if not, I'll tell him to come by and see if you have any if there's still questions with him, okay?"
Ki: "Yeah."
Justin: "I'll be right back, okay?"
Ki: "Okay great."
Justin: "And we're just waiting for Dr. Ratliff to come by, okay? Let's see if you have any additional questions for him."
Ki: "Okay."
Johnny in background: "Yeah."
[Justin comes back into the room]
Ki: "Yeah?"
Justin: "marker, this is for him. The surgeon."

# EXHIBIT AD

Transcript of Appellant's February 18, 2025 audio recording with anesthesiologist Dr. Jacob Abraham, Valley Hospital

Dkt. 81, Ex. 12 (Declaration ¶ 5)

**Significance:** Dr. Abraham returns and says: "So I thought we had, I just got a call, said you didn't want Haldol. We said we wouldn't be giving it." and "I told you I wouldn't give it to you." Six months later, at the same hospital, haloperidol was given to Appellant while she was unconscious and anesthetized in surgery.

EXHIBIT V-7-C

**VERBATIM TRANSCRIPT OF AUDIO RECORDING**
**PREOPERATIVE INTERACTION WITH ANESTHESIOLOGIST**
**DR. JACOB ABRAHAM**
**(Plaintiff Refusal of Proposed Haldol and Request for Different Anesthesiologist)**
February 18, 2025

---

Recording Details

- Date: February 18, 2025
- Location: Valley Hospital, Paramus, NJ
- Duration: 3 minutes 54 seconds
- Event: Shoulder surgery preoperative interaction
- Participants: Plaintiff Ki Sau Chan;
  Dr. Jacob Abraham (Anesthesiologist);
  Johnny Yau (Plaintiff's life partner)

This exhibit is a true and accurate transcript of a contemporaneous audio recording made during Plaintiff's second preoperative discussion with Dr. Abraham, immediately prior to her planned elective shoulder surgery. This preoperative discussion occurred during **Plaintiff's first-ever encounter** with Valley Health System.

Plaintiff's life partner, Johnny Yau, was continuously present throughout all preoperative encounters with Valley staff on February 18, 2025.

This transcript corresponds to audio recording Exhibit V-7-D (with authentication cover page V-7-D-1) submitted via Evidence Submission Module. The original audio file, including embedded metadata, is preserved and available for review.

---

Relevance

This recording is submitted in support of Plaintiff's application for preliminary injunctive relief and demonstrates:

- acknowledgment by Valley anesthesiologist Dr. Jacob Abraham that Haldol would not be administered, confirming that the psychoactive medication had been proposed earlier in the preoperative period;
- corroboration of Plaintiff's prior **express refusal** to Haldol, as documented in the contemporaneous audio recording with Preoperative/OR Nurse Justin M. (Exhibit V-7-B);
- Plaintiff's request for an alternate anesthesiologist;
- selective documentation in the anesthesia record, which reflects only the nerve block change requested by Plaintiff while omitting any reference to Haldol or Plaintiff's refusal (Exhibit V-7-E: Selective Omission of Haldol in Anesthesia Record Feb 2025);
- circumstances supporting an inference that **Defendants' preoperative decision-making was influenced by undisclosed flags or alerts** rather than individualized clinical assessment.

The discussion occurred during Plaintiff's first-ever encounter with Valley Health System and before any observation or characterization of Plaintiff's behavior could have been made. In light of Plaintiff's lack of psychiatric history or clinical indication, the recording calls into question whether undisclosed behavioral or psychiatric designations influenced care.

This exhibit and its corresponding audio recording (Exhibit V-7-D) are relevant to issues of informed consent, procedural fairness, and the completeness of Defendants' medical records.

**Full Transcript (3:54 minutes length)**

**(Timestamp 0:00 to 00:25)**

Dr. Abraham: "So I thought we had, I just got a call, **said you didn't want Haldol. We said we wouldn't be giving it."**

Ki: "**Yeah"**

Dr. Abraham: "**But then you didn't don't want me to be at we don't have anybody else.** This may be, you know, so I don't know what else to do. **I told you I wouldn't give it to you"**

Ki: "I was thinking about the" [my throat started to hurt due to titanium plate and screws from my previous cervical spine surgery]

Dr. Abraham: **"about Haldol."**

Ki: **"the Haldol and the nerve block** because I just read here with the C5 C6 issues with the anterior scalene block because you're gonna be putting like the nerve block there, right?"

[I, Ki, had just read up on my iPhone about the scalene block being inserted right near C5 C6 where I was having severe pain and where Dr. Kalika who did dynamic ultrasound on me showed me enlarged nerve roots at C5 to C6 and I didn't want anything such as the nerve block medication to inflame it more and cause more damage to my c-spine."

Dr. Abraham: "Well, not exactly so it's, it's the nerve roots that come there"

Ki: "yeah " [Dr. Abraham cut me off]

Dr. Abraham: "but we do it under direct visualization."

Ki: "Okay"

Dr. Abraham: "This is the standard of care. You can refuse it, but the chances are that you'll be pretty uncomfortable. The other option, if you want, I can do a superclavicular block."

Ki: "Okay yeah."

Dr. Abraham: "But this this will this is a little bit lower."

Ki: "Yeah"

Dr. Abraham: "but it'll mean you won't be able to move your arm at all. So with that interscalene block, you you won't be able to move here, but you're generally able to move your fingers and things like that."

Ki: "Okay"

Dr. Abraham: "Ah, still need a sling. This one will knock out your entire arm"

Ki: "Hm"

Dr. A: "but if you preferred the superclavicular, we can do it. It's not it may not work. I mean, like it'll work, but it may not work as well, but if you know, standard of care is the interscalene block."

Ki: "Yeah"

Dr. A: "I as you don't have anything wrong with the actual nerves, and we're not doing it actually, like while those are the nerves we're working with, let me bring out a picture"

Ki: "You said you're doing it at this nerve roots, right? Because that's where I have issues with the nerve root issues, that's where the nerves are coming out."

Dr Abraham: "but but you were issues at the nerve roots where there"

Ki: "C5"

Dr. Abraham: "Yeah but where, where it's coming out of your hold on, let me show you. Uh, brachial plexus. Let's do an image of the brachial plexus here. Okay. So, you're having the issue, see, right over here, right? And we are while we are doing the nerve block we're doing it more like over here."

Ki: "hmm hmm."

Dr Abraham: "This is where it's coming out of the let me see if I can get a spinal view. uh brachial plexus, cervical plexus"

Ki: "Cause Dr. Kalika already says that my nerve roots are enlarged, they're radiating abnormally"

Dr Abraham: "I mean, listen, if you really feel like so here."

Ki: "Yeah so"

Dr. Abraham: "so these they are coming out here, but the actual nerve block is done distal to your spinal process your your transverse processes. So your transverse processes are those things that stick out of the side."

Ki: "Hmm hmm."
Dr. Abraham: "The actual nerve block is done out here, right?"
Ki: "Hmm hmm."
Dr. Abraham: "Because we're staying away from all the bone. Those are still the nerve roots. If you want, we can do the superclavicular, if it makes you feel better."
Ki: "Yeah, yeah, because I already had issues and they weren't even sure and it was affecting this arm as well recently. So, yeah, that's why we postponed this shoulder surgery for like months because of the C-spine issues."
Dr Abraham: "I mean, listen, I can do it a little bit more distally. I'm not hundred I won't guarantee the same coverage. uh, you should be okay, but it's not usually what we do for this type of surgery, okay?"
Ki: "Okay."
Dr Abraham: "But technically it should cover cover that area, right?"Ki: "Yeah, just do the safer area, you know."
Dr Abraham: "Okay. Alright if that's what you want"
Ki: "Yeah"
Dr Abraham: "that's what we can do."
Ki: "Thank you."

**03:33**
Dr Abraham: "**Are you okay and do you want because we don't have another anesthesiologist it's gonna delay for several hours.**"
Ki: "No, it's fine with you."
Dr Abraham: "Oh, okay. all right. So, I thought we had discussed the Haldol and everything"
Ki: "Yeah"
Dr Abraham: "and are you okay now?"
Ki: "Yeah"
Dr Abraham: "with the plan?"
Ki: "Yeah, the plan is good."
Dr. A: "The plan is okay?"
Ki: "Yeah"
Dr Abraham: "All right, okay."
Ki: "Thank you."
Dr Abraham: "So I'll tell them to bring you into the room."
Ki: "Okay.'

# EXHIBIT AE

Transcript of Appellant's August 12, 2025 audio recording with night nurse Nicole Smith, Valley Hospital Room 7S-0004

Dkt. 81, Ex. 16; Dkt. 4, Ex. I (Declaration ¶ 16; Yau Declaration ¶ 6)

**Significance:** Night nurse Nicole Smith discloses, after surgery, that a Foley catheter was inserted while Appellant was unconscious: "they gave you the Foley catheter during surgery," and "Well, if the surgery is not that long, then they don't do any catheter." Reading the chart, she states that "the procedure started at about 3 p.m and ended at 5 p.m.," that "they had manage urinary catheter at 5 p — at 5 p.m.," and "If you weren't awake for it, they took it out before you woke up." The surgery lasted about two hours. Appellant understands that Foley catheters are generally used for surgeries longer than three hours, and believes the catheter, placed as her surgery ended and removed before she woke, was inserted for no clinical purpose, including collecting urine. No one disclosed it or sought consent beforehand.

Case: 26-3345 Document: 8 Page: 202 Date Filed: 10/13/2026

# EXHIBIT 16

**Verbatim Transcript of Audio Recording, Night Nurse Nicole Smith, Postoperative Foley Catheter Disclosure for a short-two hour surgery, August 12, 2025**

**Legal significance:** When Plaintiff reported painful urination, Nurse Smith disclosed on recording: "That's from the Foley catheter... I wasn't sure at first, I'm like, you really shouldn't be having any pain like that, but they gave you the Foley catheter during surgery." **Smith confirmed the catheter was not routine for short surgeries** ("if the surgery is not that long, then they don't do any catheter"), was inserted at approximately 5:00 p.m. — the end of the two-hour procedure — removed before Plaintiff woke, and appeared "just inserted... just in case." Plaintiff was never informed before surgery; this recording is the disclosure.

**EXHIBIT V-8A**
**AUDIO RECORDING AND VERBATIM TRANSCRIPT**
**NIGHT NURSE NICOLE – POSTOPERATIVE DISCLOSURE (FOLEY CATHETER)**
**August 12, 2025 night**

**Location:** Valley Hospital, Room 7S-0004
**Duration:** 7 minutes 13 seconds
**Format:** MP3 (converted from original for e-filing compatibility)

---

PROVENANCE & AUTHENTICATION

- Audio recorded contemporaneously by Plaintiff on personal mobile device
- Original, unaltered, accurate recording of conversation as it occurred
- Native file with metadata preserved and available for inspection
- Plaintiff has personal knowledge and can authenticate if called to testify
- Johnny Yau (Plaintiff's life partner) was present and can independently verify accuracy

---

DESCRIPTION

This exhibit consists of an audio recording and corresponding verbatim transcript of one of Plaintiff's many interactions with Night Nurse Nicole during Plaintiff's medical care.

---

RELEVANCE

This recording is relevant to the absence of informed consent for an invasive procedure into Plaintiff's intimate anatomy performed while Plaintiff was sedated and unconscious and in surgery, and to omissions of multiple invasive medical interventions in Defendants' medical records.

Disclosure of Foley catheter insertion occurred only postoperatively, through night nurse Nicole. No Defendant disclosed, discussed, or obtained consent for Foley catheter insertion prior to surgery.

- Disclosure occurred only after the procedure had been performed, eliminating any opportunity for consent;
- The intervention was not documented in the medical records produced to Plaintiff;
- The disclosure was later corroborated by surgical resident Dr. Shmuel Kassirer; and
- Night Nurse Nicole stated that Foley catheter insertion was not the usual medical protocol given the brief duration of Plaintiff's surgery (approximately two hours).

The absence of contemporaneous documentation of this invasive intervention—despite post-operative disclosure by both nursing staff and a physician—is directly relevant to:

- lack of informed consent;
- concealment of medical interventions;
- selective or incomplete medical recordkeeping; and
- Defendants' reliance on undisclosed information adversely affecting Plaintiff's care.

This exhibit supports Plaintiff's request for injunctive relief by demonstrating ongoing deprivation of transparency and procedural fairness in Defendants' medical decision-making.

**Full Transcript (7:13 mins length)**

[Sound of door swinging open]

Ki: "Are you getting angry?"
Nurse Nicole: "No."
Ki: "Okay, 'cause you seem really angry."
Nurse Nicole: "Oh, I'm sorry. I didn't mean to [mumbled]. You know, I pulled the door shut and then it actually closed and I was like, oh, is she gonna think I'm angry?"
Ki: Yeah, you seem very angry."
Nurse Nicole: "It normally doesn't close all the way. Yeah, normally just it open a little bit like that, but then it actually shut, I was like she's gonna think I'm angry so I'm sorry."
Ki: "All right, I was like, okay."
Nurse Nicole: "No, I did not mean to close the door.. I mean to you again?
And I moved your bracelet, so that way, if I have to come in and change your bag while you're sleeping, I don't have to leave your. [Nicole whispers to herself]
[Nurse Nicole moving stuff and scanning my bracelet]

Nurse Nicole: "It's your abdomen that hurts, right?"
Ki: "Yep. Right here."

[Nurse Nicole moving my arm for IV]

Ki: "That's why I'm afraid to lean back as I know if I try to get up it's going to, you know, hurt." [my stomach and back were in severe pain]

Nurse Nicole: "You can. But if you think it might hurt."
Ki: "Yep, it's going to hurt like crazy."

Ki: "I know my body. I can only take certain medication."
Nurse Nicole: "Yeah"

Ki: "It's always the same. Like, at home, I only take Tylenol [for stomach pain]. In surgery they always give me oxycodone, alternating with Tylenol."

Nurse Nicole: "Yeah"

Ki: "That's it. I don't take"

Nurse Nicole: "But those surgeries were for your ankles, right?"

Ki: "For my ankles, my shoulder, and my spine."

Nurse Nicole: "Yeah, those were orthopedic surgeries. This is a gastrointestinal surgery. So oxycodone is the pain reliever of choice cause I float to the orthopedic for a lot too. And they do a lot of oxycodone for those guys. But for gastrointestinal surgeries, they don't do a lot of oxycodone. They do morphine, dilaudtid because it's different kind of pain."

Nurse Nicole: "The good news is you got up and you walked and you peed, and that's like a huge part of being able to go home after surgery."

**3:44 to 6:22**
Ki: "Oh, good. **But then the urination is so painful."**

Nurse Nicole: "**That's from the Foley catheter.**" [I wasn't fully awake so I don't think I realized what Nurse Nicole was saying. So I didn't mention not getting my consent for Foley catheter. You can hear how exhausted and groggy I was. This was after surgery.]

Ki: "Okay."

Nurse Nicole: "Yeah, **because I wasn't sure at first, I'm like, you really shouldn't be having any pain like that, but they gave you the Foley catheter during surgery.**"

**Ki: "do they usually give you that [Foley catheter] during surgery?"**

Nurse Nicole: "**Well, if the surgery is not that long, then they don't do any catheter.**"

**Ki: "Okay."**

**Nurse Nicole: "But since they had you for quite some time.. "**

**Ki: "Oh, how long was I in surgery?"**

Nurse Nicole: "**Oh, they just, because it was laproscopic turned open.**"

Ki: "Oh, really?" [I'm in shocked because Dr. Winkler said he'd only do laprascopic appendectomy]

Nurse Nicole: "Yeah."

**Ki: "So, how many hours was it?"**

Nurse Nicole: "Let's see. Well, when I start in my shift, you still weren't here. So let's see exactly. Let's see. You remember what time she left?"

[Nurse Nicole is talking to Johnny]

**Johnny: "I think around 2:30?"**

**Nurse Nicole:** "Yeah, so it says that 2:00 Okay, yeah, **they put the urinary catheter in at like 5 p.m. So.**"

**Ki: "So that means they didn't start until 5 [when they gave me the catheter]"**

**Nurse Nicole: "No, that just means that's when they inserted the catheter."**

Ki: "Okay."

Nurse Nicole: "Yeah."

**Ki: "Do they do that [catheter insertion] after the surgery? Or during the surgery?"**

Nurse Nicole: "So it depends, see, send you into preop anesthesia and surgeon arrival, **the time out was called, the procedure started at about 3 p.m and ended at 5 p.m."**

**Ki: "Okay, but they only inserted it at 5 p.m?"**

Nurse Nicole: "No, that's just what I'm seeing, **like the order like they had manage urinary catheter at 5 p — at 5 p.m."**

**Ki: "Yeah. So that's at the end."**

Nurse Nicole: "If you weren't awake for it, they took it out before you woke up."

Ki: "Okay."

Nurse Nicole: "**And if you weren't awake for them inserting it, it seems like they just inserted it just in case and took some urine out and then that was it.**" [silence as Nurse Nicole continues reading the computer screen on the wall]

Nurse Nicole: "Okay, **so the burning from urinating that should go away after a few more urine, okay? Definitely drink some water if you can. Take it easy. Take it slow.**"

Ki: "Yeah, hmmhmm"

Nurse Nicole: "**Since you threw up a little bit.**"

Ki: "So the question is, I'm allowed to go home tomorrow or what?"

Nurse Nicole: "Oh, that was the question for the doctor. But I am going to tell him that you walked and you peed."

Ki: "Okay."

Nurse Nicole: "The next step is to eat something. Definitely"

Ki: "No, I'm not eating."

Nurse Nicole: "No, not tonight, but definitely try to keep liquids down."

Ki: "Yeah."

Nurse Nicole: "Because if you don't eat, then you don't leave the hospital."

Ki:"Yeah."

Nurse Nicole: "Okay. But don't force it because if you throw up, that's a problem. Okay?"

Ki: "Okay? Mm"

Nurse Nicole: "But you walked and you peed, and those two things are huge. Okay. I'm gonna try to not slam the door on my way out. I'm so sorry I did that. It normally never shut and I have to pull it closed."

Ki: "All right. All right, thank you."

Nurse Nicole: "All right."

# EXHIBIT AF

Transcript of Appellant's August 13, 2025 audio recording with surgical resident Dr. Shmuel Kassirer, Valley Hospital Room 7S-0004

Dkt. 81, Ex. 17 (Declaration ¶ 16)

**Significance:** Appellant tells Dr. Kassirer, Dr. Winkler's surgical resident, that night nurse Nicole told her they prescribed Haldol, and asks who ordered it; he answers, "I can check." When she says she was told a catheter had been put in, he answers, "right, yeah."

Case 2:26-cv-03358-MCA-AME Document 1 Filed 08/21/26 Page 115 of 134 PageID: 1589

# EXHIBIT 17

**Verbatim Transcript of Audio Recording, Dr. Shmuel Kassirer (Surgical Resident to Dr. Winkler), Postoperative Discussion, August 13, 2025**

**Legal significance:** The morning after surgery, Plaintiff told Dr. Kassirer that a nurse had disclosed haloperidol and a catheter; Dr. Kassirer acknowledged the catheter ("right, yeah") and, asked who ordered the haloperidol, stated "I can check." Neither intervention had been disclosed to Plaintiff before surgery. **Plaintiff has no evaluation, diagnosis, treatment, or referral for any condition warranting antipsychotic medication her entire 57 years of life.**

**EXHIBIT V-8-C**
**AUDIO RECORDING AND VERBATIM TRANSCRIPT**
**DR. SHMUEL KASSIRER – POSTOPERATIVE DISCUSSION FOLLOWING APPENDECTOMY**
**August 13, 2025**

**Location:** Valley Hospital, Room 7S-0004
**Duration:** 5 minutes 34 seconds
**Format:** MP3 (converted from original for e-filing compatibility)

---

PROVENANCE & AUTHENTICATION

- Audio recorded contemporaneously by Plaintiff on personal mobile device
- Original, unaltered, accurate recording of conversation as it occurred
- Native file with metadata preserved and available for inspection
- Plaintiff has personal knowledge and can authenticate if called to testify
- Johnny Yau (Plaintiff's life partner) was present and can independently verify accuracy

---

DESCRIPTION

This exhibit consists of an audio recording and corresponding verbatim transcript of Plaintiff's interaction with Dr. Kassirer, Dr. Carl Winkler's surgical resident, during Plaintiff's medical care.

---

RELEVANCE

This exhibit is relevant because it documents:

- acknowledgment by Dr. Shmuel Kassirer, surgical resident to Dr. Carl Winkler, of postoperative interventions that were not disclosed to Plaintiff prior to surgery;
- corroboration of prior nursing disclosures regarding the insertion of a Foley catheter and the use of Haldol;
- confirmation that these interventions occurred while Plaintiff was sedated and unconscious; and
- the absence of contemporaneous informed consent for invasive or psychotropic interventions.

The recording is relevant to issues of informed consent, the performance of invasive medical interventions during a brief surgical procedure without documented indication, and the accuracy and completeness of Defendants' medical records..

—

(Transcript follows)

**Full Transcript (5:34 mins length)**

"Much better this morning than last night. I was like vomiting and stuff today I'm feeling better."

Dr. Kassirer: "You were vomiting last night?"

"Yeah, a couple of times."

Dr. Kassirer:: "Okay, you were nauseous, too."

**(Timestamp 00:23)**
Ki: "**So. Yeah, I was, like, surprised that Nicole the nurse told me that they prescribed me Haldol? Haldol and Benadryl, but I was like, why are they giving me Haldol? What is that for? I've never been. I'm never taken that before.**"

Dr. Kassirer: "Did it help? Did you have anything for the pain or?"

Ki: "I think later on, just Tylenol and then later on they gave me Morphine."

Dr. Kassirer: "Okay. Are you in pain now?"

Ki: "Um, right now, they gave me Tylenol and Gabapentin."

Dr. Kassirer: "Okay.. And you've been drinking?"

Ki: "I've been drinking water in now."

Dr. Kassirer: "Last night, you had something to eat?"

Ki: "Nothing."

Dr. Kassirer: "Nothing. Okay. So just liquids."

Ki: "Okay, just water. There's no way I would have eaten. I don't even think I can eat today. Yeah, because I'm not, you know, not feeling good."

Dr. Kassirer: "Have you been passing gas?"

Ki: "I don't know."

Dr. Kassirer: "You don't know?"

Ki: "I don't know to be honest."

Dr. Kassirer: "But you haven't had a bowel movement?"

Ki: "No, not yet."

Dr. Kassirer: "What about going to urinate?"

**1:47**
Ki: "Yeah, I went to — yeah, but it was very painful, that was the thing. **And they told me they put in a catheter** they had in there I don't know?"

Dr. K: "right, yeah. Um, and have you been trying to walk around a bit"

Case: 26-3345 Document: 8 Page: 211 Date Filed: 10/13/2026

Ki: "No"

Dr. Kassirer: "That's okay."

Ki: "I'm just too dizzy so and I was just gonna say, like, last night, I was like, I had to be in this position, higher, actually, because I couldn't lie flat, because I couldn't get up to, like, get water and stuff, it was like really painful"

Dr. Kassirer: "Um hmm, Yeah. Is there a particular position?"

**2:35**
Ki: "Right now I have like an ice pack here. [I let him see the ice pack on top of stomach]. **Okay, my question is do you know who ordered the Haldol?"**

**Dr. Kassirer: "I can check."**

**Ki:** "Okay, yeah, can you? **Like what's that about?"**

Ki: "This morning it's painful but not as painful as[as last night]"

Dr. Kassirer: "Is it alright if I put you down for ?"

Ki: "Oh, um. I'm afraid, I'm afraid I can't get up [to get water since I'm so thirsty]"

Dr. Kassirer: "It's fine."

Ki: "Yeah, I can't do it." [I try to lie down but I couldn't get up without severe pain in both my stomach and lower back].

Ki: "Yeah, I was also told that at first **it was laparoscopy and then afterwards, it became open, so what happened?"**

Dr. Kassirer: "So, they went in with the camera? Yeah. Just sort of take a look and see what they can do, and they spend a lot of time laparoscopically trying their best to avoid opening, but at some point, it was everything was too, you know, stuck together."

Ki: "Oh, really?"

Dr. Kassirer: "Yeah, from the appendix. So they made an incision right there."

Ki: "Oh, wow. So it was vertical."

Dr. Kassirer: "Yeah, so you see the paper bandage?"

Ki: "I didn't look at it, yeah, because"

Dr. Kassirer: "Yeah, that's fair. Yeah, so they went in and they were able to open it up and take what was left of the appendix."

Ki: "Okay."

Dr. Kassirer: "and move it, put everything back together, so."

Ki: So, it was just the appendix that was the problem. Everything else was intact, right?"

Dr. Kassirer: "Yeah"

Ki: "Oh, good."

Dr. Kassirer: "Yeah, exactly. I know you were concerned about that before. Yeah, it went well, though.."

Ki: "Oh, good, yeah.
Dr. Kassirer: "As long as you slowly progress and I feeling better because you good signs, which is, you know, just asking those questions or"

Ki: "So yeah. Okay, um, yeah, so, so, Winkler - I keep thinking, name is Wilkins. Okay, Winkler. He's going to be coming today?"

Dr. Kassirer: "I can ask him he may. I'll ask him.

I don't want to say ask him.

Ki: "I'm hoping to be discharged."

Dr. Kassirer: "Yeah, of course. So hopefully, I'll let him know, and then he'll let me know."

Ki: "Okay."

Dr. Kassirer: "I'll ask him if he wants to"

Ki: "Yeah, I'll try to do a bowel movement if I can umm because they said I had to have bowel movement in order [to be discharged], you know.

Dr. Kassirer: "Yeah, exactly."

Ki: "So I'm hoping"

Dr. Kassirer: "So hopefully to progress your diet. Do you have any questions for him that I can ask?"

Ki: "No, I'll just ask him, you know, when he comes, I hope he comes."

Dr. Kassirer: "Okay. Sounds good."

Ki: "Yeah. Okay, thank you so much."

Dr. Kassirer: "You're welcome. You're welcome."

# EXHIBIT AG

Outside CT report (abdomen/pelvis), August 8, 2025, provided to Valley's emergency department at presentation

Dkt. 4-2, Ex. S (Declaration ¶ 15)

**Significance:** Before Appellant arrived at Valley, an outside CT found a "punctate appendicolith" and suspected acute appendicitis. Valley nonetheless characterized her condition as "chronic," canceled emergency imaging, and delayed her appendectomy four days, by which time her appendix had perforated.

CP ADVANCED IMAGING

155 Canal Street
New York, NY 10013
Tel: (212) 431-9010 • Fax: (212) 219-9291

**Patient:** CHAN, KI SAU
**DOB:** [redacted] F/56
**MRN:** [redacted] **Accession#:** 1848704

**Referring Physician:** SANDY NG M.D.
17 ELIZABETH STREET, SUITE 608
NEW YORK NY 10013

**Date of Exam:** 8/08/2025

**PROCEDURE:** CT ABDOMEN AND PELVIS WITHOUT CONTRAST

**COMPARISON:** MR, LUMBAR SPINE W/O CONTRAST, 8/05/2025.

**INDICATIONS:** Lower abdominal pain, diarrhea.

**TECHNIQUE:** Axial 3 mm CT images of the abdomen and pelvis were obtained without intravenous contrast. Oral contrast was not administered (patient declined intake of oral contrast). Coronal and sagittal reformatted images were generated. Dose reduction techniques: automated exposure control, adjustment of the mA and/or KV according to the patient size and use of iterative reconstruction technique.
CT Radiation DLP: 164 mGy.cm

**FINDINGS:**
No pleural effusions at the lung bases.

No radiopaque gallstones or sludge visualized. No pericholecystic fluid.

Evaluation of vessels, bowel, and organs is limited without intravenous contrast. The liver, spleen, pancreas, and adrenal glands are unremarkable.

No ureteral stones on either side. Kidneys enhance symmetrically without hydronephrosis. Urinary bladder is unremarkable.

Stomach is not abnormally dilated. No bowel obstruction or ileus. Arising from the cecum, there appears to be a tubular structure which may represent the appendix. This measures up to 9 mm, for example as seen on series 2 image 96 and contains a punctate appendicolith. There is mild surrounding inflammatory stranding/edema as well. These findings are suspicious but not definitive for acute appendicitis. Along the posterior aspect of the pelvis, there appears to be a low-attenuation area measuring 22 x 50 x 32 mm as seen on series 2 image 102. This may represent a uterine fibroid. However, overall evaluation is limited due to a lack of IV and enteric contrast.

No free intraperitoneal air or ascites. Abdominal aorta normal in caliber. No mesenteric or retroperitoneal lymphadenopathy.

There is no pelvic sidewall or inguinal lymphadenopathy.

No aggressive appearing sclerotic or lytic osseous lesions.

CONTINUED ON NEXT PAGE...

**Continued Report - Page 2 of 2**

**Patient:** **CHAN, KI SAU**
**DOB:** [redacted] **F/56**
**MRN:** **Accession#:** **1848704**

**Referring Physician:** **SANDY NG M.D.**
**17 ELIZABETH STREET, SUITE 608**
**NEW YORK NY 10013**

---

**Date of Exam: 8/08/2025**

**CONCLUSION:**

1. Findings suspicious but not definitive for acute appendicitis. Evaluation is limited without IV or enteric contrast.
2. Low-attenuation area along posterior aspect of the uterus may represent a fibroid.

Findings were discussed by phone with Dr. Sandy Ng on 8/8/2025, 1:20 p.m.

Findings faxed to the referring physician on 8/8/2025.

Dictated and Approved by: Patrick Shin, M.D. on 8/08/2025

# EXHIBIT AH

Outside gastroenterology referral for surgical evaluation of acute appendicitis, August 8, 2025

Dkt. 4-2, Ex. T (Declaration ¶ 15)

**Significance:** Appellant's gastroenterologist expressly referred her for surgical evaluation of acute appendicitis. Appellant gave this referral to Valley's emergency department at presentation.

# Downtown Gastroenterology Associates, P.C.

**Danny Chu, M.D. Mark Chu, D.O. Wallace Wang, M.D. Sandy Ng, M.D**

**Gastroenterology • Hepatology Liver Disease**

- 17 Elizabeth Street, Suite 608, New York, NY 10013 Tel: (212) 219-8031 Fax: (212) 219-3903
- 5610 7th Avenue, Brooklyn, NY 11220 Tel: (718) 567-7888 Fax: (212) 219-3903
- 136-20 Maple Avenue, Suite 801, Flushing, NY 11355 Tel: (718) 316-6873 Fax: (212) 219-3903

**Date:** 8/8/2025 4:04 PM

**Provider:** Sandy Ng, MD

**Patient Name:** Ki Sau Chan

**DOB (age):** [redacted]

To Whom It May Concern:

I am referring Ki Sau Chan to surgery for evaluation and management of acute appendicitis. After the visit, please fax your consult note to my office at 212-219-3903. Thank you!

Sincerely,

Sandy Ng, MD
Electronically signed on 8/8/2025 4:05:24 PM by Sandy Ng, MD

**CC:**

# EXHIBIT AI

Transcript of Appellant's August 9, 2025 (afternoon) audio recording with emergency physician Defendant Dr. Juxhesta Cakrani, Valley Hospital

Recording listed at Dkt. 81, Ex. 19, at 127 (Declaration ¶ 15)

**Significance:** In the afternoon, Dr. Cakrani planned emergency imaging: an ultrasound and, if inconclusive, "the next step would be an MRI of the pelvis." Mr. Yau was present.

**EXHIBIT V-5-AX**

**AUDIO RECORDING/TRANSCRIPT COVER PAGE**
**ER Interaction with Dr. Juxhesta Cakrani, M.D.**
**Valley Hospital Emergency Department**
**August 9, 2025 (~2 PM Afternoon)**

**Location:** Valley Hospital, Emergency Department
**Audio recording Duration**: 7 minutes 28 seconds
**Format:** MP3 (converted from original for e-filing compatibility)
**Speakers:** Plaintiff Ki Sau Chan, Dr. Juxhesta Cakrani (ER physician), Johnny Yau (Plaintiff's life partner)

---

PROVENANCE & AUTHENTICATION

- Lawfully recorded by Plaintiff as a participant in the conversation (N.J.S.A. 2A:156A-4)
- Audio recorded contemporaneously by Plaintiff on personal mobile device
- Original, unaltered, accurate recording of conversation as it occurred
- Native file with metadata preserved and available for inspection
- Plaintiff has personal knowledge and can authenticate if called to testify
- Plaintiff Life Partner, Johnny Yau, was present and can independently verify accuracy

---

DESCRIPTION

This exhibit consists of an audio recording *(submitted separately as Exhibit V-5-B)* and verbatim transcript of Plaintiff's initial emergency department interaction with Dr. Juxhesta Cakrani on August 9, 2025 during Plaintiff's presentation for abdominal pain and suspected acute appendicitis.

At presentation, Plaintiff provided emergency department with:

- an outside CT report stating "punctate appendicolith" and suspected "acute appendicitis"; and
- a gastrointestinal physician referral expressly requesting surgical evaluation for "acute appendicitis."

During this interaction, Dr. Cakrani:

- conducted a physical examination;
- acknowledged Plaintiff's elevated white blood cell count and calprotectin levels;
- stated she would order an ultrasound of the pelvis; and
- stated that if the ultrasound was inconclusive, "the next step would be an MRI of the pelvis."

---

RELEVANCE

This recording documents Dr. Cakrani's **initial plan to perform emergency diagnostic imaging** (ultrasound and, if needed, MRI). This imaging plan was **later reversed** when Dr. Cakrani returned that evening to inform Plaintiff that imaging had been canceled and that on-call surgeon Dr. Winkler had **recharacterized Plaintiff's condition as "chronic appendicitis."** (*See Exhibits v-5-CX and V-5-D for* transcript and audio recording of Plaintiff's ~8pm evening interaction with Dr. Cakrani in the same ER room).

**The change in diagnostic approach**—from ordering imaging to canceling it—**despite objective findings from outside records stating "acute appendicitis" and "punctate appendicolith"** is relevant to whether nonclinical considerations such as **undisclosed flags influenced emergency care decisions.**

**Contents**


- Page 1: Cover page
- Pages 2-5: Verbatim transcript

**EXHIBIT V-5- AX**

**FULL Transcript - ER Dr. Cakrani - Valley Hospital ER - August 9, 2025 Sat ~2pm**

**Timestamp 00:00**
Dr. Cakrani: “How are you doing?”

Ki: “Not good.”

Dr. Cakrani: “I’m sorry to hear that. What's going on?”

Ki: “So your last name is K-R-E”

Dr. Cakrani: “Yes, Dr. Cakrani. I' C A K. R E N I. R A N.” [I wrote down her name in my notes in iphone]

Ki: “Okay.”

Dr. Cakrani: “Yes”.

Ki:”All right, so what's happened is that for the past eight weeks, I had stomach pain.. First, it was just food poisoning, or so we suspected.

Dr. Cakrani: “Mm hmm.”

Ki: ”But I was like, the first day vomiting and diarrhea, a lot of diarrhea. And it was nonstop.
But then the second day, the vomiting stopped, okay? But it just kept getting diarrhea. completely loaded and paper. **So I went to see a G.I doctor and she ordered some labs, so that was so we finally got the CT scan."**

Okay.

Ki: “Yesterday. **So she sent us to me and she said, go to the ER because it's a suspected, acute appendicitis.** Okay. So that's why we're here. But the thing is, is that I can't do contrast for CT, because I'm allergic to iodine.”

Mm.

And I'm also allergic to steroids, so we can't even make contra, you know. Contraindicated And I didn't do the barium intake either, the fluid.

You can't do that, you can't tolerate that?

**Ki: “Well, she told me that it [the barium sulfate] might cause rupture in the appendix.”**

Dr. Cakrani: “Okay.”

Ki: “That’s why we didn't do that. So, in any case, so it's non contrast, and it's just suspected.”

Dr. Cakrani: “All right, so, that makes it a little bit harder.”

**01:32**
Ki: “**Yeah, so, what we're thinking is to do an ultrasound instead,** because you should be able to see whether it is an appendicitis.”

Dr. Cakrani: “**I mean, we can't but it again, it's not gold standard, but we can do that.** Uh, your pain has been constant for the last three weeks, hon?”

Ki: Yeah. Yeah, **kind of like, down here now, like, on the right side**, and on the left, but **mostly on the right,** so I don't know what that means, because it seemed like it was bilateral then it was like here, **isolated it here.** [I point at my lower right side] I'm not even sure what, you know, what is here."

Dr. Cakrani: "Gotcha. Okay. **Any history of fibroids?"**

Ki: "No."

No. Okay. No.

Dr. Cakrani: "**No vaginal bleeding? Are you still having nausea or vomiting?"**

Ki**: "**No, no, nausea, no vomiting. Just. I couldn't put food down for the longest time, so I lost about like 10 pounds now."

Dr. Cakrani: "For how long?"

Ki: "The past three weeks."

Dr. Cakrani: "Yeah."

Ki: "So I was like 120 now I'm 109 pounds today."

Dr. Cakrani: "No history of cancer?"

Ki: "No."

Dr. Cakrani: "No, have you had a colonoscopy recently, honey?"

Ki: "No, but I did take, like, some kind of stool for colon cancer test. Yeah, and that was negative."

Dr. Cakrani: "The [inaudible] B test?"

Ki: Yeah.. That was a stool, and that's negative.

Okay. Uhm all right. What is your allergy to contrast in your allergy to steroids? Is it anaphylaxis?

Ki: yes rash all over, edema. It's very painful.

Dr. Cakrani: "Yeah. I got cha. And this was done in New York?

Ki: "Yeah, New York."

Dr. Cakrani: "Do you live in this area?"

Ki: "We live in Harrison, which is just 20 minutes away from here.

Dr. Cakrani: "Gotcha. Okay, just making sure because sometimes, you know, people tend to go between, which is totally okay, but I like to ask to see where their care is done."

Ki: "No, we live in New Jersey, but by, you know, my mom's doctor. That's my mom's doctor.. "

Dr. Cakrani: “That’s your mom’s doctor? Yeah, that’s totally fair, yeah, you go to where you trust, I get it. No recent colonoscopies, you’ve never do one, correct?”

Ki: “No.”

Dr. Cakrani: "All right, who's your primary care doctor, honey?

Ki: “Dr. Billy Li, he's also around that area.”

Dr. Cakrani: In New York City?

Ki: “Yeah, in New York City.

Dr. Cakrani: “Okay. No fevers, no chills?

Ki: “No, we did she did run some, you know, blood work and here's some of that. Calprotectin is really high.”

Dr. Cakrani: “Yeah. Okay, that was the latest with the stool. And it shows, like, albumen is low with AST and ALT are kind of high. But White Blood Cells are off the charts.”

Dr. Cakrani: “Off the charts. Ok, they look okay today.”

Ki: “This one is just my summary of what's going on. Okay for you guys, in case you need it.
It has my PCP and GI doctor listed.”

Dr. Cakrani: “yeah, I'll take that as well. I'll bring you back.”

Ki: “okay great, yeah, you can make copies.”

Dr. Cakrani: “Can I press on your belly, honey?

Yeah, you can.

Dr. Cakrani: “I’m gonna make you lay flat. What makes this paint better or worse? Movement?
Does that make you a lot worse?

Ki: “Yes, yeah, I can't. I barely walk. And then my dog also, like, jumped on my stomach.”

Dr. Cakrani: “And I can't imagine a stomach that’d hurt so much. Okay.”

Ki: “And he did that, like the day after“

Dr. Cakrani: “Are you allergic to any pain meds? Are you, like, allergic to dilaudid or morphine?

Ki: “No, steroids.”

Dr. Cakrani: “Just steroids.”

Ki: “Yeah, yeah. Ouch. It hurts there.” [Dr. Cakrani was still pressing on my stomach]

Ki: “Yeah, ah!”

Dr. Cakrani: “Yeah. Okay. Done. Sorry.”

Ki: “Steroids, nickel and iodine contrast. That's it, just three things.”

**5:22**
Dr. Cakrani: “So we have a couple labs cooking. **I'm gonna add the ultrasound of the pelvis**, and I'm gonna get you something for pain. Sounds like a good plan?”

Ki: “Yeah.”

Dr. Cakrani: “All righty. And then we'll come chat when things come back, okay?”

Ki: “Okay.”

**05:32 - 05:55**
Dr. Cakrani: “**If the ultrasound is negative, because again, it's not the gold standard, unfortunately, for folks who are adults and not children, the next step would be an MRI of the pelvis. Okay?**

Ki: “Okay.”

Dr. Cakrani: “**Just want to update your on that. Obviously, if the ultrasound is like, yep, grade one appendicitis, different story, we'll call it a surgeon, but if it’s inconclusive, we’ll do the MRI. Okay?”**

**Ki: “**Okay.”

Dr. Cakrani: “All righty. I'm gonna put that in.”

Ki: “Can I have some water?”

Dr. Cakrani: **“No water for right now. We can do some swabs to keep your mouth moist.” [I never received any ice swabs, despite Dr. Cakrani’s promise]**

**Ki: “**Yeah.”

Dr. Cakrani: “Okay? We'll do some IV fluids as well. Okay?”

Ki: “Okay.”

Johnny: “Thank you.”

Dr. Cakrani: “Absolutely”

# EXHIBIT AJ

Transcript of Appellant's August 9, 2025 (evening) audio recording with Defendant Dr. Juxhesta Cakrani, Valley Hospital

Recording listed at Dkt. 81, Ex. 19, at 127 (Declaration ¶ 15)

**Significance:** That evening, after speaking with Defendant Dr. Carl Winkler, Dr. Cakrani reversed course: "he didn't recommend an ultrasound at this point," and "No surgery as of right now." Emergency imaging was not performed. Pharmacist Sofie witnessed Appellant's sudden symptoms after an IV injection described as Dilaudid, which Appellant believes was actually haloperidol, given without her knowledge or consent.

# EXHIBIT V-5-Cx

**AUDIO RECORDING/TRANSCRIPT COVER PAGE**
**ER Interaction with Dr. Juxhesta Cakrani, M.D.**
**Valley Hospital Emergency Department**
**August 9, 2025 (~8 PM EVENING)**

**Location:** Valley Hospital, Emergency Department
**Audio recording Duration**: 9 minutes 17 seconds
**Format:** MP3 (converted from original for e-filing compatibility)
Speakers: Plaintiff Ki Sau Chan, Dr. Juxhesta Cakrani (ER physician), Sofie (Valley Pharmacist), Johnny Yau (Plaintiff’s life partner)

---

PROVENANCE & AUTHENTICATION

- Audio recorded contemporaneously by Plaintiff on personal mobile device
- Original, unaltered, accurate recording of conversation as it occurred
- Native file with metadata preserved and available for inspection
- Plaintiff has personal knowledge and can authenticate if called to testify
- Plaintiff Life Partner, Johnny Yau, was present and can independently verify accuracy

---

DESCRIPTION

This exhibit consists of an audio recording *(submitted separately as Exhibit V-5-D)* and verbatim transcript of Plaintiff’s interaction with Dr. Juxhesta Cakrani and Pharmacist Sofie, during Plaintiff’s emergency department presentation for abdominal pain and suspected acute appendicitis.

Earlier that afternoon, Dr. Cakrani informed Plaintiff that she would order emergency imaging, including ultrasound and MRI of the abdomen. This recording reflects Dr. Cakrani's return later that evening (approximately 8:00 p.m.) to inform Plaintiff that the previously discussed imaging had been canceled.

At presentation, Plaintiff provided Emergency Department staff with:

- an **outside CT report** stating **"punctate appendicolith"** and suspected **"acute appendicitis";** and
- a gastrointestinal **physician referral** expressly requesting **surgical** evaluation for **"acute appendicitis."**

Immediately before this recording began, **a nurse administered IV medication to Plaintiff, stating it was “Dilaudid.”** Dr. Cakrani entered the room shortly after the nurse exited. During this interaction, Pharmacist Sofie entered to update medication history. Shortly thereafter, Plaintiff experienced sudden onset of trembling, dizziness, dry throat, and distress. Pharmacist Sofie observed these symptoms, expressed concern, and called for nursing assistance. These symptoms were inconsistent with Plaintiff's prior experiences with Dilaudid in previous surgeries.

---

RELEVANCE

This recording demonstrates:

- Dr. Cakrani informing Plaintiff that previously discussed **emergency imaging (ultrasound and MRI) had been canceled;**
- Dr. Cakrani stating that on-call surgeon Dr. Carl Winkler **recharacterized Plaintiff's condition as "chronic appendicitis"** despite outside imaging documenting acute findings;
- A change in emergency diagnostic decision-making inconsistent with objective findings in outside imaging and referral records;
- Plaintiff's **sudden onset of unexplained symptoms following IV medication administration, witnessed by Pharmacist Sofie;** and
- Context relevant to whether undisclosed flags influenced emergency care decisions.

---

Contents

• Page 1: Cover page
• Pages 2–7: Verbatim transcript

**FULL TRANSCRIPT - ER Dr. Cakrani - Valley Hospital ER - August 9, 2025 ~ 8pm**

[A female nurse had just exited the room after injecting medication into Plaintiff's IV, stating it was "Dilaudid." Dr. Cakrani entered shortly thereafter.]

**Timestamp 00:08**
Dr. Cakrani "And we talked about, like the inability to get a CT due to your allergy. He said, let's just treat it as appendicitis. So what his recommendations are obviously keeping you in the hospital, starting on IV antibiotics, and then he'll see ya, okay? **No surgery as of right now. We'll treat it with IV antibiotics for Dr. Winkler.**

Ki: "Okay."

**00:21**
Dr. Cakrani "**Because we don't have any confirmatory imaging right now, the ultrasound might not be the best guidance, but they'll talk about other imaging if need to be, but we'll treat it as such, okay?"**

**Ki: "Okay, so he's not going to do an ultrasound?"**

**00:31**
Dr. Cakrani "**No, he didn't recommend an ultrasound** at this point. He just said, "Let's treat it as appendicitis. We'll do the IV antibiotics. We'll keep you in the hospital, he'll come and see ya, and he'll kind of talk shop with ya.

Ki: Okay, um, **why is he not doing the ultrasound?**

**00:49**
Dr. Cakrani: Cause it's not the best modality.
K: Okay, **what about the MRI now?**

Dr. Cakrani **That's not going to get done here. So they'll talk about getting an MRI upstairs if they need it for confirmatory testing.** Um, I'll bring it up to like the hospitalist to see if they would want it, but nothing that I will need to do here, which is good, because we can just expedite your care and get you to a more comfortable bed, starting these antibiotics, and kind of take care of ya.

**1:09**
K: Okay, but **it's acute appendicitis, you're supposed to have surgery, right?**

**1:18**
Dr. Cakrani "So, this symptoms have been ongoing for three weeks. **He doesn't think it's acute appendicitis. He thinks like, yes, it's appendicitis, but it's probably ongoing for the last three weeks, especially if your symptoms have been consistent."**

Ki: "Okay. But how do you treat ongoing?"

**1:31**
Dr. Cakrani: "**Chronic appendicitis** is usually antibiotics, is what he told me over the phone."

Ki: "**cause my doctor said that I would need appendectomy."**

Dr. Cakrani “That was your GI doctor?

K: “Yeah.”

Dr. Cakrani “This is the surgeon, so this is kind of his specialty. He'll talk to you whether or not, like, he would want like a colonoscopy to be done before, because your symptoms have been ongoing for three weeks. But right now, he would just want antibiotics and they get you admitted to the hospital.”

**2:03**
Ki: “Okay. **Are they gonna run tests to like, you know, at least confirm whether it’s appendicitis or not.”**

Dr. Cakrani “So we have that, I'm going to leave that to the upstairs team, to be honest with you. I'm going to leave it to, like the hospitalist and the surgeon to kind of chat amongst themselves. Uh, But right now we got lab work, we have a lactate pending, your life, so your pancreas numbers look good, you don't have a white count here, uh, your lactase, so it's the profusion levels, your profusing of your gut well. So all of your labs your electrolytes look pretty okay. on this end, okay? You don't have a white count right now, which is reassuring. It's at 8 and some change. So that's gone down. Um, but again, let’s treated it as appendicitis. We'll do the IV antibiotics, we'll admit you in the hospital, get you more pain meds, make you comfortable, and have the surgeon kind of talk shop with you about what the next steps would be. Okay.
Okay?

Ki: “Okay.”

Dr. Cakrani “All right. Sounds like a good plan?

Ki: “Yeah.

Dr. Cakrani “Okay. Any other I know, it's not an ideal plan, but at least we have a plan, and we can just get you a minute, get you feeling a little bit better.

Ki: “Yeah. So what about the uterine fibroids or whatever that is?”

Dr. Cakrani “That’s an OB question. That's nothing to do inpatient. You'll have to follow up with outpatient for an ultrasound with that.

Okay.

Dr. Cakrani “Okay, that's more of a pelvic ultrasound with the transvaginal ultrasound from what I've seen in the past that they do. But it's nothing inpatient.

Ki: **“Alright It's it possible for them to do the CT scan, and just, you know, give me some kind of allergy medication?**

Dr. Cakrani: "You’re allergic to steroids and the prep is steroids.”

Ki: “It has to be steroids?”

Dr. Cakrani “Yes. It's either are you allergic to solumedrone?”

Ki: “I don't know what that is.”

Dr. Cakrani “That’s a steroid, and then hydrocortisone is also a steroid.

Ki: “Okay. I'm allergic to prednisone.

Dr. Cakrani.: “Uh huh.”

Ki: “Um, triamcinolone”

Dr. Cakrani “uh hm.”

**4:01**
[A knock is heard at the door]

Dr. Cakrani “come on in”

[A woman who later identified herself as “Sofie”, a pharmacist, walks in]

K: “And dexamethasone."
Dr. Cakrani “Dexamethasone? Come on in.. So those are both steroids, which are solumedrone is kind of the same family, and so is hydrocortisone, I believe. Correct?”

Ki: “I can” [Dr. Cakrani cuts me off]

Dr. Cakrani: “She's allergic to steroids. she's allergic to dexamethasone.

Ki: “I can use topical cream hydrocortisone over the counter. I’m fine with that and also topical triamcinolone, I can do over the counter, it’s just when they inject it into me.”

Dr. Cakrani “Right, and this is injectable. Yeah, it's not it's not topical, unfortunately.”

**Pharmacist Sofie:** “What happens **my name is Sofie, I’m a pharmacist here.**
I just wanted to update medication history. What happens with the steroid? What type of a reaction do you get from the injectable?”

Ki: “Rash or over essentially your eye and my, and then ozema and her ankle broke very painful..

Dr. Cakrani "So a real a real allergy, yeah, for sure. So that's why we can't really prep you or get, you know, but we're going to treat it as appendicitis, for sure.

Dr. Cakrani “We’ll do the IV antibiotics, see how you feel. Okay? Okay. So I give you a plan? Did you get your pain meds yet?”

Ki: “**Yeah, she put some Dilaudid. That’s why I’m all dizzy. And some anti nausea medicaiton. My mouth is very, very. Very dry?**

Dr. Cakrani: “Did she get you the swab? No, not yet. Okay.”

[PA system calls for Dr. Cakrani]

Dr. Cakrani: “Okay. That’s me. All right, honey, I'll get the ball rolling, okay?”

Johnny: “Thank you.”

Sofie: “Yeah. I'm sorry, I know it's difficult. We just wanted to update medication. Is there any prescription medicine you take at home on a regular basis?

Look at something.

Ki: “Synthroid 50 MCG.”

Sofie: “50, 50?”

Ki: “yeah. MCG.”

Sofie: “MCG? Do you know what days, are those always the same days like Monday?

Ki:”yeah, Monday, Wednesday, Friday.”

Sofie, “Monday, Wednesday, that’s what we had from before. Perfect. Monday, Wednesday.”

**05:54**
Ki: “**Ok, I’m feeling kind of anxious right now.”**

**[At this point, I began experiencing sudden trembling, severe dizziness, and dry throat. Pharmacist Sofie appeared concerned and offered to call the nurse. These symptoms were unlike my prior experiences with Dilaudid in previous surgeries.]**

Sofie: “That’s what we had from before history.

Ki: **“Like my throat is really dry.”**

Sofie: “**Do you want me to call the nurse back?**

Ki: “Yeah.”

Sofie: “Okay, but it's Synthroid, the levothyroxin, that's the only medication you take at home? Prescription wise?”

Ki: “And for my spine, I do Licart patches.”

Sofie: “Lidocaine patch?”

Ki: “And tizanidine or something like that.”

Sofie: “You’re not on any scopolamine or something like that?”

**6:33**
Ki: “I am, yeah. For dizzy spells. **I don’t have it right now but I want it. I feel really dizzy right now.”**

Sofie: “Also that dries out your mouth as well.”

Ki: “**Oh wow, oh my goodness, I’m very dizzy. Oh my god.”**

Sofie: **“Let me just get the nurse first.”**

Ki: “Yeah.”

Sofie: “See if the nurse.”

Ki: “Johnny can you push this up? I need”

Sofie: **“Let me just get the nurse.”**

[Johnny pushes the hospital bed up]

Johnny: “Is that good?”

Ki: “Yeah.”

Johnny: “Yeah.”

Sofie: “**We're going to send the nurse in.**”

**7:26**
Ki: “Yeah, **I'm like all shaky.**”

Sofie: **“Did they just give you something?”**

Ki: “**They gave me dilaudid. Point five?”**

Sofie: “That's a low dose, but if you've never had it and”

Ki: **“I've had it in the past, but way in the past. I don’t remember feeling like this. I’m feeling really sick.”**

Sofie: **“Okay. The nurse will be coming in. Okay.”**

Ki: “Okay.”

**09:17**
Sofie: “**Just close your eyes and try to, you know, keep steady instead of interrupting, everyone bothering you. Just if you lay motionless for a couple of minutes, um, she can bring you in some ice chips or something.”**

Ki: “Yeah, that’ll be good.”

Sofie: “Yeah”

Ki: “**My throat’s really dry.”**

Johnny: “**Let me get more blankets.” [I was shivering nonstop]**

Ki: “**That smells like ice chips. Did she put the IV in?”**

Sofie: "This is just the normal saline. This is just this bag of saline that's dripping in now. Whether they gave you something for pain, they would have been put it into the IV like that would have already infused. Like, she would have done it here. So this is nothing in it except saying saline, salt water.”

Ki: “That would help with the hydration?”

Sofie: “Yes, absolutely. So they could hydrate you. This is what the purpose of this one is the hydrate you.”

**08:34**
**Ki: “Oh my God. What is happening?”** [I was getting so dizzy]

**08:42**
Sofie: “**So this is something new for you, the shakiness and wonder if it's the dilaudid or what’s causing it?”**

Ki: “yeah”

Sofie: “If no one comes shortly, just go back to the desk”

Johnny: “Okay”

Sofie: “Because right now, they were in the patient's room, so she has the on the. But don't be hesitate to go back and ask someone to come in.”

Ki: “Yeah”

Johnny: “Okay. Thank you.”

Ki: “Thank you.”

Johnny: “Are you alright?”

# EXHIBIT AK

Emails of Danielle Bruno, HSS Office of the President, June 9 – July 12, 2021 (including Appellant's unanswered July 12, 2021 follow-up), and HSS billing record showing $2,000.00 "Administrative Write Off" of Appellant's private-room charge

Dkt. 92 at 16–21, 40 (Yau Affidavit Exs. B, F)

**Significance:** Defendant HSS apologized in writing for Appellant's treatment by its nurses: "Again, I am so so sorry that you had such a terrible experience," and reported that the charge nurse "has been working with her staff to ensure this does not happen again or in the future." HSS refunded her private room in full. Appellant's July 12, 2021 follow-up went unanswered; the next day's date, July 13, 2021, appears on the PCA behavioral contract.

Gmail

# Re: [EXTERNAL] Private Room Refund

1 message

**Ki Chan** <kchan.hlp@gmail.com> Mon, Jul 12, 2021 at 8:09 AM
To: "Bruno, Danielle" <brunod@hss.edu>

Hi Danielle,

Thank you. How long will it take for Patient Experience to contact me because my ankle has been in severe pain since Jan 2021? I just want to be able to walk, run and function normally again.

In the past, I had reached out to Ms. Janet Villa, the assistant director of Patient Experience but she had been primarily nonrespondent.

Also, pls make sure no other patient is mistreated at HSS. Being nonambulatory or disabled and in chronic pain makes a patient extremely vulnerable, particularly when we are dependent on others for activities of daily living and especially during a global pandemic.

Sincerely,

Ki Chan

On Fri, Jul 9, 2021 at 4:53 PM Bruno, Danielle <brunod@hss.edu> wrote:

> Hi Ki,
>
> Thank you for reaching out! I am so sorry to hear about all of this and moving forward I wish you the best and a healthy recovery. I wanted to let you know that I referred your concerns to the Office of Patient Experience who are currently going over everything and will be reaching out to you directly.
>
> I wish you the best and as always I am here if you need anything!
>
> All the best,
>
> Danielle
>
> DANIELLE BRUNO
>
> Patient Relationship Manager
>
> Ambassador Services
> Office of the President

**HSS | Hospital for Special Surgery**

535 East 70th Street, New York, NY 10021

TEL 212.774.2172 CELL 732.512.8813

**From:** Ki Chan <kchan.hlp@gmail.com>
**Sent:** Friday, July 9, 2021 4:05 PM
**To:** Bruno, Danielle <brunod@HSS.EDU>
**Subject:** Re: [EXTERNAL] Private Room Refund

P.S. my 6/3 surgery with Dr. Elliott was a revision of his prior surgery where he overcorrected my flat feet and misaligned my foot and tibia. Again he did not fix the ankle ligaments because he said he does not do ligament reconstruction. Hence why he referred me to Dr. Drakos.

Ki Chan

On Fri, Jul 9, 2021 at 2:33 PM Ki Chan <kchan.hlp@gmail.com> wrote:

> Hi Danielle,
>
> Thanks for asking. I did enjoy the July 4th weekend.
>
> I'm having a hard time writing this email because I so much want to give you good news since you've been so kind to me. In the past, I've recover relatively quickly from my surgeries. However, following my recent 6/3-6/4 adverse experience at HSS, I have continued to have recurrent nightmares about how I was mistreated by the nurses on the 11th floor so that has increased my panic attacks and negatively impacted my progress.
>
> **Also, I do not know if the following is part of your purview, but can you provide guidance as to what to do about the following incident and how to get my ankle sprains treated?**

**I do not believe it is standard of care and also because my HSS surgeon, Dr Andrew Elliott did not repair my torn deltoid ligaments at my 6/3 surgery, I am still suffering intense pain at ankle and unable to walk.**

I had a severe ankle sprain on 1/28/2021. In March 2021, my MRI showed high grade deltoid ligament tears. Dr. Elliott referred me to see a fellow HSS surgeon, Dr. Mark Drakos because Dr. Elliott said he does not do ligament reconstructions and Dr. Drakos does.

On 3/22/2021, I saw Dr. Drakos for an initial visit. He asked me to followup with him in 5 weeks if my ankle pain did not improve and he will then consider surgery. My significant other Johnny and I were going on vacation from 5/1-9 so I scheduled a new MRI for 5/10/2021. I then called Dr. Drakos' office on 4/28/2021 to schedule for 5 week followup since I figured it was reasonable to schedule ahead of time since when we return from trip it'd be past 5 week mark.

I spoke with Dr. Drakos' receptionist Sharon who scheduled me an appointment for mid-May. Then 15 minutes after, she calls me back to cancel the appointment and tells me Dr. Drakos said, and I quote her verbatim, "Dr. Drakos says to tell you he has no recommendations for you and for you to follow up with your current surgeon Dr. Elliott".

When I explained to her that Dr. Drakos was the one who asked me to follow up with him, she continues repeating the same phrase, "Dr. Drakos says to tell you he has no recommendations for you and for you to follow up with your current surgeon Dr. Elliott."

I then asked to speak directly with Dr. Drakos but she refused and continued repeating the same phrase.

When I requested that Dr. Drakos refer me to another surgeon who does ligament reconstruction, she repeated the same phrase.

I had reported this incident the same day to Janet Villa at Patient Experience and asked her to find out from Dr. Drakos what is happening. However, she has been unhelpful since I never received any update from Ms. Villa.

I have T-mobile phone records of the four phone calls made on 4/28 to Dr. Drakos and Ms. Villa

and Sharon to me.

Thus, I was a patient of Dr. Drakos and then he suddenly without cause, abandoned my care and he offered no reason and no referrals. I believe this is considered patient abandonment, yes?

As a result, I had no surgeon to repair my high grade tears in deltoid ligament and no one treated my severe ankle sprain and I continue to have debilitating pain in ankle.

Pls advise as to what to do. I am 6 weeks postop to foot surgery but still have severe debilitating pain in the ankle due to untreated high grade deltoid ligament tears.

Sincerely,

Ki Chan

On Jul 6, 2021, at 4:55 PM, Bruno, Danielle <brunod@HSS.EDU> wrote:

Hi Ki,

I hope you are doing well and enjoyed your holiday weekend! I did have a meeting with the floor manager, the charge nurse and patient experience to go over your incident report. I wanted them to be aware of the level of patient care you received. The charge nurse who runs the 11th floor was very upset to hear about this and has been working with her staff to ensure this does not happen again or in the future.

Thank you again for all your help!

All the best,

Danielle

DANIELLE BRUNO

Patient Relationship Manager

Ambassador Services
Office of the President

HSS | Hospital for Special Surgery

535 East 70th Street, New York, NY 10021

TEL 212.774.2172 CELL 732.512.8813

<image003.png>

**From:** Ki Chan <kchan.hlp@gmail.com>
**Sent:** Monday, July 5, 2021 7:54 PM
**To:** Bruno, Danielle <brunod@HSS.EDU>
**Subject:** [EXTERNAL] Re: Private Room Refund

CAUTION: External Email.

Hi Danielle,

What was the response of the nursing management to the incidents? Will there be any changes made to the protocol of patient care?

Sincerely,

Ki Chan

On Wed, Jun 9, 2021 at 3:07 PM Bruno, Danielle <brunod@hss.edu> wrote:

Hi Ki,

Thank you hopping on a phone call and explaining your experience on the 11 North unit to me. Again, I am so so sorry that you had such a terrible experience and as I stated I will be connecting with the floor manager to ensure your feedback is heard. As previously discussed, I reached out to the finance department and they will be providing you with a full refund for the duration of your stay. I know this doesn't make up for how you were treated during your time here but I hope I was able to help a little bit.

I appreciative your time and feedback! Please feel free to reach out should you need anything else in the future.

Have a great day,

Danielle

DANIELLE BRUNO

Patient Relationship Manager

Ambassador Services
Office of the President

**HSS** | Hospital for Special Surgery

535 East 70th Street, New York, NY 10021

TEL 212.774.2172 CELL 732.512.8813

<image002.png>

# Date Range

Showing 1 out of 1 accounts from 06/03/2021 to 06/03/2021 Newest first

JUN 3 2021

**Surgery at 11th Floor North Inpatient Unit**
Jun 3, 2021 to Jun 4, 2021
Hospital Services
Provider: Andrew Elliott
Patient: Ki Sau Chan
Primary insurance: Aetna (Commercial)
Account #[redacted]

✔ Paid off

| | |
|---|---|
| Billed | $57,112.00 |
| Insurance covered | -$55,112.00 |
| Discounted | -$2,000.00 |
| **Outstanding balance** | **$0.00** |

## Benefits Summary from Insurance

ⓘ Learn more

| | |
|---|---|
| Aetna (Commercial) | |
| Billed to Insurance | $57,112.00 |
| Insurance covered | -$55,112.00 |
| Remaining responsibility | $2,000.00 |
| Not covered | $2,000.00 |

Detailed Account Information

| | |
|---|---|
| Laboratory | $1,219.00 |
| Operating Room | $25,222.00 |
| Patient Convenience Items | $2,000.00 |
| Pharmacy | $783.00 |
| Physical Therapy | $300.00 |
| Recovery Room | $8,794.00 |
| Supplies & Devices | $18,794.00 |
| Payments and Adjustments | |
| Aetna (Commercial) | -$55,112.00 |
| Administrative Write Off - Jun 14, 2021 | -$2,000.00 |